## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

BERNELL JULUKE,

        Plaintiff,

    v.

LEN DAVIS, an individual and former
New Orleans Police Department officer;
SAMUEL WILLIAMS, an individual and
former New Orleans Police Department
officer; WAYNE TAMBORELLA, an individual
and former New Orleans Police Department
officer; DWIGHT DEAL, an individual and
former New Orleans Police Department
officer; ANTHONY SMALL, an individual and
former New Orleans Police Department
officer; ROSS J.J. MOCKLIN, an individual and
former New Orleans Police Department
officer; KENNETH HARRIS, an individual and
former New Orleans Police Department
officer; and CITY OF NEW ORLEANS,
LOUISIANA, a municipal corporation; and
HARRY F. CONNICK, SR., in his official
capacity as Orleans Parish District Attorney,

        Defendants.

CASE NO.:

**JURY TRIAL DEMANDED**

---

## COMPLAINT

Plaintiff Bernell Juluke, by and through his counsel, Ben Crump Law PLLC, Hart
McLaughlin & Eldridge, LLC, and Unglesby & Crompton, LLC, states as follows for his
Complaint against Defendants Len Davis, a former police officer with the New Orleans Police
Department ("NOPD"); Samuel ("Sammie") Williams, a former police officer with the NOPD;
Wayne Tamborella, a former police officer with the NOPD; Dwight Deal, a former police officer

with the NOPD; Anthony Small, a former police officer with the NOPD; Ross J.J. Mocklin, a former police officer with the NOPD; Kenneth Harris, a former police officer with the NOPD; the City of New Orleans, Louisiana, a municipal corporation ("the City"), and Harry F. Connick, Sr., in his official capacity as Orleans Parish District Attorney at the relevant time (collectively, "Defendants"):

## OVERVIEW OF THE ACTION

1.      Nearly 30 years ago, then 18-year-old Plaintiff Bernell Juluke was wrongfully arrested, convicted, and sentenced to life in prison for a murder he did not commit. He was arrested and convicted alongside two other innocent teenagers, then 17-year-old Kunta Gable and 17-year-old Leroy (Sidney) Nelson.

2.      Mr. Juluke spent over 28 years imprisoned as a result, as did his co-defendants. He was released on October 19, 2022, when the Orleans Parish District Attorney's Office ("OPDA") moved to vacate his conviction along with his co-defendants', calling it a "miscarriage of justice."

3.      That miscarriage of justice was initiated by notorious former NOPD officers Len Davis and Sammie Williams. They framed Mr. Juluke for the murder.

4.      Specifically, Officers Davis and Williams arrived at the scene of the murder within seconds of its commission and immediately identified Bernell Juluke as the perpetrator despite having no basis to do so. Within 15 minutes Mr. Juluke was stopped in a vehicle with Gable and Nelson over five miles away, unarmed. Despite their innocence, Davis' and Williams' false implication was enough to result in their arrest.

5.      The subsequent conviction of Officer Davis for murder and drug conspiracy, for which he now sits on death row, would demonstrate that this was not the only time Officers Davis and Williams acted this way. Indeed, their modus operandi involved intentionally misdirecting

criminal investigations to benefit themselves or their drug-dealing accomplices. This is precisely what they did when they falsely identified Bernell Juluke as the murder suspect here.

6.    While Davis' and Williams' lie set in motion Mr. Juluke's arrest and conviction, they did not act alone. Other NOPD officers furthered their lie by failing to quash it and, worse, by facilitating a rigged lineup for a false and coerced identification of Mr. Juluke and his co-defendants by the lone surviving witness to the murder.

7.    Further compounding the misconduct at issue, the NOPD and OPDA withheld material exculpatory evidence to obtain Mr. Juluke's conviction, including the original incident report authored by former officers Davis and Williams, crucial police logs, and key witness statements.

8.    The misconduct of the Defendant officers did not occur in a vacuum. In the early to mid-1990s, the NOPD failed to supervise or discipline officers perpetrating such misconduct, which allowed it to thrive and become commonplace. Moreover, the NOPD failed to train officers in essential investigative tactics, including in constitutionally procuring identification of suspects as well as on evidentiary disclosure obligations under *Brady v. Maryland*.

9.    By the same token, the OPDA had a pattern and practice of withholding material exculpatory evidence to obtain convictions as they did here. As such, the institutional failures of both the NOPD and OPDA caused Mr. Juluke's arrest and conviction as well as the individual officers.

10.    Now 47 years old, Mr. Juluke has never once wavered in his declaration of innocence. He seeks justice from those who violated his constitutional rights and stole much of his life.

## JURISDICTION AND VENUE

11.     The Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1331 in that claims in this action arise under the United States Constitution.

12.     To the extent that some of Plaintiff's claims arise under Louisiana state law, the Court has supplemental subject matter jurisdiction over those claims under 28 U.S.C. § 1367(a).

13.     The Court has personal jurisdiction over Defendants because at least some reside in the State of Louisiana and because their conduct described herein occurred exclusively in Louisiana.

14.     Venue is proper in this Court because Plaintiff Bernell Juluke's injuries and damage occurred in the Eastern District of Louisiana, most Defendants reside and conduct business in the Eastern District of Louisiana, and virtually all the occurrences described herein occurred in the Eastern District of Louisiana.

## THE PARTIES

15.     Plaintiff Bernell Juluke is a resident of the State of Louisiana and resides in New Orleans. He was wrongfully arrested and tried for the murder of Rondell Santinac in Orleans Parish, convicted, and incarcerated for over 28 years until his release from prison on October 19, 2022.

16.     Defendant City of New Orleans is a political subdivision of the State of Louisiana and a municipal corporation, which at all relevant times was the employer of the individual defendants. The City of New Orleans is and was, at all times relevant to this Complaint, responsible for the policies, practices, patterns, and customs of the NOPD and OPDA.

17.     Defendant Len Davis was an officer with the NOPD whose misconduct resulted in Plaintiff's wrongful arrest, conviction, and imprisonment. He is currently incarcerated on death row in federal prison at USP Terre Haute, Indiana, for murder and other offenses.

18.     Defendant Samuel Williams was an officer with the NOPD whose misconduct resulted in Plaintiff's wrongful arrest, conviction, and imprisonment. On information and belief, Mr. Williams resides in the State of Texas.

19.     Defendant Wayne Tamborella was an officer with the NOPD whose misconduct resulted in Plaintiff's wrongful arrest, conviction, and imprisonment. On information and belief, Mr. Tamborella resides in the State of Louisiana.

20.     Defendant Dwight Deal was an officer with the NOPD whose misconduct resulted in Plaintiff's wrongful arrest, conviction, and imprisonment. On information and belief, Mr. Deal resides in the State of Louisiana.

21.     Defendant Anthony Small was an officer with the NOPD whose misconduct resulted in Plaintiff's wrongful arrest, conviction, and imprisonment. On information and belief, Mr. Small resides in the State of Louisiana.

22.     Defendant Ross J.J. Mocklin was an officer with the NOPD whose misconduct resulted in Plaintiff's wrongful arrest, conviction, and imprisonment. On information and belief, Mr. Mocklin resides in the State of Louisiana.

23.     Defendant Kenneth Harris was an officer with the NOPD whose misconduct resulted in Plaintiff's wrongful arrest, conviction, and imprisonment. On information and belief, Mr. Harris resides in the State of Louisiana.

24.     Defendant Harry F. Connick, Sr. was the Orleans Parish District Attorney at the relevant time. He is sued in his official capacity in relation to the policies, patterns, practices, and/or customs of the OPDA causing Plaintiff's injury.

## FACTS APPLICABLE TO ALL COUNTS

I.     **Officers Len Davis and Sammie Williams frame Bernell Juluke for the murder of Rondell Santinac.**

25.     On August 22, 1994, at approximately 9:22 p.m., 20-year-old Rondell Santinac was shot and killed in the passenger seat of a vehicle driven by 20-year-old Samuel Raiford. The vehicle was exiting a driveway on Humanity Street at Desire Parkway, in the Desire housing project, as shots were fired at it. Mr. Raiford escaped unharmed.

26.     As the sole living eyewitness, Mr. Raiford would become central to the investigation. He is a self-described slow learner, with a borderline IQ, and a long, violent criminal history. He was involved in drug dealing and other criminal activity which made him a target of violence.

27.     After exiting the vehicle, Mr. Raiford ran to his girlfriend's mother's home at 3219 Desire Parkway and then to the home of his neighbor, Lizzie Graham, at 3607 Benefit Street. Ms. Graham called 911 at Raiford's request and then handed Raiford the phone. He described a single perpetrator to the 911 operator—specifically, an unknown black male, wearing unknown color clothing, in a blue Chevy Beretta that fled on Benefit toward the interstate. This is the entirety of the information Mr. Raiford provided immediately after the shooting.

28.     Within two minutes of the shooting, by approximately 9:24 p.m., NOPD officers Len Davis and Samuel "Sammie" Williams arrived. They were the first officers to arrive—arriving even before the officers who were dispatched to the scene by 911. Mr. Raiford was not on scene when Officers Davis and Williams arrived.

29.     Despite not yet having spoken with Mr. Raiford, the lone living eyewitness, and despite Mr. Raiford having been unable to identify the perpetrator, Officer Len Davis immediately called-in a perpetrator of astonishing and unique detail: "perps Pernell Maze bunch of golds in his mouth."

30.     Officer Davis intended to frame Bernell Juluke. "Pernell Maze" is a misspelling of "Bernell Mays," which is the name Officer Davis called in. Officer Davis was familiar with Bernell Juluke's older half-brother, Warren Mays, who was a known drug dealer in New Orleans. Bernell Juluke sometimes went by the name of "Bernell Mays."

31.     Accordingly, in identifying Mr. Juluke, Officer Davis intentionally framed Juluke for murder. Officer Williams endorsed and participated in that plan.

32.     Documentary evidence additionally supports the fact that Officers Davis and Williams fabricated Mr. Juluke as the suspect. Officers Davis and Williams authored the original incident report for the Santinac murder. The report does not mention any discussion with Samuel Raiford regarding the identity of a perpetrator or even that the officers suspected a perpetrator. To the contrary, the report merely notes that Officers Davis and Williams held Mr. Raiford until homicide detectives arrived to interview him. More importantly, the incident report affirmatively states that the identity of any suspect was "unknown" to Officers Davis and Williams.

33.     Astonishingly, Officer Davis' and Williams' incident report containing the above-mentioned exculpatory information was never produced to Bernell Juluke or his counsel. Neither were police logs showing that it was Officer Davis and Williams who were the genesis of the suspect "Pernell Maze," not Samuel Raiford.

34.     Officer Davis' and Williams' mendacity had its intended effect. Within minutes, over five miles away from the scene of Rondell Santinac's murder, at North Prieur Street and

Bienville Street, NOPD Officer Tommie Felix pulled-over a two-door, grey Chevy Beretta, with 18-year-old Bernell Juluke driving, 17-year-old Kunta Gable in the front passenger seat, and 17-year-old Leroy (Sidney) Nelson in the back seat.

35.    Officer Felix stopped the vehicle after a radio description was broadcast by Davis and Williams describing the suspect vehicle as a "blu 4-dr chevy beretta" and then "veh-lt-blu-in-clr-chevy beretta." Mr. Juluke was in a grey, two-door Chevy Beretta, however.

36.    Mr. Juluke, Mr. Nelson, and Mr. Gable did not run from the car when pulled over.

37.    Other officers involved in the investigation of the Santinac murder arrived shortly thereafter. Mr. Juluke, Mr. Gable, and Mr. Nelson were searched by officers, as was their vehicle. The searches yielded no evidence of any crime, let alone involvement in an assault weapon drive-by shooting minutes earlier. Mr. Juluke, Mr. Nelson, and Mr. Gable had no weapons on their person or in the vehicle. There were no shell casings in the vehicle or on their persons. Subsequent forensic testing would show no gunshot residue or any other evidence that these three had fired a weapon or been involved in the murder. In short, there was no forensic evidence whatsoever connecting them to the murder occurring minutes earlier, miles away, in the Desire.

38.    In reviewing Mr. Juluke's case in 2022, the OPDA summarized the stop of Mr. Juluke and his co-defendants Gable and Nelson aptly: They "became suspects despite being stopped unarmed, miles away from the murder in a car that did not match the description given by the [lone] witness because then-NOPD officers Len Davis and Sammie Williams inserted themselves immediately into the homicide investigation and called in a purported suspect's name into dispatch[.]"

39.    Nonetheless, NOPD officers arrested Mr. Juluke, Mr. Gable, and Mr. Nelson for Rondell Santinac's murder and brought them to the Homicide Division of NOPD. They did so

without probable cause for arrest, given that the lone witness had identified the perpetrator as a single, unknown black male, in unknown clothing, in a blue Chevy Beretta.

40.     NOPD officers drove Mr. Raiford to the Homicide Division between 10:30 p.m. and 10:50 p.m. that evening, so that he could identify Mr. Juluke, Mr. Nelson, and Mr. Gable as the perpetrators of the shooting.

41.     Before Mr. Raiford had ever seen Juluke, Gable, or Nelson and before he had been presented with any lineup for identification purposes, on information and belief, police officers told Mr. Raiford that he was a suspect in the shooting, at least in part to frighten and coerce him into identifying the three teenagers. On information and belief, the NOPD officers involved in such coercion of Mr. Raiford included Defendant-Officers Len Davis and Sammie Williams, along with the lead investigator Detective Wayne Tamborella.

42.     Furthermore, before Mr. Raiford had ever seen Juluke, Gable, or Nelson and before he had been presented with any lineup for identification purposes, police told Mr. Raiford that they had recently arrested Mr. Juluke, Mr. Gable, and Mr. Nelson driving together within minutes of the crime. Police said or suggested that they were responsible for the shooting, again to ensure Mr. Raiford would identify them as the culprits. On information and belief, the NOPD officers involved in coercing Mr. Raiford in this fashion included the lead investigator Detective Wayne Tamborella as well as Detective Dwight Deal and Detective Anthony Small, who handled the identification procedure at the Homicide Division.

43.     Mr. Juluke, Mr. Nelson, and Mr. Gable were shown to Mr. Raiford shortly thereafter. NOPD officers brought the three teenagers together on the other side of mirrored glass, in a "lineup" comprised of *only* the three teenagers. According to police records, Mr. Raiford identified Mr. Gable and Mr. Nelson as the shooters and Mr. Juluke as the driver of the vehicle

from which they shot. However, there was no recording of the identification procedure, nor any contemporaneous notes taken by officers.

44.    As would be revealed at the trial of Mr. Juluke, Mr. Gable and Mr. Nelson, Samuel Raiford admitted that he *never* saw Bernell Juluke and only "identified" him because NOPD told him that Mr. Juluke had been arrested within minutes of the crime riding with Mr. Gable and Mr. Nelson. (Raiford would, on the other hand, maintain the lie at trial that he clearly saw both Gable and Nelson shoot Santinac, despite the fact that he had identified only a single unknown perpetrator to 911.) In short, the unconstitutionally suggestive lineup was designed to produce the false identification. Given the context for the identification, including NOPD officers' coercive and suggestive practices, NOPD falsified official reports when they documented that Raiford identified the three men as the perpetrators.

45.    Mr. Raiford would later testify that he had seen Mr. Juluke, Mr. Gable, and Mr. Nelson together earlier that evening in the Iberville housing project, arguing with another man. He would further testify that he generally knew of the three. This fact—that Raiford could recognize Mr. Juluke, Mr. Gable, and Mr. Nelson before the shooting—further demonstrates that he did not actually witness these three commit the crime. Under such circumstances, it makes no sense for Mr. Raiford to have merely described a single unknown perpetrator, in unknown clothing, in the moments after the shooting, if he in fact knew it was Juluke, Gable, and Nelson.

46.    Shortly after Mr. Raiford "identified" the three young men, Detective Ross J.J. Mocklin interviewed Raiford and Detective Kenneth Harris took a formal statement from him. On information and belief, Detective Mocklin and Detective Harris knew from the interview that Samuel Raiford did not witness Juluke, Gable, or Nelson commit the crime and only identified

them after coercion. Nonetheless, they documented Raiford's false statements in support of arresting and convicting the three innocent teenagers Juluke, Gable, and Nelson.

47.     Indeed, Mr. Raiford is a documented liar, albeit a coerced one here. His sworn testimony changed repeatedly from the night of the shooting through trial. This would have alerted any police officer or prosecutor that his story was coerced and/or false, to the extent that they did not already know.

a.  With respect to the perpetrator of the shooting, Raiford initially identified only a single unknown perpetrator in unknown clothing as discussed above. Thereafter, when he was presented with a lineup, he identified all three by name. Later, Raiford testified in a grand jury hearing that he "had no problem seeing" all three occupants of the vehicle and recognized their clothing. Yet later, at trial, Raiford conceded that he did not see Mr. Juluke at all.

b.  With respect to the color of the perpetrator's vehicle, Mr. Raiford's testimony was similarly incredible. He initially claimed that the vehicle was "blue," later "lime green," still later "wine candy green," then "turquoise green." Ultimately at trial, he admitted that he just did not see the color of the vehicle. (The vehicle in which Mr. Juluke was riding when arrested was grey.)

c.  With respect to the weapons the perpetrator(s) wielded, Mr. Raiford testified before the grand jury that he saw all three alleged occupants with weapons ("Looked like two of them had a 'K' and one had a 30/30."). Thereafter, including at trial, he would testify that only Mr. Gable and Mr. Nelson were shooting.

48.     Mr. Raiford's testimony was rife with additional lies and inconsistencies. His lack of knowledge and credibility would have been obvious to all officers involved, as well as the Assistant District Attorneys in the OPDA. As Officer Len Davis would later recall when interviewed from his cell on death row, "Danky was in the game." Danky was Samuel Raiford's nickname, and "in the game," according to the OPDA, referred to Raiford's involvement with "selling drugs and other illegal activities that might cause him to be a target" of violence. Raiford was precisely the kind of witness through which the NOPD and OPDA would manifest Len Davis' and Sammie Williams' framing.

49.     Indeed, NOPD investigation of Mr. Santinac's murder involved little else beyond the framing of Bernell Juluke and coerced identification of Juluke, Gable, and Nelson in a rigged lineup. All NOPD did was obtain a single search warrant to look for weapons at the home of an uninvolved person (Albertha Carter). They found nothing. NOPD's investigation ended there, and the matter was turned over to OPDA.

50.     On October 20, 1994, Mr. Juluke, Mr. Gable, and Mr. Nelson were indicted for the murder of Rondell Santinac.

**II.     Officers Len Davis' and Sammie Williams' framing of Bernell Juluke was consistent with their modus operandi.**

51.     NOPD officers Len Davis and Sammie Williams' misconduct here was consistent with their modus operandi at the same time and location as the Santinac murder. In particular, they misdirected criminal investigations as a matter of course and they were involved in murder and drug trafficking. For such behavior, Len Davis earned the nickname "the Desire Terrorist."

### A. Len Davis successfully ordered the murder of a young mother, Kim Groves.

52.    Officer Davis successfully ordered the murder of Kim Marie Groves, a young mother who had filed a complaint against him and Williams for excessive force. Officer Williams was also aware of and complicit in the murder.

53.    Specifically, on October 11, 1994, Ms. Groves witnessed Defendant Officers Len Davis and Sammie Williams strike 17-year-old Nathan Norwood with both their guns and fists and slam him into phone booth equipment.

54.    Upon witnessing this unprovoked and unjustified attack, Ms. Groves intervened and verbally confronted Officers Davis and Williams. In response, Davis and Williams threatened and verbally abused Ms. Groves before leaving the scene.

55.    The next day, Ms. Groves gave a statement to the NOPD Internal Affairs Division regarding what she saw.

56.    When Officer Davis learned that Ms. Groves had done so, he arranged her murder with the assistance of drug dealers and hitmen with whom he and Williams had close relationships, including Paul Hardy, Damon Causey, and Steve Jackson.

57.    Officer Davis then surveilled Ms. Groves and provided information to Hardy and the others to commit the murder, including Ms. Groves' description, the clothing she was wearing, and her precise location.

58.    As a result, on October 13, 1994, Kim Groves was shot and killed outside of her home by Paul Hardy, with the assistance of Damon Causey and Steve Jackson.

59.    Defendant Officer Sammie Williams had knowledge of the plan to murder Ms. Groves as well as the ability to intervene, but he chose not to do so.

60.    Upon being informed of Ms. Groves' murder, Len Davis let out a "happy shout" captured on a federal wiretap.

**B.  Len Davis and Sammie Williams traffic illicit drugs.**

61.    Additionally, Officers Davis and Williams worked with and provided protection to drug dealers in New Orleans in exchange for money.

62.    A now well-known FBI sting operation, entitled "Shattered Shield," ensnared Davis, Williams, and several other NOPD officers for perpetrating and participating in a web of corruption and criminality.

63.    As background, FBI Agent Juan Jackson served as an FBI undercover agent assigned to New Orleans to investigate corruption in the NOPD. Mr. Jackson used the persona of a major drug trafficker with ties to Miami and New York City who had come to New Orleans to set up an operation.

64.    Jackson first met Len Davis and Sammie Williams on April 21, 1994, when they escorted him to the Sheraton Hotel in uniform and armed. After Jackson told them he wanted to use New Orleans as a shipping point for cocaine, Officer Davis gave him a "mini drug smuggling course" on the best way to move cocaine in New Orleans. Undercover agent Jackson met again with Officers Davis and Williams on May 4, 1994, to set up a "hub."

65.    Officer Davis' role was to develop a protection scenario where he would guard shipments of cocaine in a warehouse at 420 Franklin Avenue in New Orleans, which was used to house drugs while they were transported in and out of New Orleans.

66.    And he did. Once a month from June through November 1994—overlapping with the Rondell Santinac murder and Bernell Juluke's framing here—NOPD officers recruited by Officer Davis guarded shipments of cocaine in and out of the warehouse.

67.     On October 14, 1994, undercover agent Jackson paid Officer Davis $16,000 for his protection work in the drug operation.

68.     All told, Officer Davis was paid $88,000 for his drug trafficking protection services.

### C. Len Davis is arrested, tried, and sentenced to death for Ms. Groves' murder and his drug crimes, largely on the testimony of Sammie Williams.

69.     Officers Len Davis and Sammie Williams were arrested for Kim Groves' murder and drug conspiracy charges. This occurred before even a motion had been heard in the prosecution of Mr. Juluke and his co-defendants. (Nonetheless, the jury in Mr. Juluke's, Gable's, and Nelson's trial would never hear about any of this. Officers Davis and Williams were never even called to the witness stand.)

70.     The original trial of Officer Davis and his drug-dealing associates occurred in the Spring of 1996 (shortly after Juluke and his co-defendants were convicted of murder). It ended in the convictions of Len Davis and others for Groves' murder as well as drug and conspiracy offenses.

71.     Officer Sammie Williams offered damning testimony at the sentencing phase of Officer Davis' trial, detailing exactly how he and Officer Davis would aid and abet Ninth Ward drug dealers in violence and murder. Officer Williams explained that they did this in a variety of ways, including by telling murderers and drug dealers when to commit their crimes and by covering-up evidence of the same. Davis would provide criminals with intel on when police officers would be in a particular area and intentionally divert officers from an area where his friends intended to commit crimes, including murders.

72.     For example, on September 30, 1994, Paul Hardy and his crew murdered a man in the Florida housing project. Sammie Williams was the first one on the scene and realized Hardy was the perpetrator. Officer Williams did not arrest him and instead alerted Len Davis. In turn,

15

Officer Davis called Hardy, admonished him to be more careful, wear a mask next time, and to inform him and Officer Williams via beeper when he was committing a crime so that Davis and Williams could be there to assist and/or divert or steer law enforcement activity.

73.    On October 19, 1994, Officers Davis and Williams came across a gunshot victim who muttered the name "Damon" before dying. Damon Causey was Paul Hardy's right-hand man. Rather than call for medical assistance for the victim, Davis called Damon Causey to ask whether he was the shooter. When Causey denied it, Davis nonetheless promised not to mention that the victim had uttered the name "Damon."

74.    On October 20, 1994, Hardy informed Davis and Williams that he would be murdering Hardy's rival, a man nicknamed "Puny." Davis and Williams communicated back and forth with Hardy to ensure law enforcement was not in the area when Hardy decided to strike and, further, informed Hardy when the best time to murder his rival would be.

75.    An FBI wiretap of Officer Davis in 1994 was played to the jury, wherein Officer Davis said that the NOPD "lost [him] a long fucking time ago," and he was "just there in uniform" but "sure not the police no more." Officer Davis said that he was "on this bitch strictly to get what I can get, use my job to benefit me." Encapsulating his attitude, Davis said "Fuck the, fuck the citizens."

76.    As such, Officers Davis and Williams' actions in this case are consistent with their modus operandi in others during the same time period in and around the Desire housing project. They had no scruples, nor any compunction about framing someone like Bernell Juluke, Kunta Gable, or Sidney Nelson for murder.

III.    **Officer Davis and Williams had a history of problematic behavior known to NOPD prior to their participation in the Santinac murder investigation.**

77.    Officer Davis had a long history of civilian complaints for abusive and improper behavior prior to being caught by the FBI. Davis was well known inside the NOPD for treating civilians in an abusive and brutal fashion. This was a reputation known to his fellow officers, his supervisors, the Internal Affairs Division of the NOPD, the superintendent of police under whom he was employed, and the then-titled Office of Municipal Investigation.

78.    Numerous civilian complaints were leveled against him with insufficient or no punishment from NOPD. Even when he was disciplined on a few occasions, as discussed below, it was done in a deficient and deliberately indifferent manner, permitting him to return to duty and to continue to operate as a murderous thug.

79.    For example, on April 15, 1992, it was found that Officer Davis, on an official call, engaged in a verbal argument with a woman through a window as he was arresting a man outside. Officer Davis reached-up with his metal flashlight and struck the woman in the head through the window, causing her wooziness and giving her a bleeding laceration to her forehead which required medical treatment. The NOPD determined that this constituted a violation of law, intimidation, and neglect of duty. While the NOPD suspended Officer Davis, it was for merely 51 days and they returned him fully to service to continue to operate unfettered. On information and belief, the NOPD did not require training, re-training, or counseling prior to returning Officer Davis to full duty.

80.    As another example, Officer Davis interfered with a homicide investigation and was found by NOPD to have been both untruthful and unprofessional in the process. Specifically, he violated the commands of a superior officer investigating a homicide by returning to the vehicle of the victim and taking documents from the vehicle. All that Officer Davis received was a 10-day

suspension—again he was returned to full duty to operate in the same manner as before, with disastrous results. On information and belief, the NOPD did not require training, re-training, or counseling prior to returning Officer Davis to full duty.

81.    Defendant Sammie Williams also had complaints against him for abuse of citizens' rights, yet the NOPD similarly permitted him to operate unfettered and took little or no action against him. Mr. Williams was known to assist and support the misconduct of Len Davis, by taking part in his misconduct or falsely reporting or failing to report same. Indeed, he admitted as much when he testified for leniency against Davis in the above-mentioned federal trial.

### IV.    Mr. Juluke and his co-defendants are tried, convicted of murder, and sentenced to life in prison without benefits.

82.    From February 26 to March 1, 1996, Mr. Juluke, Mr. Gable, and Mr. Nelson were tried for the murder of Rondell Santinac, together in a single trial in Orleans Parish.

83.    The evidence against them involved little more than the testimony of Samuel Raiford. The jury did not hear about Officer Davis or Williams or their rampant misconduct, nor were they ever called to the witness stand.

84.    Despite the flaws of Raiford's testimony, despite the fact that Mr. Juluke introduced seven alibi witnesses placing him elsewhere at the time of the murder (in and around the Iberville after having had a verbal confrontation with another teenager, Jacob Carter, who also testified in Juluke's defense as an alibi witness), and despite the fact that two other witnesses who claimed to see the murder testified that Juluke, Nelson, and Gable were not the perpetrators, the jury convicted Mr. Juluke and his co-defendants of second-degree murder after 10 hours of deliberation. They were sentenced to life in prison without benefits.

85.    Mr. Juluke was transferred to the Louisiana State Prison, a.k.a. "Angola," shortly thereafter, where he was incarcerated until his release on October 19, 2022.

86.     Mr. Juluke, along with his co-defendants Mr. Gable and Mr. Nelson, maintained their innocence throughout the entirety of their arrest, prosecution, and decades-long incarceration during which time they pursued appeals (one of them successful for Mr. Juluke but reversed thereafter by the Louisiana Supreme Court), federal habeas review, and post-conviction relief.

87.     It was not until the Civil Rights Division of the OPDA became involved that the possibility of their freedom became real.

**V.     The OPDA's newly formed Civil Rights Division evaluates Mr. Juluke's case, determines that his conviction was the result of misconduct, and develops evidence of the actual suspect(s) in the Santinac murder having nothing to do with Juluke or his co-defendants.**

88.     The Civil Rights Division ("CRD") of the Orleans Parish District Attorney's Office was established in January 2021.

89.     Part of the CRD's mission is reviewing cases of wrongful conviction, which are cases "where the defendant did not commit the crime; those caused by police or prosecutors violating the law or their ethical obligations; and those caused by the use of racially discriminatory policies, practices or laws."

90.     Upon the CRD's formation, Mr. Juluke immediately requested review of his case, as did his co-defendants Gable and Nelson.

91.     The CRD undertook an "extensive" investigation of Mr. Juluke's and his co-defendants' case, which included but was not limited to: "collecting and reviewing all court and law enforcement records on this murder and other potentially connected crimes, reviewing all records relating to the defendants and the witnesses, obtaining federal records and recordings, re-interviewing all remaining witnesses and law enforcement (those that testified at trial and those who did not), communicating with Mr. Santinac's family, and communicating with the defendants' attorneys and their families."

92.     Based on such a review, the OPDA concluded that Juluke and his co-defendants became suspects only "because then-NOPD officers Len Davis and Sammie Williams inserted themselves immediately into the homicide investigation and called in a purported suspect's name into dispatch[.]" The OPDA acknowledged the fact that there was no basis for a murder arrest given that the men were "stopped unarmed, miles away from the murder in a car that did not match the description given by the [lone] witness" Raiford.

93.     As a part of the OPDA's review, they concluded that:

a.  "At the time this crime happened, Officers Len Davis and Sammie Williams were in the business of manipulating evidence at murder scenes to cover up for their drug-dealing associates."

b.  "Raiford did not initially describe three perpetrators and the first time three perpetrators were mentioned by anyone is by Len Davis after the three defendants were pulled over in the Treme no more than 23 minutes after the crime."

c.  Raiford never accurately described the color of Juluke's car.

d.  "Before anyone learned of [Juluke's, Gable's, and Nelson's] alibi, Raiford statement to police matched what defendants' alibi witnesses themselves testified to—that the defendants were in the Iberville Housing Project fighting with Jacob Carter between 8 p.m. and 9 p.m. Raiford subsequently changed his story to witnessing the fight the day before, and then [later] testified that it was the same day [as the murder], but much earlier [in the day than 8-9 p.m.]"

e.  Raiford perjured himself on the witness stand, under oath, one month before Juluke's trial, in a separate criminal proceeding against Raiford.

94.     Further, the CRD "unequivocally concluded that the verdicts against Mr. Juluke, Mr. Gable, and Mr. Nelson were secured by the State while the jury was unaware of significant evidence that undermined the State's case and exculpated the defendants, some of which were available at the time of trial but not known to the jury, and some of which has been discovered since. Every remaining juror that the State has been able to contact [5 of the original 12] has indicated that the information now known would have certainly made a difference to what were anyway long and contentious deliberations and could likely have changed the eventual verdict."

95.     Specifically, the CRD's review determined that the government had withheld three key pieces of exculpatory information in existence at the time of Mr. Juluke and his co-defendants' trial, including: (1) the transcribed Grand Jury testimony of Samuel Raiford, given on October 20, 1994; (2) handwritten notes of an ADA's interview with Samuel Raiford that occurred before October 18, 1994; and (3) the transcribed interview of Samuel Raiford at the NOPD Homicide Division given in the early hours of August 23, 1994 (hours after the murder).

96.     Such exculpatory evidence demonstrated Raiford's inconsistent statements with respect to: (1) the color of the alleged perpetrator's vehicle; (2) whether he had seen Juluke, Gable, and Nelson earlier the day of the murder at a basketball court in the Iberville projects arguing with Jacob Carter or whether he had in fact seen them a day earlier in a different location in the Iberville (a store on the corner of Bienville)—inconsistencies which would further demonstrate that Raiford did not witness them shoot Santinac and which would further corroborate the alibi defense of Juluke and his co-defendants; and (3) Raiford having provably lied under oath, just a month before Juluke's trial, in another matter in which he pled guilty to burglary—which would have further demonstrated Raiford's lack of credibility and the prosecution's insistence that Raiford was "truthful and forthright."

97.    Based on this, the CRD concluded that the State failed "to meticulously observe the constitutional safeguards in criminal proceedings and give full and forthright disclosure of all relevant information" and explained that:

> . . . significant information bearing on [Mr. Juluke's, Mr. Nelson's, and Mr. Gable's] guilt or innocence was kept from the jury at their trial" and that they "suffered a miscarriage of justice and their convictions and continued imprisonment violate the Sixth, Eighth and Fourteenth Amendments to the United States Constitution, corresponding Supreme Court precedent, and the Louisiana Constitution. The law compels a remedy for the defendants . . . Therefore, the parties jointly move this Court . . . to vacate the convictions of the Petitioners for second-degree murder and the corresponding life sentences imposed on each Petitioner.

98.    Ultimately, the CRD concluded that "[a]ny confidence the State had in the convictions of Bernell Juluke, Kunta Gable, and Leroy Nelson has been entirely undermined." Indeed, the CRD's investigation demonstrated what Mr. Juluke and his co-defendants had maintained from the moment of their arrest: *they are innocent.*

99.    Importantly, the CRD's review caused them to conclude that Mr. Santinac was likely killed due to a dispute between rival groups in the Desire housing project area in 1994—groups and a dispute having no connection whatsoever to Mr. Juluke, Mr. Nelson, or Mr. Gable. (Evidence indicates that, similarly, Mr. Santinac had no connection to the rival groups and was tragically an unintended target of the shooting.)

100.    Samuel Raiford, on the other hand, was connected to such rival groups. On information and belief, Samuel Raiford's involvement, or the involvement of his acquaintances resulted in the shooting.

**VI.    During the relevant time, in the early to mid 1990s, the NOPD condoned corruption and investigative misconduct by failing to train, supervise, or discipline.**

101.    As part of the OPDA's motion to vacate Mr. Juluke's conviction, the OPDA cited criminologist Peter Scharf, who has said, "The Len Davis case needs to be understood among systemic corruption. This was an era — not an individual."

102.    Indeed, the corruption fostered by the NOPD's policies in the late 1980s and early 1990s are well known and included racketeering, murder, and participation by police officers in the illegal drug trade, including Defendant Officers Davis and Williams as discussed above.

103.    Prior to and at the time of Mr. Juluke's unlawful arrest, prosecution, and conviction, the NOPD, by and through its policymakers, maintained a policy, pattern, practice, or custom of condoning corruption, which included condoning widespread investigative misconduct by failing to supervise, discipline, and train its officers who perpetrated such misconduct.

104.    Such investigative misconduct included: utilizing improper and suggestive identification procedures; failing to document and disclose material, exculpatory and impeachment evidence to prosecutors, defense counsel, and the court; failing to investigate known exculpatory evidence and otherwise failing to conduct constitutionally adequate investigations; failing to comply with widely accepted standards for record-keeping in investigations; and/or engaging in the affirmative and/or passive concealment of such misconduct.

105.    At the relevant time, the NOPD failed to maintain individual training records, failed to conduct any in-service or advanced training for supervisors, failed to ensure that its supervisors had the training and resources to supervise serious investigations, including murder investigations, and failed to adequately document and enforce disciplinary investigations and findings against

individual officers. Where there was discipline imposed, it was effectively a slap on the wrist when considered in light of officers' conduct.

106.    On information and belief, NOPD's supervisors and policymakers had actual and constructive notice of NOPD's policy and practice of investigative misconduct and concomitant failures to supervise and train through numerous cases and investigations that took place prior to the Santinac investigation. The misconduct committed in those cases by NOPD officers, including investigators involved in this investigation such as Davis and Williams, was actually or constructively known to NOPD supervisors and policymakers prior to this investigation—including by means of their direct participation in the investigations—and, upon information and belief, NOPD supervisors and policymakers failed to train, supervise, discipline, or otherwise remediate NOPD investigators in response to such notice.

107.    Despite notice providing NOPD the knowledge that such policies and practices were reasonably likely to lead to constitutional violations like those perpetuated against Mr. Juluke here, NOPD leadership continued to maintain those customs, patterns, and practices in deliberate indifference to the rights of citizens like Mr. Juluke.

108.    The above deficiencies in NOPD were acknowledged both internally by NOPD and externally by expert industry organizations.

109.    In 1991, the International Association of Chiefs of Police ("IACP") published a report citing a "stunning lack of training" at the NOPD and finding that the NOPD's training record was "not nearly in compliance with professional expectations." The IACP's report concluded that NOPD's failure to keep training records "leaves the department dangerously defenseless against failure-to-train based allegations and lawsuits." Furthermore, with respect to criminal investigations, the report concluded, ". . . the CIB [the Criminal Investigation Bureau] is failing in

almost every crime category. While the entire department must share responsibility for this poor performance, the CIB is simply not getting its portion of the job done. . . primitive case management practices, absence of performance goals, measurement accountability, flawed selection process, and a stunning lack of training inhibits investigative effectiveness." The IACP's report was distributed to all NOPD division commanders.

110.    In 1994, the Louisiana National Guard in partnership with the City of New Orleans found that "[a] great deal has been written about the state of training within the NOPD. Year after year it does not seem to improve. It is clearly apparent that the city and department leaders do not understand, or simply choose to ignore, the importance of training for police officers . . . Unfortunately, even after three previous reports criticizing training within the NOPD, very little action has been taken to improve the situation."

111.    In 1995, the NOPD conceded that its suspect identification process was egregiously flawed. For example, NOPD admitted that "[i]n order to conduct a photo lineup, an officer has to go to the records room and pull the pictures needed by hand, ensuring a similarity of suspects and backgrounds. Districts and commands generally do not have mugshot books, or even access to mugshot books (a sprinkling of investigators have created their own). Officers estimate that less than ten photo or regular line-ups are conducted on an annual basis by patrol officers."

112.    For the above reasons, as well as others, in 1996, the U.S. Department of Justice ("DOJ") notified the City of New Orleans that it was investigating the NOPD. The DOJ issued a technical assistance letter to the City, recommending numerous reforms which included some, if not all, of the very same issues addressed in a subsequent 2012 consent decree discussed below. The DOJ investigated NOPD for several years, before announcing the end of such investigation in 2004.

113.    The years following the end of that investigation would include well-reported acts of misconduct by NOPD in the wake of Hurricane Katrina.

114.    Consequently, in May 2010, DOJ formally notified the City of New Orleans that it was again initiating an investigation of NOPD for a pattern and practice of unlawful conduct. As part of its investigation, DOJ conducted a detailed fact-finding review of NOPD and issued a written report on March 16, 2011, documenting patterns of unconstitutional conduct. As a result, in 2012, the City of New Orleans entered into a consent decree, which acknowledged patterns of unconstitutional conduct at issue here, including arrests of persons without probable cause or based on information materially false or incorrect, the use of improper and unconstitutionally suggestive lineups, inadequate supervision of police officers (requiring the implementation of evaluation systems, supervision, and "early alert" systems to identify problematic officers), and documentation requirements to avoid false, incorrect, or omitted information in investigations, among other requirements.

115.    While the conduct forming the basis of DOJ's 2011 report, which led to the 2012 consent decree, did not specifically address conduct from the mid-1990s when Mr. Juluke's arrest took place, the 2012 consent decree addresses problems that have long existed in the NOPD, including at the time of Mr. Juluke's arrest, as evidenced by the allegations above, the history of NOPD, and the history of DOJ's oversight of the NOPD.

116.    The NOPD's patterns and practices of investigative misconduct along with its failures to train, supervise, and discipline officers in lawful investigative techniques were reflected in the multiple acts of misconduct committed by the Defendant officers in the Santinac murder investigation and led to Mr. Juluke's wrongful arrest, conviction, and decades-long incarceration.

**VII.    Both the NOPD and OPDA had a pattern and practice of failing to disclose exculpatory evidence in violation of *Brady v. Maryland*.**

117.    As discussed above and acknowledged by the CRD, significant exculpatory evidence was withheld from Bernell Juluke, including most prominently Officer Davis' and Williams' original incident report, the police logs showing that Officer Davis and Williams—not Samuel Raiford—created from whole cloth Bernell Juluke as the suspect, and statements and testimony from Samuel Raiford showing that he was not credible.

118.    Both the NOPD and the OPDA had a pattern or practice of withholding exculpatory witness statements and exculpatory reports at the relevant time. This was both a result of deliberate indifference to the need to train police officers and prosecutors as to the requirements of *Brady v. Maryland*, as well as practices encouraging the withholding of exculpatory evidence in pursuit of arrest and conviction.

119.    Prior to the arrest and prosecution of Bernell Juluke here, the NOPD was on notice of the need to train officers with respect to their obligation to disclose to the defense exculpatory witness statements and police reports, or else violate the constitutional rights of defendants like Bernell Juluke. Indeed, several published decisions exposing the NOPD's failure to turn over exculpatory witness statements are documented both before and after Bernell Juluke's prosecution, including but not limited to: *Kyles v. Whitley*, 514 U.S. 419 (1995); *Clark v. Blackburn*, 632 F.2d 531 (5th Cir. 1980); and *Lockett v. Blackburn*, 571 F.2d 309 (5th Cir. 1978).

120.    Similarly, prior to the prosecution of Bernell Juluke here, the OPDA was on notice of the need to train prosecutors with respect to their obligation to disclose to the defense exculpatory witness statements and police reports, or else violate the constitutional rights of defendants like Bernell Juluke. Several published decisions exposing the OPDA's failure to turn over exculpatory witness statements in cases prior to Bernell Juluke's prosecution are documented,

including but not limited to: *State v. Cousin*, 710 So.2d 1065 (La. 1998); *Kyles v. Whitley*, 514 U.S. 419 (1995); *State v. Knapper*, 579 So.2d 956 (La. 1991); *State v. Rosiere*, 488 So.2d 965 (La. 1986); *State v. Perkins*, 423 So.2d 1103 (La. 1982); *State v. Curtis*, 384 So.2d 396 (La. 1980); *State v. Carney*, 334 So.2d 415 (La. 1976); *see also State v. Lindsay*, 844 So.2d 961 (La. Ct. App. 2003); *State v. Smith*, 591 So.2d 1219 (La. Ct. App. 1991); *State v. Oliver*, 682 So.2d 301 (La. Ct. App. 1996); *Smith v. Cain*, 132 S.Ct. 627 (2012); *State v. Bright*, 875 So.2d 37 (La. 2004); *Mahler v. Kaylo*, 537 F.3d 494 (5th Cir. 2008).

121.    Nonetheless, the OPDA maintained a policy of withholding such documentation and/or was deliberately indifferent to the obvious need to train or re-train their prosecutors on constitutional disclosure obligations with respect to witness statements and police reports.

122.    Such failures directly led to Bernell Juluke being deprived of material exculpatory evidence here and contributed to his wrongful conviction and imprisonment.

## VIII.    Bernell Juluke suffered extreme injury due to nearly three decades of wrongful incarceration at Angola.

123.    Mr. Juluke spent over 28 years imprisoned for a murder he did not commit, almost all of it at the Louisiana State Penitentiary, or "Angola."

124.    As a result of the misconduct in this case and the time he spent wrongfully arrested, accused, convicted, and imprisoned, Bernell Juluke has experienced horrific and permanent injury, including but not limited to the pain of incarceration and the danger, stress, and fear that came with it; the loss of freedom; the loss of time, affection, and support of/with loved ones, including his children, mother and siblings, missed birthdays, graduations, funerals, and other milestones; emotional pain and suffering of the most severe and persistent nature; and extreme psychological torment.

125.    Further, Mr. Juluke has been deprived of the ability to earn a living and has lost wages for nearly 30 years as a result.

## CLAIMS

## COUNT 1
**42 U.S.C. § 1983: Deprivation of Liberty Without Due Process of Law**
**(Against Defendants Len Davis, Samuel Williams, Wayne Tamborella, Dwight Deal,**
**Anthony Small, Ross J.J. Mocklin, Kenneth Harris)**

126.    Plaintiff incorporates the foregoing paragraphs as if full set forth here.

127.    Defendant-NOPD officers Len Davis, Samuel Williams, Wayne Tamborella, Dwight Deal, Anthony Small, Ross J.J. Mocklin, and Kenneth Harris ("Defendant Officers"), under color of law and within the scope of their employment with the NOPD, deprived Plaintiff of his clearly established constitutional right to due process of law and to a fair trial.

128.    Defendant Officers deprived Plaintiff of his right to due process of law in the ways described in detail above and summarized here as follows:

  a. Defendant Len Davis fabricated evidence implicating Bernell Juluke as the perpetrator of the shooting, intimidated Samuel Raiford by threatening him as a suspect in the murder to coerce him to identify Mr. Juluke and others as the perpetrators, and withheld and/or concealed his incident report from Mr. Juluke in violation of *Brady v. Maryland*, *Napue v. Illinois*, and their progeny.

  b. Defendant Samuel Williams fabricated evidence implicating Bernell Juluke as the perpetrator of the shooting, intimidated Samuel Raiford by threatening him as a suspect in the murder to coerce him to identify Mr. Juluke and others as the perpetrators, and withheld and/or concealed his incident report from Mr. Juluke in violation of *Brady v. Maryland*, *Napue v. Illinois*, and their progeny.

c.  Defendant Wayne Tamborella fabricated evidence by participating in and/or supervising the implication of Bernell Juluke as the perpetrator of the shooting, intimidated Samuel Raiford by suggesting that he was a suspect in the murder to coerce him to identify Mr. Juluke and others as the perpetrators and further coerced Raiford by participating in and/or supervising the informing of Raiford that Juluke, Gable, and Nelson were arrested together and were the perpetrators, and withheld and/or concealed the Davis/Williams incident report, police logs, and Raiford statements and testimony from Mr. Juluke in violation of *Brady v. Maryland*, *Napue v. Illinois*, and their progeny. As the lead investigator in the Santinac murder, Defendant Tamborella failed to intervene and has supervisory liability for the acts of his fellow officers in which he participated and/or had or should have had knowledge of, including fabrication of Bernell Juluke as the perpetrator, threatening and coercing witness Samuel Raiford, conducting an unconstitutional and intentionally suggestive lineup (in which he participated by, at a minimum, coordinating the rigged lineup with Detectives Dwight Deal and Anthony Small), and withholding *Brady* material.

d.  Defendant Dwight Deal fabricated evidence implicating Bernell Juluke as the perpetrator of the shooting by coercing Raiford and informing him that Juluke, Gable, and Nelson were arrested together and were the perpetrators and conducting an unconstitutional and intentionally suggestive lineup.

e.  Defendant Anthony Small fabricated evidence implicating Bernell Juluke as the perpetrator of the shooting by coercing Raiford and informing him that Juluke,

Gable, and Nelson were arrested together and were the perpetrators and conducting an unconstitutional and intentionally suggestive lineup.

f.   Defendant Ross J.J. Mocklin fabricated evidence implicating Bernell Juluke as the perpetrator of the shooting by knowingly eliciting a false statement from Samuel Raiford as to the perpetrators of the shooting.

g.   Defendant Kenneth Harris fabricated evidence implicating Bernell Juluke as the perpetrator of the shooting by knowingly eliciting a false statement from Samuel Raiford as to the perpetrators of the shooting and withheld Samuel Raiford's statement in violation of *Brady v. Maryland*, *Napue v. Illinois*, and their progeny.

h.   To the extent the above officers documented Raiford's identification of Bernell Juluke as a suspect, they knowingly documented false information.

i.   To the extent the above officers failed to intervene with respect to their fellow officers' unconstitutional conduct, they are liable for the injury caused to Bernell Juluke.

129.   Had the Defendant Officers' fabrications of evidence, witness intimidation and coercion, and concealment and/or suppression of evidence been documented and/or disclosed, Plaintiff would have proved his innocence, cast doubt on the entire police investigation and prosecution, and impeached critical trial testimony.

130.   The exculpatory and impeachment evidence withheld by the Defendant Officers undermined confidence in the verdict against Plaintiff, and the concealment of this evidence deprived Plaintiff of a fair criminal trial.

131.    Defendant Officers performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and/or with deliberate indifference to Plaintiff's clearly established constitutional rights. No reasonable officer in 1994 would have believed such conduct was lawful.

132.    For this count, Plaintiff seeks against each of the Defendant Officers actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

### COUNT 2
### 42 U.S.C. § 1983: Malicious Prosecution
### (Against Defendants Len Davis, Samuel Williams, Wayne Tamborella, Dwight Deal, Anthony Small, Ross J.J. Mocklin, Kenneth Harris)

133.    Plaintiff incorporates the foregoing paragraphs as if full set forth here.

134.    The Defendant Officers initiated criminal proceedings against Plaintiff for the murder of Rondell Santinac. Plaintiff was convicted of the murder and sentenced to life imprisonment.

135.    Defendant Officers initiated the proceedings against Plaintiff without probable cause. Defendant Officers knowingly implicated Plaintiff in a murder that they knew Plaintiff did not commit.

136.    Plaintiff is innocent of the murder of Rondell Santinac.

137.    The Defendant Officers, acting in the ways described above, acted maliciously or for a purpose other than bringing Plaintiff to justice.

138.    Plaintiff suffered a deprivation of liberty consistent with the concept of seizure due to a legal proceeding. He was wrongfully incarcerated for over 28 years until his release on October 19, 2022.

139.    Defendant Officers acted under the color of state law to deprive Plaintiff of his rights under the U.S. Constitution. Accordingly, Defendant Officers have violated 42 U.S.C. § 1983.

140.    Plaintiff was injured as a direct and proximate result and has sustained damages.

141.    The acts and omissions of Defendant Officers were intentional, wanton, malicious, reckless, and oppressive.

142.    For this count, Plaintiff seeks against Defendant Officers actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## COUNT 3
### 42 U.S.C. § 1983: False Arrest
**(Against Defendants Len Davis, Samuel Williams, Wayne Tamborella, Dwight Deal, Anthony Small, Ross J.J. Mocklin, Kenneth Harris)**

143.    Plaintiff incorporates the foregoing allegations as if fully restated here.

144.    Defendant Officers arrested and/or initiated criminal proceedings against Plaintiff without probable cause. Defendant Officers knowingly implicated Plaintiff in a murder that they knew Plaintiff did not commit.

145.    Plaintiff is innocent of the murder of Rondell Santinac.

146.    Defendant Officers, acting in the ways described above, acted maliciously or for a purpose other than bringing Plaintiff to justice.

147.    Plaintiff suffered a deprivation of liberty consistent with the concept of seizure due to his arrest.

148.    Defendant Officers acted under the color of state law to deprive Plaintiff of his rights under the U.S. Constitution. Accordingly, Defendant Officers have violated 42 U.S.C. § 1983.

149.    Plaintiff was injured as a direct and proximate result and has sustained damages.

150.    The acts and omissions of Defendant Officers were intentional, wanton, malicious, reckless, and oppressive.

151.    For this count, Plaintiff seeks against Defendant Officers actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

### COUNT 4
**42 U.S.C. § 1983:** *Monell* **Liability: Deliberate Indifference in Retaining Officers Len Davis and Samuel Williams (Against Defendant City of New Orleans)**

152.    Plaintiff incorporates the foregoing allegations as if fully restated here.

153.    The NOPD, by and through its policymakers and supervisory personnel, were on notice of the repeated and extreme acts of misconduct perpetrated by Officers Davis and Williams prior to the incident at issue.

154.    The NOPD knew that if they did not take action to remove Officers Davis and Williams from the police force, then the violation of citizens' constitutional rights was certain to occur due to their misconduct repeatedly in the past.

155.    Despite such knowledge, the NOPD was deliberately indifferent to the risk of such constitutional violations and failed to sufficiently discipline such officers, including by failing to terminate them from patrol.

156.    As a direct and proximate result, Plaintiff's constitutional rights were violated in the ways described above by both Officer Davis and Officer Williams and he sustained damages.

157.    The City of New Orleans acted under the color of state law to deprive Plaintiff of his rights under the U.S. Constitution as described above. Accordingly, the City of New Orleans has violated 42 U.S.C. § 1983.

158.    For this count, Plaintiff seeks against Defendant City of New Orleans actual damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

**COUNT 5**
**42 U.S.C. § 1983: *Monell* Liability: Failure to Supervise or Discipline**
**Investigative Misconduct**
**(Against Defendant City of New Orleans)**

159.    Plaintiff incorporates the foregoing allegations as if fully restated here.

160.    The City of New Orleans, through the NOPD, in violation of Plaintiff's constitutional rights, implemented, enforced, encouraged, and sanctioned a policy, pattern, practice, and/or custom of condoning investigative misconduct by failing to supervise or discipline its officers.

161.    Such a pattern of investigative misconduct included utilizing improper and suggestive identification procedures; failing to document and disclose material, exculpatory and impeachment evidence to prosecutors, defense counsel, and the court; failing to investigate known exculpatory evidence; failing to comply with widely accepted standards for record-keeping in investigations; and/or engaging in the affirmative and/or passive concealment of this type of misconduct.

162.    Despite repeated instances of such investigative misconduct, including by at a minimum Officers Len Davis and Samuel Williams prior to the incident here, the NOPD was deliberately indifferent to the need to supervise and/or discipline its officers. In those instances when it did supervise or discipline its officers, it either turned a blind eye to their misconduct or imposed discipline that was woefully deficient and did not include training, re-training, and/or counseling.

163.    The fabrication of evidence, the intimidation and coercion of Samuel Raiford, the use of an improperly suggestive identification procedure, the withholding of material exculpatory evidence, and the documenting of false evidence against Plaintiff here was the result of the City of New Orleans' policy, pattern, practice, and/or custom here.

164.    The City of New Orleans acted under the color of state law to deprive Plaintiff of his rights under the U.S. Constitution as described above. Accordingly, the City of New Orleans has violated 42 U.S.C. § 1983.

165.    Plaintiff was injured as a direct and proximate result of the above policies, practices, and/or customs and sustained damages as a result.

166.    For this count, Plaintiff seeks against Defendant City of New Orleans actual damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

<u>**COUNT 6**</u>
**42 U.S.C. § 1983: *Monell* Liability: Failure to Train on Identification/Lineups**
**(Against Defendant City of New Orleans)**

167.    Plaintiff incorporates the foregoing allegations as if fully restated here.

168.    The City of New Orleans, through the NOPD, in violation of constitutional rights, implemented, enforced, encouraged, and sanctioned a policy, pattern, practice, and/or custom of failing to train on proper techniques for the use of lineups and/or obtaining identification of suspects.

169.    Prior to Bernell Juluke's arrest, the NOPD had a documented history of using improperly suggestive lineups and/or improperly suggesting identification of suspects to witnesses. Despite NOPD's knowledge of its deficiencies in this respect and despite knowing that failing to train its officers on proper use of lineups and how to constitutionally obtain identification of suspects would result in the violation of the constitutional rights of citizens like Bernell Juluke, the NOPD failed to train on these items.

170.    Their failure to train in this respect constituted deliberate indifference to the known likelihood of constitutional violations resulting from such failure.

171.    Even if the NOPD did not have such a problematic history with lineups and suspect identification, the danger of constitutional violations from the failure to train on these common aspects of police work would have been extraordinarily obvious.

172.    As a result of the City's deliberate indifference in failing to train, Bernell Juluke was arrested, convicted, and imprisoned for nearly three decades.

173.    Plaintiff was injured as a direct and proximate result of the above policies, practices, and/or customs and sustained damages as a result.

174.    The City of New Orleans acted under the color of state law to deprive Plaintiff of his rights under the U.S. Constitution as described above. Accordingly, the City of New Orleans has violated 42 U.S.C. § 1983.

175.    For this count, Plaintiff seeks actual damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## <u>COUNT 7</u>
**42 U.S.C. § 1983: *Monell* Liability: Non-Disclosure of Material Exculpatory Evidence**
***Brady* and *Napue* Violations**
**(Against Defendant City of New Orleans)**

176.    Plaintiff incorporates the foregoing allegations as if fully restated here.

177.    The City of New Orleans, through the NOPD, in violation of Plaintiff's constitutional rights, implemented, enforced, encouraged, and sanctioned a policy, pattern, practice, and/or custom of withholding material exculpatory materials from citizens like Bernell Juluke.

178.    Such a pattern was well known to the NOPD due to numerous instances of such misconduct by NOPD officers prior to the time of Bernell Juluke's arrest. Nonetheless, the NOPD knowingly permitted the pattern to persist and adopted it as an investigative tactic.

179.    In the alternative, despite NOPD's knowledge of its deficiencies in this respect and despite knowing that failing to train its officers on *Brady* obligations would result in the violation of the constitutional rights of citizens like Bernell Juluke, the NOPD failed to train its officers.

180.    Their failure to train in this respect constituted deliberate indifference to the known likelihood of constitutional violations resulting from such failure.

181.    Indeed, even if the NOPD did not have such a problematic history of *Brady* violations, the danger of constitutional violations from the failure to train on such a common aspect of police work as evidentiary disclosure obligations would have been extraordinarily obvious.

182.    The withholding of material exculpatory evidence against Plaintiff here was the result of the City of New Orleans' policy, pattern, practice, and/or custom.

183.    Plaintiff was injured as a direct and proximate result of the above policies, practices, and/or customs and sustained damages as a result.

184.    The City of New Orleans acted under the color of state law to deprive Plaintiff of his rights under the U.S. Constitution as described above. Accordingly, the City of New Orleans has violated 42 U.S.C. § 1983.

185.    For this count, Plaintiff seeks actual damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

**COUNT 8**
**42 U.S.C. § 1983: *Monell* Liability: Non-Disclosure of Exculpatory Material**
***Brady* and *Napue* Violations**
**(Against Defendant Harry F. Connick, Sr., in his official capacity**
**as Orleans Parish District Attorney)**

186.    Plaintiff incorporates the foregoing allegations as if fully restated here.

187.    The Orleans Parish District Attorney's, in violation of Plaintiff's constitutional rights, implemented, enforced, encouraged, and sanctioned a policy, pattern, practice, and/or

custom of withholding and/or suppressing material exculpatory evidence from citizens like Bernell Juluke.

188.    Such a pattern was well known to the OPDA due to numerous instances of such misconduct by Orleans Parish ADAs prior to the time of Bernell Juluke's arrest and prosecution. Nonetheless, the OPDA knowingly permitted the pattern to persist and adopted it as a prosecutorial tactic.

189.    In the alternative, despite OPDA's knowledge of its deficiencies in this respect and despite knowing that failing to train its ADAs on *Brady* obligations would result in the violation of the constitutional rights of citizens like Bernell Juluke, the OPDA failed to train its ADAs.

190.    The OPDA's failure to train in this respect constituted deliberate indifference to the known likelihood of constitutional violations resulting from such failure.

191.    Indeed, even if the OPDA did not have such a problematic history of *Brady* violations, the danger of constitutional violations from the failure to train on such a common aspect of prosecutorial work as evidentiary disclosure obligations would have been extraordinarily obvious.

192.    The withholding of material exculpatory evidence against Plaintiff here was the result of the OPDA's policy, pattern, practice, and/or custom.

193.    Plaintiff was injured as a direct and proximate result of the above policies, practices, and/or customs and sustained damages as a result.

194.    Defendant Harry F. Connick, Sr., in his official capacity, acted under the color of state law to deprive Plaintiff of his rights under the U.S. Constitution as described above. Accordingly, the City of New Orleans has violated 42 U.S.C. § 1983.

195.    For this count, Plaintiff seeks actual damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## COUNT 9
### 42 U.S.C. § 1983: Civil Rights Conspiracy
### (Against All Defendants)

196.    Plaintiff incorporates the foregoing allegations as if fully restated here.

197.    Defendants combined to do a criminal act, or to do a lawful act by unlawful means or for an unlawful purpose, namely, to arrest, prosecute, and convict Bernell Juluke despite knowing he was innocent of Rondell Santinac's murder.

198.    Defendants specifically conspired to fabricate evidence to convict Mr. Juluke and to withhold and suppress evidence demonstrating his innocence.

199.    Plaintiff's constitutional rights were violated as a direct and proximate result of such agreement and actions in furtherance thereof and suffered damages as a result.

200.    For this count, Plaintiff seeks actual damages, punitive damages against the individual defendants, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## COUNT 10
### Louisiana Common Law: False Arrest
### (Against Defendants Len Davis, Samuel Williams, Wayne Tamborella, Dwight Deal, Anthony Small, Ross J.J. Mocklin, Kenneth Harris)

201.    Plaintiff incorporates the foregoing allegations as if fully restated here.

202.    Plaintiff was unlawfully detained and arrested without probable cause.

203.    The Defendant Officers initiated, effected, and/or participated in that unlawful arrest and detention.

204.    Plaintiff was injured as a direct and proximate result of the Defendant Officers' unlawful actions and sustained damages.

205.    For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## COUNT 11
### Louisiana Common Law: Malicious Prosecution
**(Against Defendants Len Davis, Samuel Williams, Wayne Tamborella, Dwight Deal, Anthony Small, Ross J.J. Mocklin, Kenneth Harris)**

206.    Plaintiff incorporates the foregoing allegations as if fully restated here.

207.    The Defendant Officers caused the commencement or continuation of an original criminal proceeding against Plaintiff when there was no probable cause to do so.

208.    Plaintiff is innocent of the murder of Rondell Santinac. His conviction was vacated and he was released from prison on October 19, 2022.

209.    The Defendant Officers, acting in the ways described above, acted maliciously or for a purpose other than bringing Plaintiff to justice.

210.    Plaintiff was injured as a direct and proximate result of the Defendant Officers' unlawful actions and sustained damages.

211.    For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## COUNT 12
### Louisiana Common Law: Intentional Infliction of Emotional Distress
**(Against Defendants Len Davis, Samuel Williams, Wayne Tamborella, Dwight Deal, Anthony Small, Ross J.J. Mocklin, Kenneth Harris)**

212.    Plaintiff incorporates the foregoing allegations as if fully restated here.

213.    The Defendant Officers' conduct resulting in Plaintiff's wrongful arrest and decades of wrongful incarceration was extreme and outrageous.

214. Plaintiff suffered severe emotional distress as a result of Defendants' conduct, which result in wrongful arrest and incarceration for decades as a result of a murder he did not commit.

215. The Defendant Officers desired to inflict severe emotional distress on Plaintiff or knew that severe emotional distress would be certain or substantially certain to result from their conduct.

216. For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## **PRAYER FOR RELIEF**

Plaintiff requests the following relief from the Court:

a.    Compensatory damages against all Defendants in an amount to be determined by a jury;

b.    Punitive damages against all Defendants (except for City of New Orleans and official-capacity Defendant Harry F. Connick, Sr.) in an amount to be determined by a jury;

c.    Pre-judgment and post-judgment interest as allowable by law and as ordered by the Court;

d.    Attorney fees' as allowable by law and as ordered by the Court;

e.    Reasonable costs; and

f.    Such other relief that the Court deems just and equitable.

## **JURY DEMAND**

Plaintiff demands a trial by jury of all claims herein.

Date:   August 3, 2023

Respectfully submitted,

*/s/ Lance C. Unglesby*
Lance C. Unglesby (La. Bar #29690)
Adrian M. Simm, Jr. (La. Bar #36673)
Jamie F. Gontarek (La. Bar #37136)
**Unglesby & Crompton, LLC**
607 St. Charles Ave., Ste. 300
New Orleans, Louisiana 70130
Telephone: (504) 345-1390
Fax: (504) 324-0835
Lance@ucjustice.com
Adrian@ucjustice.com
Jamie@ucjustice.com

Ben Crump*
**Ben Crump Law, PLLC**
122 S. Calhoun Street
Tallahassee, Florida 32301
Telephone: (800) 713-1222
ben@bencrump.com

Steven Hart*
Brian Eldridge*
John Marrese*
**Hart McLaughlin & Eldridge, LLC**
One South Dearborn, #1400
Chicago, Illinois 60603
Telephone: (312) 955-0545
shart@hmelegal.com
beldridge@hmelegal.com
jmarrese@hmelegal.com

*Seeking *pro hac vice* admission

***Attorneys for Plaintiff Bernell Juluke***