## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

BERNELL JULUKE,

               Plaintiff,

v.

LEN DAVIS, *et al.*,

               Defendants.

Lead Case No.: 2:23-cv-03111-JCZ-DPC
Consolidated with 2:23-cv-06203-JCZ-DPC

**This Document Relates To:**
Case No. 2:23-cv-03111-JCZ-DPC

District Judge Brandon Scott Long

Magistrate Judge Donna Phillips Currault

---

### PLAINTIFF BERNELL JULUKE'S RESPONSE IN OPPOSITION TO DEFENDANT JASON ROGERS WILLIAMS'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

Plaintiff Bernell Juluke, by and through his attorneys, Hart McLaughlin & Eldridge, LLC, Unglesby & Crompton, LLC, and Ben Crump Law, LLC, submits his response in opposition to the motion to dismiss Plaintiff's amended complaint (Doc. 66) filed by Defendant Jason Rogers Williams, in his official capacity as Orleans Parish District Attorney ("OPDA"), as follows:

### OVERVIEW

Plaintiff Bernell Juluke was wrongfully convicted of murder and spent nearly 30 years in prison. Mr. Juluke's wrongful conviction was due in part to the OPDA's withholding of exculpatory police reports and witness statements in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Plaintiff has alleged that OPDA had a pattern and practice of withholding such *Brady* material during the relevant time period and, therefore, should be held liable for Plaintiff's wrongful imprisonment under *Monell v. Dept. of Soc. Svcs.*, 436 U.S. 658 (1978).

OPDA has moved to dismiss Plaintiff's claims on several grounds. The thrust of its motion, however, is that Mr. Juluke has failed to plausibly plead a pattern of *Brady*-related misconduct similar to that which resulted in Mr. Juluke's conviction, i.e., the withholding of police reports and

witness statements. To the contrary, Mr. Juluke has alleged numerous instances of such misconduct by OPDA during the relevant time period. Mr. Juluke cites 13 published decisions in particular, confirming relevant *Brady* violations in the time preceding Mr. Juluke's 1996 conviction and shortly thereafter. The detail pled by Mr. Juluke here therefore surpasses what is required to plausibly plead a *Monell* pattern and practice claim. For that reason and others, the OPDA's motion should be denied.

## FACTUAL BACKGROUND

### *Introduction*

Plaintiff Bernell Juluke spent over 28 years in prison for the murder of Rondell Santinac. (Doc. 54, Amd. Compl. ¶¶ 1-2.) Mr. Juluke is innocent of Mr. Santinac's murder, and he has never once wavered on his innocence. (*Id.* ¶ 10.)

On October 19, 2022, Mr. Juluke's conviction was vacated and he was released from prison, after the Conviction Review Division of the current Orleans Parish District Attorney's Office declared that his conviction was a "miscarriage of justice," as were the convictions of his co-defendants, Kunta Gable and Sidney Nelson (consolidated plaintiffs here). (*Id.* ¶ 2.)

Mr. Juluke's wrongful conviction was the result of abhorrent misconduct by both police and prosecution. At issue here is OPDA's motion to dismiss Plaintiff's Count 8 (*Monell*) and Count 9 (Conspiracy) against it. As such, this brief focuses on allegations against OPDA, namely, its pattern and practice of withholding exculpatory police reports and witness statements, including those withheld from Mr. Juluke. However, understanding the significance of OPDA's *Brady* violations with respect to Mr. Juluke requires an understanding of the police misconduct that precipitated those *Brady* violations. Plaintiff summarizes his allegations in that respect briefly below.

*The Murder of Rondell Santinac*

On August 22, 1994, at approximately 9:22 p.m., 20-year-old Rondell Santinac was shot and killed in the passenger seat of a vehicle driven by 20-year-old Samuel Raiford. (Doc. 54, ¶ 25.) The vehicle was exiting a driveway on Humanity Street at Desire Parkway, in the Desire housing project, as shots were fired at it. (*Id.*) Mr. Raiford escaped unharmed. (*Id.*)

As the sole living eyewitness, Mr. Raiford would become central to the investigation. (*Id.* ¶ 26.) He is a self-described slow learner, with a borderline IQ, and a long, violent criminal history. (*Id.*) He was involved in drug dealing and other criminal activity which made him a target of violence. (*Id.*)

After exiting the vehicle, Mr. Raiford ran to his girlfriend's mother's home at 3219 Desire Parkway and then to the home of his neighbor, Lizzie Graham, at 3607 Benefit Street. Ms. Graham called 911 at Raiford's request and then handed Raiford the phone. (*Id.* ¶ 27.) He described a single perpetrator to the 911 operator—specifically, an unknown black male, wearing unknown color clothing, in a blue Chevy Beretta that fled on Benefit toward the interstate. (*Id.*) This is the entirety of the information Mr. Raiford provided immediately after the shooting. (*Id.*)

*NOPD Officers Len Davis and Samuel Williams Frame Bernell Juluke*

Within two minutes of the shooting, by approximately 9:24 p.m., NOPD officers Len Davis and Samuel "Sammie" Williams arrived. (*Id.* ¶ 28.) They were the first officers to arrive—arriving even before the officers who were dispatched to the scene by 911. (*Id.*) Mr. Raiford was not on scene when Officers Davis and Williams arrived. (*Id.*)

Despite not yet having spoken with Mr. Raiford, the lone living eyewitness, and despite Mr. Raiford having been unable to identify the perpetrator in his 9-1-1 call, Officer Len Davis immediately called-in Bernell Juluke as the perpetrator. (*Id.* ¶ 29.) Officer Davis and his partner

Officer Williams intended to frame Bernell Juluke. (*Id.* ¶¶ 29-31.) They did not possess any evidence that he was the perpetrator, let alone the perpetrator identified by the lone living eyewitness, Samuel Raiford. (*Id.* ¶¶ 29-32.)

There is proof of Officers Davis' and Williams' intent to frame. Officers Davis and Williams authored the original incident report for the Santinac murder. (*Id.* ¶ 32.) The report does not mention any discussion with Samuel Raiford regarding the identity of a perpetrator or even that the officers suspected a perpetrator. (*Id.*) The report merely notes that Officers Davis and Williams held Mr. Raiford until homicide detectives arrived to interview him. (*Id.*) Perhaps most importantly, the report affirmatively states that the identity of any suspect was "unknown" to Officers Davis and Williams. (*Id.*) Neither this police report, nor police logs showing that it was Officer Davis and Williams who initially identified Bernell Juluke — not Samuel Raiford — was ever produced to Bernell Juluke. (*Id.* ¶ 33.)

Officers Len Davis and Samuel Williams' history of misconduct and criminality is now well known, and Plaintiff discusses their history in his complaint at length, including the convictions and death sentence for which former Officer Davis now sits on death row. (*Id.* ¶¶ 51-81.) Indeed, as described by OPDA in 2022 during Mr. Juluke's post-conviction proceedings, "At the time this crime happened, Officers Len Davis and Sammie Williams were in the business of manipulating evidence at murder scenes to cover up for their drug-dealing associates." (*Id.* ¶ 93(a).)

After Officer Davis and Williams implicated Mr. Juluke, other officers soon stopped a vehicle in which Mr. Juluke, Gable, and Nelson were riding, arrested them, and brought Samuel Raiford to the Homicide Division of NOPD to identify them in a rigged lineup. (*Id.* ¶¶ 40-44.) In reviewing Mr. Juluke's case in 2022, the OPDA summarized the stop of Mr. Juluke and his co-

defendants Gable and Nelson aptly: They "became suspects despite being stopped unarmed, miles away from the murder in a car that did not match the description given by the [lone] witness because then-NOPD officers Len Davis and Sammie Williams inserted themselves immediately into the homicide investigation and called in a purported suspect's name into dispatch[.]" (*Id.* ¶ 92.)

### NOPD and OPDA Withhold Material Exculpatory Evidence

Mr. Raiford became the State's key witness in the case against Mr. Juluke and his co-defendants at trial — virtually the only evidence of guilt given the absence of any other witness and the complete lack of forensic evidence against the three teenagers. (*Id.* ¶¶ 82-84, 37.) Given his centrality to the case, Mr. Raiford's accuracy and credibility was paramount. Nonetheless, three key pieces of exculpatory information refuting or at least casting doubt on Mr. Raiford's identification of Mr. Juluke and his co-defendants, were never produced, including: (1) transcribed Grand Jury testimony of Samuel Raiford, given on October 20, 1994; (2) handwritten notes of an ADA's interview with Samuel Raiford that occurred before October 18, 1994; and (3) a transcribed interview of Samuel Raiford at the NOPD Homicide Division given in the early hours of August 23, 1994 (hours after the murder).

Such exculpatory evidence demonstrated Raiford's inconsistent statements with respect to: (1) the color of the alleged perpetrator's vehicle; (2) whether he had seen Juluke, Gable, and Nelson earlier the day of the murder at a basketball court in the Iberville projects arguing with Jacob Carter or whether he had in fact seen them a day earlier in a different location in the Iberville (a store on the corner of Bienville)—inconsistencies which would further demonstrate that Raiford did not witness them shoot Santinac and which would further corroborate the alibi defense of Juluke and his co-defendants; and (3) Raiford having provably lied under oath, just a month before Juluke's

trial, in another matter in which he pled guilty to burglary—which would have further demonstrated Raiford's lack of credibility and the prosecution's insistence that Raiford was "truthful and forthright." (*Id.* ¶ 95.) The OPDA's review of Mr. Juluke's case confirmed that this information was wrongfully withheld, concluding that "significant information bearing on [Mr. Juluke's, Mr. Nelson's, and Mr. Gable's] guilt or innocence was kept from the jury at their trial" and that they "suffered a miscarriage of justice and their convictions and continued imprisonment violate the Sixth, Eighth and Fourteenth Amendments to the United States Constitution, corresponding Supreme Court precedent, and the Louisiana Constitution." (*Id.* ¶¶ 95, 97.)

In short, in pertinent part here, the OPDA withheld several key pieces of exculpatory and exonerating evidence from Mr. Juluke, including the Davis/Williams Incident Report, Police Logs, and three prior statements of chief witness Samuel Raiford. OPDA therefore played an important part in Plaintiff's (and his co-defendants') wrongful conviction.

### *The OPDA's Known History of Brady Violations at the Relevant Time*

The *Brady* violations at issue in Mr. Juluke's case were part of a pattern and practice of such violations during the relevant time period. (*Id.* ¶¶ 120-22, 118.) Plaintiff has identified 13 published decisions confirming similar violations—primarily withheld exculpatory witness statements—during the relevant time period. (*Id.* ¶ 120.) As discussed further below, additional examples of such misconduct by OPDA abound.

## LEGAL STANDARD

In deciding a Rule 12(b)(6) motion to dismiss for failure to state a claim, the court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007). A plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp v.*

*Twombly,* 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## ARGUMENT

### I.     Mr. Juluke alleges that OPDA is responsible for its unconstitutional policies and practices.

OPDA argues that because Mr. Juluke alleges that the City of New Orleans is liable for the actions of the OPDA, then the OPDA "is not responsible for the alleged policies that Mr. Juluke challenges." (Doc. 66, at 4.) OPDA's argument fails for two reasons. First, it ignores Plaintiff's allegations that OPDA is responsible for the policies and practices that caused his injuries. (Doc. 54, ¶ 24; *see also id.* ¶¶ 9, 118, 120-22.) Indeed, Count 8 of Plaintiff's complaint—alleged solely against OPDA—is premised on OPDA's responsibility for its unconstitutional policies and practices. (*Id.* ¶¶ 186-95.) OPDA may not ignore Plaintiff's allegations in service of its Rule 12(b)(6) motion. *In re Katrina Canal Breaches Litig.*, 495 F.3d at 205.

Second, Plaintiff is entitled to allege that both the City of New Orleans and OPDA are responsible for OPDA's unconstitutional policies and practices, as both may indeed be responsible for such practices. *Compare Burge v. Parish of St. Tammany*, 187 F.3d 452, 470 (5th Cir. 1999) ("Considering the Louisiana constitutional and statutory law and tort cases, we conclude that, in a suit against a district attorney in his official capacity under § 1983 for constitutional torts caused by the district attorney's policies regarding the acquisition, security, and disclosure of *Brady* material, a victory for the plaintiff imposes liability on the district attorney's office as an independent local entity."), *with Hudson v. City of New Orleans*, 174 F.3d 677, 689 (5th Cir. 1999) ("[W]e find it considerably easier to say that the City of New Orleans, rather than the [State of Louisiana], is responsible for the general debts and obligations of the Orleans Parish District

Attorney's Office."). Pleading in the alternative is proper as well. FED. R. CIV. P. 8(d)(2); *Griffin v. United Parcel Serv., Inc.*, No. CIV.A 08-2000, 2010 WL 126229, at *2 (E.D. La. Jan. 8, 2010). In short, OPDA's argument — that Plaintiff cannot plausibly allege that OPDA is responsible if Plaintiff also alleges that the City is responsible — fails as a matter of law.

In support of its argument, OPDA cites to *Arnone v. County of Dallas County*, 29 F.4th 262 (5th Cir. 2022), wherein the Fifth Circuit found that, as a matter of Texas state law, the Dallas County District Attorney acted for the State of Texas. *Id.* at 272. OPDA argues in turn that "[j]ust as, in *Arnone*, Dallas County could not be held liable for policies adopted by a *state* policymaker, Mr. Juluke cannot hold OPDA liable for alleged policies that he claims are the responsibility of the City of New Orleans." (Doc. 66 at 4-5 (emphasis in original).) However, both the Fifth Circuit and Louisiana district courts have rejected that argument.

Under Louisiana law (as opposed to Texas law, which was at issue in *Arnone*), "the Orleans Parish District Attorney and his subordinates act as an independent local autonomous entity for the purposes of *Monell* claims." *Smith v. Williams*, No. 22-1550, 2023 WL 4079559, at *4 (E.D. La. June 20, 2023); *see also Jones v.* Williams, No. 22-5907, 2023 WL 3211865, at *3 (E.D. La. May 2, 2023) (rejecting OPDA's argument here and holding that the Fifth Circuit's decision in "*Burge* necessitates the conclusion that a district attorney in Louisiana acts on behalf of the district attorney's office when making decisions regarding the disclosure of exculpatory evidence – not the state") (citing *Burge v. Parish of St. Tammany*, 187 F.3d 452, 470 (5th Cir. 1999))*.*

For those reasons, the Court should reject OPDA's argument.

## II.    Mr. Juluke need not identify an "involved policymaker" on the pleadings.

OPDA attacks Plaintiff's failure to identify the "policymaker" at issue for purposes of Plaintiff's *Monell* claim, as well as that such policymaker had knowledge of, and approved or

condoned, the alleged pattern of *Brady* violations. (Doc. 66, at 6.) OPDA's attack fails because it is both contrary to law of this circuit and ignores Plaintiff's well-pled facts.

The Fifth Circuit has declared that the "the specific identity of the policymaker is a legal question that need not be pled; the complaint need only allege facts that show an official policy, promulgated or ratified by the policymaker, under which the municipality is said to be liable." *Groden v. City of Dallas, Texas*, 826 F.3d 280, 284 (5th Cir. 2016); *see also Balle v. Nueces Cty., Tex.*, 952 F.2d 552, 559 (5th Cir. 2017) (holding that the district court erred in concluding that identity of the policymaker must be pled). As such, OPDA's argument is premised on a requirement of its own making, contrary to the law of the Fifth Circuit.

Nonetheless, even at this early stage, Plaintiff has alleged that former District Attorney Harry F. Connick, Sr., Orleans Parish District Attorney at the time of Plaintiff's wrongful conviction, is a relevant policymaker. (Doc. 54, ¶¶ 24, 194.) "A district attorney is the independent and final official policymaker for all of the administrative and prosecutorial functions of his office." *Burge v. Par. of St. Tammany*, 187 F.3d 452, 469 (5th Cir. 1999).[1]

As for OPDA's suggestion that Plaintiff has not alleged knowledge and approval or condoning of the unconstitutional practices alleged, the OPDA does not cite a single judicial decision supporting dismissal on that ground. (Doc. 66, at 6.) In any event, Plaintiff has alleged numerous facts demonstrating that over a period of several years leading up to and through Plaintiff's wrongful conviction—all of which occurred during the tenure of Harry F. Connick, Sr.—the office had a pattern and practice of *Brady* violations of which the OPDA was not only aware but embraced as standard practice. (Doc. 54, ¶¶ 120-21, 187-89.) This is sufficient at the

---

[1] Plaintiff has sued current District Attorney, Jason Rogers Williams, in his official capacity, because he is the current officeholder and "successor" to Mr. Connick (Doc. 54, ¶ 24) and, therefore, the proper official-capacity defendant here. *Armstrong v. Ashley*, 60 F.4th 62, 268 n.4 (5th Cir. 2023).

pleading stage. *See Bond v. Nueces County, Texas*. No. 20-40050, 2022 WL 4595000 (5th Cir. Sept. 30, 2022) (noting that while plaintiff's allegations of prior cases of misconduct for *Monell* purposes may be a small percentage, it would hold plaintiff to a "standard too high at this stage of litigation" to require more); *Joseph v. Franklin*, No. 1:22-CV-03198, 2023 WL 5746938, at *11 (W.D. La. Aug. 21, 2023) (denying motion to dismiss *Monell* claim for excessive force and denial of medical care where plaintiff alleged similar past practices and three instances of excessive force against him and three instances of denial of medical care); *Hanks v. Community Education Centers, Inc.*, No. 5:14-cv-43, 2015 WL 5522008, at *12 (E.D. Tex., Sept. 17, 2015) (denying motion to dismiss *Monell* claim where "[p]laintiffs here allege several policies or customs which they claim led to [decedent's] death and cite four other instances of inmates who were denied or delayed medical care").

Accordingly, the Court should deny OPDA's motion on this ground.

### III.   Mr. Juluke has plausibly alleged a pattern and practice of OPDA withholding exculpatory witness statements and police reports.

OPDA argues that Plaintiff has not alleged sufficient support to show a pattern and practice of *Brady* violations. OPDA's assertion is based upon three arguments, including that: (1) Plaintiff has not adequately described relevant *Brady* violations; (2) Plaintiff's identification of 13 other cases involving *Brady* violations by OPDA is insufficient to plead a pattern or practice; and (3) Plaintiff has not shown that such other instances are similar to Plaintiff's allegations of misconduct here. Each of these arguments fails, as set forth below.

#### A.   Mr. Juluke has specified the factual basis of *Brady* violations in the 13 other cases cited.

The OPDA claims that "Mr. Juluke does not directly allege that OPDA prosecutors withheld exculpatory evidence from any other defendant in any other case." (Doc. 66, at 6.) That

is false. Indeed, in the very next sentence of its brief, OPDA acknowledges that Mr. Juluke has listed 13 published court decisions wherein OPDA withheld *Brady* material. (*Id.* at 6-7 (citing Doc. 54, ¶ 120).)

In turn, OPDA asserts that Mr. Juluke "includes no factual allegations setting forth precisely what OPDA is alleged to have done in any of these cases." (Doc. 66, at 7.) That is also wrong. Mr. Juluke specifies that in each of those cases, the court ruled that OPDA failed to turn over exculpatory witness statements or similar material in violation of *Brady* — precisely a part of Plaintiff's allegation here. (Doc. 54, at ¶¶ 118, 120.) Moreover, OPDA does not contest that the decisions cited by Plaintiff stand for that proposition (because it cannot). For that reason, the Court should reject OPDA's attempt to ignore the express allegations in Plaintiff's complaint, as well as the holdings of the decisions cited by Plaintiff demonstrating repeated *Brady* violations by OPDA at the relevant time.

  **B. Mr. Juluke's reference to 13 other published decisions demonstrating relevant *Brady* violations distinguishes this matter from the complaint at issue in *Armstrong v. Ashley.***

OPDA argues that Plaintiff's citation to 13 other published decisions involving OPDA *Brady* violations "does not plausibly demonstrate" a pattern or practice of misconduct. (Doc. 66, at 7.) OPDA relies exclusively on the Fifth Circuit's recent opinion in *Armstrong v. Ashley*, 60 F.4th 262 (5th Cir. 2023), for its argument. (*Id.*) A close review of *Armstrong*, however, demonstrates that Mr. Juluke's complaint here does not suffer from the infirmities identified there.

Specifically, in *Armstrong*, in affirming dismissal of the plaintiff's *Monell* claim against the Caddo Parish District Attorney's Office, the Fifth Circuit noted that "nine constitutional violations [alleged] over a 24-year period and thousands of prosecutions are hardly sufficient to show a municipal custom." *Armstrong*, 60 F.4th at 277-78. Importantly, however, the plaintiff's

complaint there suffered from a "more fundamental problem," which was "the complaint's mischaracterization of [those] nine cases, none of which found a *Brady* violation." *Id.* Unlike the plaintiff in *Armstrong*, Mr. Juluke here has identified 13 published decisions confirming numerous instances of OPDA *Brady* violations through the withholding of exculpatory witness statements and related materials. (Doc. 54, ¶ 120.) Accordingly, Plaintiff's allegations are far more robust than the plaintiff in *Armstrong*.

Indeed, Mr. Juluke's allegations comport with numerous decisions finding a plausibly pled custom of unconstitutional actions under *Monell. See Marshall v. Webre*, No. 23-1319, 2023 WL 5952645, at *5 (E.D. La. Sept. 13, 2023) (denying motion to dismiss where plaintiff included factual allegation regarding his own experiences that "support the claim that Sherriff Webre maintained *de facto* policies of ignoring legitimate and serious medical needs and failing to provide adequate medical attention to inmates); *Alanis-Mejia v. Cameron County, Texas*, No. 1:23-cv-40, 2023 WL 4109784, at *6 (S.D. Tex. May 17, 2023) (denying motion to dismiss *Monell* claim for excessive force where the plaintiff alleged three prior incidents); *Joseph*, 2023 WL 5746938, at *11 (denying motion to dismiss claim for *Monell* liability for excessive force and denial of medical care where plaintiff alleged three instances of excessive force against him and three instances when he was denied medical care); *Guillot v. Lopinto*, No. 20-1604, 2021 WL 5386260, at *13 (E.D. La. Nov. 18, 2021) (holding that "three previous suicides evidence a pattern of CHL improperly delegating medical decisions" to a social worker prior to their suicides); *Reyes v. City of Austin, Inc.*, No. 21-CV-00992, 2022 WL 789333, at *4 (W.D. Tex. March 15, 2022) (holding that two separate arrests and "about 10 or so" additional arrests was sufficient to state a "policy and custom" at the pleading stage); *Hankins v. Community Education Centers, Inc.*, No. 5:14cv43, 2015 WL 5522008, at *12 (E.D. Tex. Sept. 17, 2015) (denying a motion to dismiss

where plaintiff cited four other instances of inmates who were denied or delayed medical care); *Barr v. San Antonio*, No. SA-06-CA-0261-XR, 2006 WL 2322861, at *4 (W.D. Tex. July 25, 2006) (finding allegations of four prior lawsuits against city concerning unlawful arrest and excessive force sufficient to state a policy or custom claim under Section 1983).

OPDA's history of repeated *Brady* violations during the relevant time period are well documented in this district. One recent district decision referenced plaintiff's plan to introduce evidence of "44 cases in which federal or state courts have found that OPDA violated *Brady*." *Jones v. Cannizzaro*, No. 18-503, 2019 WL 2289470, at *8 n.53 (E.D. La. May 28, 2019) (collecting cases). In *Jones*, the OPDA convicted the plaintiff in 1996. *Jones v. Cannizzaro*, No. 18-503, 2019 WL 5692962 at *1 (E.D. La. Nov. 4, 2019). As with Mr. Juluke, the OPDA's case had rested on eyewitness testimony. *Jones v. Cannizzaro*, 514 F. Supp. 3d. 853, 860 (E.D. La. 2021). That conviction was vacated in 2014, however, because of OPDA's suppression of favorable evidence in violation of *Brady*. *Jones*, 2019 WL 5692962 at *1. In an opinion on *Daubert* motions, the district court rejected OPDA's argument and allowed Jones's expert to testify that it is "her opinion that the actual number of *Brady* violations by the OPDA is likely much larger than the number that has been documented in court decisions." *Jones*, 514 F. Supp. 3d at 866.

For these reasons, the Court should deny the OPDA's argument premised exclusively on the Fifth Circuit's *Armstrong* opinion, which involved a complete absence of confirmed *Brady* violations against the Caddo Parish District Attorney. In the event the Court nonetheless finds Mr. Juluke's allegations here insufficient, the Court should grant him leave to amend his complaint to identify additional instances of relevant *Brady* violations. Plaintiff can identify several additional instances of relevant misconduct. *See, e.g.*, *Reeder v. Williams*, No. 22-4614, 2023 WL 8449261, at *1-*2 (E.D. La. Dec. 06, 2023) (discussing the vacating of Reeder's conviction in 1995 where

13

the OPDA withheld two exculpatory witness statements from its sole witness that contradicted his trial testimony); *Adams v. City of New Orleans*, No. 1501543, 2016 WL 4272711, at \*4-\*5 (E.D. La. Aug. 15, 2016) (discussing two exculpatory police reports that were withheld during his 1990 trial and conviction that led OPDA to exonerate him in 2014); *State v. Davis*, 727 So.2d 453, 456-57 (La. Ct. App. 1998) (finding that the withholding of a supplemental police report in a 1995 trial was "[c]learly . . . *Brady* material, which the prosecutor was obliged to overturn to the defense").

### C. The pattern of *Brady* violations identified by Plaintiff are sufficiently similar to those alleged in his complaint.

OPDA also argues that Plaintiff's complaint does not demonstrate that the 13 other instances of *Brady* violations are sufficiently similar to Plaintiff's alleged violations here. (Doc. 66, at 7-8.) OPDA relies on the Fifth Circuit decisions in *Johnson v. Harris Cty.*, 83 F.4th 941 (5th Cir. 2023) and *Martinez v. Nueces Cty.*, 71 F.4th 385 (5th Cir. 2023), for its argument. As discussed below, however, the plaintiffs in *Johnson* and *Martinez* could not identify a history of unconstitutional conduct similar to that which caused the plaintiff's harms and, therefore, they are unhelpful here.

In *Johnson*, the plaintiff alleged that "Harris County engaged in a custom or policy of arresting individuals without probable cause." 83 F.4th 941, 947 (5th Cir. 2023). The plaintiff did not allege specific facts about the challenged practice. *Id*. As such, the Court held that 23 prior incidents of criminal charges that were later dismissed for lack of probable cause lacked detail to show that "pattern of examples is sufficiently similar to her incident." *Id*. The "proffered examples only state[d] that (1) an individual was arrested and (2) charged with a crime that was (3) later dismissed for lack of probable cause." *Id*. at 947 n.6. Without pointing to the specific policy that caused his injury, plaintiff could not "allege *any* pattern of conduct – much less a pattern of similar violations." *Id*. (emphasis in original).

14

Similarly, in *Martinez,* the plaintiff alleged that "Nueces County had a policy of ignoring the serious medical needs of those entrusted to its care." 71 F.4th 385, 389 (5th Cir. 2023) (cleaned up). The court affirmed dismissal because "Martinez's description of what happened to him is so vague, we cannot accept that the proffered examples are sufficiently similar to his own incident that the municipality can be found liable." *Id*. Because he did not provide specific allegations about what caused his injury, the Court could not say "that the occurrence was similar enough to the previous incidents that the county's acquiescence in the patten of previous incents was the moving force behind [plaintiff's] injury." *Id*. at 390.

Both *Johnson* and *Martinez* bear no resemblance to Mr. Juluke's allegations here. Juluke identifies thirteen cases, four of them occurring between the time he was indicted and convicted, that involve the same unconstitutional actions by the OPDA that Juluke alleges occurred to him, namely, that the OPDA withheld exculpatory information in the form of witness statements and police reports. (Doc. 54, ¶¶ 95). This misconduct did not occur in a vacuum. As alleged by Mr. Juluke, throughout the 1990s, the OPDA obtained convictions of other people through this very same method.

For example, in *State v. Oliver*, the Court of Appeal of Louisiana vacated a 1994 conviction because the OPDA failed to disclose prior inconsistent statements and reports that "would have made possible the vigorous and meaningful cross-examination of the two 'star witnesses.'" 682 So.2d 301, 308-09 (La. Ct. App. 1996). The Court felt compelled to remind the OPDA to comply with "*Bagley* and the ABA Standards for Criminal Justice which call generally for prosecutorial disclosures of any evidence tending to exculpate or mitigate." *Id*. at 312.

Further, in *Mahler v. Kaylo*, the Fifth Circuit vacated a 1997 conviction where "[t]he [OPDA's] case . . . depended on the reliability of the very witnesses whose pretrial statements

were suppressed." 537 F.3d 494, 504 (5th. Cir. 2008). Again, in *State v. Bright*, the Supreme Court of Louisiana vacated a 1996 conviction where the OPDA's "failure to disclose the criminal history of its key witness . . . require[d] reversal under the rule of" *Brady*. 875 So. 2d 37, 44 (La. 2004). Yet again, in *Smith v. Cain*, the Supreme Court of the United States vacated a 1995 conviction where the OPDA's only evidence linking Smith to the crime was the testimony of one witness whose "undisclosed statements directly contradict[ed] his testimony." 565 U.S. 73, 76 (2012).

Likewise, in *State v. Cousin*, the Supreme Court of Louisiana vacated a 1995 conviction where the ODPA did not disclose an exculpatory statement. 710 So. 2d 1065, 1073 (La. 1998). Mr. Juluke's reference to these and other cases demonstrate sufficient similarity to his own. *See Estate of Davis ex rel. McCully v. City of North Richland Hills*, 406 F. 3d 375, 383 (5th Cir. 2005) (explaining that "[w]hile the specificity required should not be exaggerated, our cases require that the prior acts be fairly similar to what ultimately transpired").

Indeed, Mr. Juluke's complaint is more akin to the one at issue in *Bond v. Nueces County, Texas*. No. 20-40050, 2022 WL 4595000 (5th Cir. Sept. 30, 2022). There, the Court reversed the district court's denial of plaintiff's motion for leave to file a third amended complaint. The third amended complaint identified 23 specific prior incidents of misconduct. *Id*., *6. The Fifth Circuit explained that "Bonds proposed complaint noted that each of the cited incidents involved inmates who were refused timely medical attention when it was requested or the need was shown, resulting in injury or death — the precise basis of Bond's complaint regarding [decedent's] treatment." *Id*. Similarly, here, the cases cited by Juluke of "prior indications . . . point to the specific violation in question." *Id*. As such, Plaintiff's complaint permits the reasonable inference that the OPDA had a wide-spread practice of violating the constitutional rights of the citizens like Plaintiff by withholding and suppressing exculpatory police reports and witness statements.

16

IV.     **Mr. Juluke has plausibly alleged deliberate indifference by the OPDA.**

OPDA argues that Plaintiff's complaint does not plausibly allege that the OPDA was deliberately indifferent to Plaintiff's rights under *Brady*. (Doc. 66, at 8-9.) For many of the same reasons addressed in Section III-B and III-C, above, OPDA's argument should be rejected. *See Mitchell v. City of New Orleans*, 184 F. Supp. 3d 360, 373 (E.D. La. 2016) ("A pattern of complaints by other citizens can evidence not only the existence of a policy but also deliberate indifference").

Mr. Juluke alleges numerous specific instances where OPDA withheld witness statements and police reports in violation of *Brady*. (Doc. 54, ¶120.) In each of those instances, the Orleans Parish District Attorney, Harry F. Connick Sr., was listed as a counsel of record. Such allegations surpass that which is required to plausibly plead deliberate indifference on the face of the complaint. *See Balle v. Nueces County,* Texas, 952 F.3d 552, 560 (5th Cir. 2017) (reversing dismissal of municipal liability claim where a pattern of failing to provide medical care alleged in the pleadings was sufficient for "[r]easonable inferences can clearly be drawn that Nueces County had an unwritten policy or widespread practice . . . that was the moving force behind the unconstitutional injuries"); *see also Sinegal v. City of El Paso*, No. EP-19-CV-107-C, 2020 WL 13442013, at *16 (W.D. Tex. July 6, 2020) (finding that "[w]here flagrant and glaringly similar incidents occur even just a few times, it may be reasonable to infer the deliberate indifference of municipal policymakers."). Indeed, the allegations here demonstrate a continuity of practice by the same office (OPDA under Connick) both before and after Mr. Juluke's conviction, rendering OPDA's complaint that "five of the 13 court decisions listed were issued *after* Mr. Juluke's prosecution" of minimal value. (Doc. 66, at 9.)

With respect to the failure-to-train *Monell* claim (as distinguished from the claim based on OPDA's custom of *Brady* violations, discussed above), OPDA relies on *Connick v. Thompson*, 563 U.S. 51 (2011), to shield itself from liability. (Doc. 66, at 9-10.) Plaintiff's allegations here are distinguishable from *Connick* because there, Plaintiff had only alleged four prior instances of *Brady* violations which were unrelated to the blood testing evidence withheld in the case. *Id.* at 61. Here, as described above, the pattern of violations identified by Mr. Juluke demonstrates the circumstance described in *Connick*, where a "pattern of violations" demonstrates that a prosecutor's typical "tools are insufficient to prevent constitutional violations" in the absence of training. *Id.* at 67. Here, the OPDA's "policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by . . . itself to violate the Constitution." *Joseph*, 2023 WL 5746938, at *12 (cleaned up) (quoting *Connick*, 563 U.S. at 62). The Court should therefore reject OPDA's argument here as well.

### V.     Mr. Juluke has plausibly alleged that the OPDA's *Brady* practices were the "moving force" behind his injuries.

OPDA next argues that Plaintiff has failed to allege that the OPDA's unconstitutional practices were the "moving force" behind Plaintiff's injuries. (Doc. 66, at 10.) However, OPDA does not cite a single judicial decision supporting its request for dismissal here. In fact, review of relevant precedent demonstrates that Plaintiff's complaint meets the pleading standard.

Mr. Juluke alleges that the OPDA withheld several pieces of material evidence from him—namely, the original incident report, police logs, and documents casting doubt on the credibility of the State's key witness, Samuel Raiford (Doc. 54, ¶¶ 95, 117) — and that such withholding caused his wrongful conviction. (Doc. 54, ¶¶ 117, 121, 122.) In turn, as discussed at length above, Mr. Juluke has alleged a pattern of similar *Brady* violations by OPDA. Therefore, Plaintiff has pled that OPDA's unconstitutional policy was the moving force (i.e., cause) of his injuries. *See, e.g.*,

*Doe v. Dantin*, No. 11-467, 2014 WL 2045344, at *7 (E.D. La. May 16, 2014) (equating "moving force" with "causation").

That is all that is required to plead that OPDA's practices were the moving force behind Plaintiff's injury. For example, in *Groden v. City of Dallas, Tex.*, the Fifth Circuit reversed the the dismissal of plaintiff's complaint, where he had alleged that the city of Dallas had an unconstitutional crackdown policy of "arresting individuals who were not committing any crimes" and that he was arrested based on that policy. 826 F.3d 280, 286-87 (5th Cir. 2016). "He thus pled sufficient facts to show that the alleged crackdown policy . . . was the moving force behind the city's alleged unconstitutional arrest." *Id*. Likewise, in *Doe v. Dantin*, the court denied a motion to dismiss where the plaintiff alleged there that the Chief of Police had an "official policy of destroying and concealing confessions" and that policy was the moving force behind the failure to "[preserve] Dantin's confession" in violation of plaintiff's "First Amendment right of access to the courts." 2014 WL 2045344, at *2, *8.

Similar to the plaintiffs in *Groden* and *Dantin*, Mr. Juluke alleges that OPDA's custom of withholding exculpatory police reports and witness statements caused his conviction. (Doc. 54, ¶¶ 122, 192-93.) For these reasons, the Court should deny OPDA's unsupported argument here.

**VI.    Plaintiff has adequately alleged civil conspiracy against the OPDA.**

To establish a Section 1983 conspiracy claim, the plaintiff must plead "1) an agreement between the alleged conspirators to commit an illegal act, and 2) an actual deprivation of constitutional rights." *Williams v. Zordon*, No. 21-1061, 2023 WL 6451111, at *9 (W.D. La. Sept. 29, 2023). "An agreement to commit an illegal act may be proved by indirect or circumstantial evidence." *Dantin*, 2014 WL 2045344, at *6.

OPDA argues that Plaintiff has failed to allege conspiracy. (Doc. 66, at 11.) Again, however, OPDA does not cite any judicial decision supporting its position. Indeed, contrary to its position, Plaintiff has sufficiently alleged that the OPDA acted in concert with the NOPD — namely, by conspiring to withhold and suppress exculpatory evidence — to convict Mr. Juluke. (Doc. 54, ¶¶ 197-99.) This is sufficient on the pleadings. *See, e.g.*, *Jones v. Arbuckle*, No. 18-1197, 2019 WL 4316220, at *1-2 (W.D. La. Sept. 11, 2019) (conspiracy sufficiently pled based on defendants' interaction followed by negative consequences for plaintiff).

## CONCLUSION

For the reasons above, the Court should deny the OPDA's motion to dismiss. To the extent the Court dismisses Plaintiff's claim, Plaintiff respectfully requests that the Court do so without prejudice to repleading against OPDA.

Respectfully submitted,

/s/     *John Marrese*
One of Plaintiff's Attorneys

Steven Hart*
Brian Eldridge*
John Marrese*
**HART MCLAUGHLIN & ELDRIDGE, LLC**
One South Dearborn, #1400
Chicago, Illinois 60603
Telephone: (312) 955-0545
shart@hmelegal.com
beldridge@hmelegal.com
jmarrese@hmelegal.com

Lance C. Unglesby (La. Bar #29690)
Adrian M. Simm, Jr. (La. Bar #36673)
Jamie F. Gontarek (La. Bar #37136)
**UNGLESBY & CROMPTON, LLC**
607 St. Charles Ave., Ste. 300
New Orleans, Louisiana 70130
Telephone: (504) 345-1390
Fax: (504) 324-0835

Lance@ucjustice.com
Adrian@ucjustice.com
Jamie@ucjustice.com

*Admitted *pro hac vice*

**Attorneys for Plaintiff**