**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| BERNELL JULUKE, | Civil Action No. 23-03111 |
| | c/w 23-6203 |
| *Plaintiff*, | |
| | Relates to: No. 23-cv-03111 |
| v. | |
| | Section O |
| LEN DAVIS, *et al.*, | Judge Brandon S. Long |
| | |
| *Defendants*. | Division 2 |
| | Magistrate Judge Donna Phillips Currault |

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

Defendant Jason R. Williams, in his official capacity as Orleans Parish District Attorney ("OPDA"), through undersigned counsel, respectfully submits this memorandum in support of his motion seeking dismissal, pursuant to Federal Rule of Civil Procedure 12(b)(6), of the claims asserted against OPDA in Plaintiff Bernell Juluke's Second Amended Complaint (the "Complaint"), Doc. No. 160.

### INTRODUCTION

In 1996, Bernell Juluke was convicted, along with Kunta Gable and Leroy Nelson, of the second-degree murder of Rondell Santinac. On appeal, the Louisiana Supreme Court rejected Mr. Juluke's challenge to the sufficiency of the evidence supporting his conviction. *See State v. Juluke*, 725 So. 2d 1291 (La. 1999). Mr. Juluke then filed post-conviction applications in state and federal court, alleging *Brady* violations and other constitutional defects; these claims were rejected on the merits. *See, e.g.*, *Juluke v. Cain*, 134 F. App'x 684 (5th Cir. 2005).

Notwithstanding these denials, after Jason Williams took office as Orleans Parish District Attorney in 2021, his newly created Civil Rights Division voluntarily undertook a comprehensive review of Mr. Juluke's conviction. After an investigation, the Civil Rights Division and Mr. Juluke

1

filed a joint agreement and motion to vacate his conviction. Mr. Juluke acknowledges in his Complaint that "[i]t was not until the Civil Rights Division of the OPDA became involved that the possibility of [his] freedom became real." Doc. No. 160 at ¶ 87. However, after obtaining his freedom with the assistance of OPDA's Civil Rights Division, Mr. Juluke chose to sue OPDA for damages.

Mr. Juluke alleges that he is the victim of NOPD officers who "intentionally framed [him] for murder." Doc. No. 160 at ¶ 31. He alleges that these officers "were involved in murder and drug trafficking" and "intentionally misdirect[ed] criminal investigations to benefit themselves or their drug-dealing accomplices." *Id.* at ¶¶ 5, 51. He further alleges that NOPD officers obtained a "coerced identification" using a "rigged" and "unconstitutionally suggestive lineup" that was "designed to produce [a] false confession." *Id.* at ¶¶ 6, 44, 49. He alleges that the actions of the NOPD officers were "intentional, wanton, malicious, reckless, and oppressive," and "for a purpose other than bringing [him] to justice." *Id.* at ¶¶ 155, 160. Yet even while alleging such egregious intentional wrongdoing by police officers, Mr. Juluke seeks to blame his conviction and imprisonment on OPDA's alleged failure to disclose exculpatory evidence.

Mr. Juluke lists three items of evidence that he believes should have been disclosed to him: (1) an incident report written by Officers Len Davis and Sammie Williams; (2) a 911 call/dispatch log; and (3) certain "statements and testimony" by witness Samuel Raiford. *See* Doc. No. 160 at ¶ 117. OPDA does not concede that this evidence was suppressed or that it was favorable to Mr. Juluke or material. *See, e.g.*, *Lawrence v. Lensing*, 42 F.3d 255, 257 (5th Cir. 1994) (describing elements of *Brady* claim). Indeed, Mr. Juluke's *Brady* claims have already been rejected with respect to most of this evidence. *See Juluke*, 134 F. App'x at 687–88 ("Nothing in the logs or report was material to Juluke's guilt or innocence.").

However, assuming solely for the purposes of this motion that Mr. Juluke has adequately alleged a *Brady* violation, his claims against OPDA still must be dismissed because he has not adequately alleged the elements necessary to hold OPDA liable. That is, Mr. Juluke's allegations concerning OPDA do not include the facts necessary to plausibly show that OPDA's policymaker acted with deliberate indifference and adopted official policies that were likely to violate the constitutional rights of criminal defendants. He also has not adequately alleged that the purported *Brady* violations in his case were caused by OPDA's official policies, or that OPDA participated in a conspiracy to knowingly and illegally convict an innocent man. The claims against OPDA (Counts 8 and 9) therefore must be dismissed.

OPDA previously moved to dismiss Mr. Juluke's claim on similar grounds. *See* Doc. No. 66. On February 25, 2025, this Court held that Mr. Juluke had "fail[ed] to plead facts plausibly establishing a custom, pattern, or practice of *Brady* violations that is sufficiently common and well settled as to fairly represent OPDA policy." Doc. No. 153 at 9. The Court also held that Mr. Juluke had "fail[ed] to plausibly plead a 'pattern of similar [*Brady*] violations'" that could show deliberate indifference by OPDA's policymaker. *Id.* at 12. The Court further held that, because Mr. Juluke had not adequately alleged a policy, he "necessarily fail[ed] to plead facts sufficient to show that any such 'policy' was the 'moving force' behind his alleged 'constitutional injury.'" *Id.* at 13. Finally, the Court held that Mr. Juluke had "fail[ed] to plead a plausible civil-rights conspiracy claim" against OPDA because his allegations were "conclusory" and "[did] not even distinguish among the various 'Defendants.'" *Id.* at 14. The Court granted Mr. Juluke leave to amend his complaint.

On March 18, 2025, Mr. Juluke filed a Second Amended Complaint (the "Complaint"). Mr. Juluke adds 15 new paragraphs in an attempt to allege an unconstitutional official policy of

3

OPDA and a series of *Brady* violations in other cases. *See* Doc. No. 160 at ¶¶ 121–135. For the reasons explained below, Mr. Juluke still has not alleged (and cannot allege) an unconstitutional official policy or deliberate indifference. And with respect to the "moving force" element and the conspiracy claim against OPDA, Mr. Juluke has not even made any serious attempt to overcome the deficiencies noted by the Court. He includes a single conclusory allegation as to "moving force"[1], but he still does not identify any OPDA prosecutor who worked on his case, describe the actions taken by any prosecutor, or provide any plausible basis whatsoever to infer that whatever actions the prosecutors might have taken in his case were directly caused by an official OPDA policy. Similarly, although Mr. Juluke describes actions allegedly taken by seven former NOPD officers in support of his conspiracy claim, *see* Doc. No. 160 at ¶ 142, he does not allege any actions taken by any person associated with OPDA. Because Mr. Juluke has failed to correct the deficiencies previously noted by this Court, his claims against OPDA should be dismissed with prejudice.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "To be plausible, the complaint's 'factual allegations must be enough to raise a right to relief above the speculative level.'" *In re Great Lakes Dredge & Dock Co.*, 624 F.3d 201, 210 (5th Cir. 2010) (quoting *Twombly*, 550 U.S. at 555). Although the Court must "accept all well-pleaded facts as true," it

---

[1] *See* Doc. No. 160 at ¶ 208 ("Plaintiff was injured as a direct and proximate result of the above policies, practices, and/or customs, such that those policies, practices and customs were the moving force behind the violation of Plaintiff's constitutional rights.").

should not "accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Id.* (quotation omitted).

### DISCUSSION

Assuming for the sake of argument that Mr. Juluke has adequately alleged a constitutional violation in connection with his criminal proceedings, he has not adequately alleged the elements necessary to hold OPDA liable. "Three essential elements must be established for a municipality to face § 1983 liability." *Alvarez v. City of Brownsville*, 904 F.3d 382, 389 (5th Cir. 2018) (en banc). "There must be (1) a policymaker; (2) an official policy; and (3) a violation of a constitutional right whose 'moving force' is the policy or custom." *Id.* "An official policy usually exists in the form of written policy statements, ordinances, or regulations, but may also arise in the form of a widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy." *Id.* at 389–90 (quotation omitted). However, "[a] city cannot be liable for an unwritten custom unless ***actual or constructive knowledge of such custom is attributable to a city policymaker***." *Pena v. City of Rio Grande City*, 879 F.3d 613, 623 (5th Cir. 2018) (quotation omitted, emphasis added). The plaintiff "must demonstrate that the policy was implemented with deliberate indifference to the known or obvious consequences that constitutional violations would result." *Id.* at 390 (quotations omitted). "The description of a policy or custom and its relationship to the underlying constitutional violation, moreover, cannot be conclusory; it must contain specific facts." *Guillot on behalf of T.A.G. v. Russell*, 59 F.4th 743, 752 (5th Cir. 2023). Mr. Juluke has not adequately pleaded any of these elements.

**I.      Mr. Juluke has not adequately alleged that OPDA maintained any unconstitutional policies related to disclosure of evidence.**

As this Court recognized, Mr. Juluke's prior complaint did not "allege that an official written policy instructed OPDA prosecutors to withhold exculpatory evidence." Doc. No. 153 at

7. In his new Complaint, Mr. Juluke still does not allege any such facially unconstitutional policy directly instructing prosecutors to violate the constitutional rights of defendants. At best, Mr. Juluke alleges that OPDA had a one-paragraph "written *Brady* policy" that "contained numerous misstatements of law" and therefore failed to properly instruct Assistant District Attorneys. *See* Doc. No. 160 at ¶ 122. Mr. Juluke also complains of various policies that OPDA allegedly ***did not*** have. He alleges that OPDA did not have "a valid, written policy to prosecutors to guide their disclosure practices"; "did not have a policy to discipline ADAs for choosing not to disclose *Brady* evidence"; "did not supervise prosecutors' handling of *Brady* obligations"; "did not require supervisors to review *Brady* compliance as a part of trial preparation"; and did not "require prosecutors to report the *Brady* violations of other prosecutors." Doc. No. 160 at ¶ 124.[2] Yet none of these alleged failings reflects a facially unconstitutional policy.

Because Mr. Juluke has not adequately alleged that OPDA promulgated official policies that are facially unconstitutional and that caused his alleged injuries, he must demonstrate deliberate indifference on the part of OPDA's alleged policymaker, Harry Connick. *See, e.g.*, *Edwards v. City of Balch Springs*, 70 F.4th 302, 309 (5th Cir. 2023).[3] As explained further below, he has failed to do so.

---

[2] It must be emphasized that, although Mr. Juluke's well-pleaded factual allegations of fact are accepted as true for purposes of this motion, most of these allegations are in fact false.

[3] *See also Armstrong v. Ashley*, 60 F.4th 262, 276 (5th Cir. 2023) ("Armstrong does not allege that an officially promulgated policy instructed police to investigate using unconstitutional methods. . . . Therefore, she had to rely on a custom or practice so common and well settled as to constitute a custom that fairly represents municipal policy, and actual or constructive knowledge of such custom must be attributable to the policymaker.") (quotations omitted).

6

**II.    Mr. Juluke has not adequately alleged that OPDA's policymaker acted with deliberate indifference.**

Mr. Juluke also has not adequately alleged that OPDA's alleged policymaker, Harry Connick, acted with deliberate indifference in maintaining policies concerning *Brady* disclosures. "Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of a city 'policy or custom' that is actionable under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 389 (1989). "Municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by city policymakers." *Id.* (quotation omitted). "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (quotation omitted). "Knowledge on the part of the policymaker that a constitutional violation ***will most likely result*** from a given official custom or policy is a *sine qua non* of municipal liability under section 1983." *Burge v. St. Tammany Parish*, 336 F.3d 363, 370 (5th Cir. 2003) (emphasis added). "Deliberate indifference is a degree of culpability beyond mere negligence or even gross negligence; it must amount to an intentional choice, not merely an unintentionally negligent oversight." *Alvarez*, 904 F.3d at 391 (quotation omitted).

"Because the standard for municipal fault is a stringent one, a pattern of similar constitutional violations by untrained employees is ordinarily required to show deliberate indifference." *Pena v. City of Rio Grande City*, 879 F.3d 613, 623 (5th Cir. 2018) (quotations omitted); *see also Davidson v. City of Stafford*, 848 F.3d 384, 396 (5th Cir. 2017) ("A pattern requires similarly, specificity, and sufficiently numerous prior incidents."). The Fifth Circuit has explained that only "very similar violations" can provide the "notice" to policymakers that would give rise to deliberate indifference. *See Jason v. Tanner*, 938 F.3d 191, 198 (5th Cir. 2019); *see*

*also Robinson v. Midland County*, 80 F.4th 704, 710 n.3 (5th Cir. 2023) ("The deaths of other inmates are not sufficiently similar to put the county on notice of a failure to provide adequate medical care because only one of them is alleged to have involved a failure to follow proper procedures, and none of the allegations involve fabrication of medical reports."); *Johnson v. Harris County*, 83 F.4th 941, 946–47 (5th Cir. 2023) (The "specific facts" of the alleged practice "must be similar to the case at hand: Prior indications cannot simply be for any and all bad or unwise acts, but rather must point to the specific violation in question.") (quotation omitted).

Mr. Juluke alleges that "numerous published decisions demonstrate the OPDA's repeated failure to turn over exculpatory police reports and witness statements and information as well as impeachment evidence under the leadership of Connick." Doc. No. 160 at ¶ 127. He cites 23 decisions, involving Orleans Parish cases tried over a period of 24 years (1974–1997), in which courts allegedly found that exculpatory evidence was not disclosed. *See* Doc. No. 160 at ¶ 127. There are several problems with these allegations. First, at least six of the cases cited by Mr. Juluke do not involve any finding of unconstitutional non-disclosure of evidence:

- In *State v. Henderson*, 362 So. 2d 1358 (La. 1978) (see Doc. No. 160 at ¶ 127d), the Louisiana Supreme Court remanded the case to the trial court to determine whether evidence was suppressed but did not find that it was in fact suppressed or that the constitution would have required disclosure.

- In *State v. Davis*, 727 So. 2d 453, 458–59 (La. App. 4th Cir. 1998) (see Doc. No. 160 at ¶ 127q), the Fourth Circuit in fact rejected the defendant's *Brady* claim and held that the allegedly withheld evidence was not material.

- In *State v. Parker*, 361 So. 2d 226, 227 (La. 1978) (see Doc. No. 160 at ¶ 127b), the defendant alleged that the State withheld exculpatory evidence of the victim's

8

arrest history, but the Louisiana Supreme Court did not credit those allegations or reverse on *Brady* grounds—rather, the court granted a new trial because an incomplete trial transcript made it impossible to "afford a meaningful appeal."

- In *State v. Smith*, 591 So. 2d 1219, 1225–27 (La. App. 4th Cir. 1991) (see Doc. No. 160 at ¶ 127m), the Fourth Circuit did not hold that the State failed to disclose exculpatory evidence about an agreement with a witness in exchange for his testimony—rather, the court reversed the conviction because the defendants were denied their "constitutional right to confrontation" when the trial court prevented them from asking the witness about the circumstances of his arrest.

- In *State v. Hunter*, 648 So. 2d 1025, 1034 (La. App. 4th Cir. 1994) (see Doc. No. 160 at ¶ 127o), the Fourth Circuit's decision is ambiguous at best, finding a "*Brady* violation" yet *affirming* the defendant's conviction after concluding that the failure to disclose exculpatory evidence did not deny the defendant a fair trial and that there was no reasonable probability of a different outcome if the evidence had been disclosed.

- In *State v. Cousin*, 710 So. 2d 1065 (La. 1998) (see Doc. No. 160 at ¶ 127s), the Louisiana Supreme Court—contrary to Mr. Juluke's contention—did not reverse the defendant's due to nondisclosure of exculpatory evidence. The conviction was reversed due to "erroneous admission of testimony as impeachment evidence and the prosecutor's use of that evidence in closing argument," and the court expressly "[did] not reach the issue of the prosecutor's failure to disclose exculpatory evidence material to defendant's guilt." *Cousin*, 710 So. 2d at 1073 n.8.

9

Second, the decisions in ten of these cases did not occur until *after* Mr. Juluke's conviction in March 1996.[4] Accordingly, these decisions could not possibly have provided any notice of deficiencies in the office's policies at the relevant time. *See, e.g.*, *Truvia v. Connick*, 577 F. App'x 317, 324 (5th Cir. 2014) ("Appellants' citations to over a dozen federal and state cases to show a 'continuum' of *Brady* violations *are not probative* because the vast majority of them occurred after Appellants were convicted in July 1976.") (Emphasis added); *see also Walter v. City of New Orleans*, EDLA Case No. 23-cv-4352, Doc. No. 64, at 23–24 (Sep. 30, 2024) ("Plaintiff must not only identify cases with convictions occurring before December 1986, but the *Brady* finding *also must have occurred before December 1986*.").

Third, Mr. Juluke's allegations that *Brady* violations occurred over several decades in Orleans Parish at a rate of less than one per year are all but meaningless because he fails to include the necessary context—such as the number of cases prosecuted—to put these numbers in perspective. This is illustrated by the Fifth's Circuit's recent decision in *Verastique v. City of Dallas*, 106 F.4th 427 (5th Cir. 2024).

In *Verastique*, plaintiffs alleged that a Dallas police officer, Roger Rudloff, used excessive force while arresting them during widespread protests. They sought to hold the City of Dallas liable under *Monell*, alleging that there were 19 prior complaints of misconduct *by Mr. Rudloff* over 23 years. However, the Fifth Circuit affirmed the district court's dismissal of the claim on the pleadings, concluding that the other incidents were "not sufficiently similar, specific, or numerous." *See Verastique*, 106 F.4th at 432–34. The Fifth Circuit first explained that the allegations regarding the 19 other incidents were "devoid of critical factual enhancement,"

---

[4] *See* Doc. No. 160 at ¶ 160j, n, p, q, r, s, t, u, v, w (cases involving Reginald Adams, Eugene Lindsey, Alfred Oliver, Jermaine Davis, Kuantay Reeder, Shareef Cousin, Juan Smith, Dan Bright, Robert Jones, and David Mahler).

including facts that would have elucidated how and why the incidents occurred: "Plaintiffs, for example, cite five incidents allegedly involving a flashlight or nightstick. Some are listed incident-by-incident. But all still remain totally devoid of critical facts. What prompted the encounters? Did the individuals threaten Rudloff with physical harm? Were they attempting to resist arrest?" *Id.* at 432; *see also Jason v. Tanner*, 938 F.3d 191, 198 (5th Cir. 2019) (holding that only "very similar violations" can provide the "notice" to policymakers that would give rise to deliberate indifference); *Robinson v. Midland County*, 80 F.4th 704, 710 n.3 (5th Cir. 2023) ("The deaths of other inmates are not sufficiently similar to put the county on notice of a failure to provide adequate medical care because only one of them is alleged to have involved a failure to follow proper procedures, and none of the allegations involve fabrication of medical reports.").

In *Verastique*, the Fifth Circuit went on to explain that, even assuming these other alleged incidents were "sufficiently specific and similar" to the constitutional violations alleged in the lawsuit, they were insufficient as a matter of law to "create a pattern capable of providing constructive notice":

> It took twenty-three years to amass the nineteen incidents mentioned in the complaint. Plaintiffs posit that the protracted time span works in their favor. In their view, the fact that the incidents occurred over two decades further evinces a consistent pattern of failed discipline. Incorrect.

> Given a constant number of incidents, a longer time span yields a *lower rate* of violations—*militating against* constructive notice. Nineteen allegations over the span of twenty-three years yields a mere annualized incident rate of 0.826. In other words: Plaintiffs—at most—show that, for over two decades, Rudloff, on average, received *fewer than one accusation of misconduct per year*.

*Verastique*, 106 F.4th at 433–34.

The Fifth Circuit further explained that the complaint failed to provide information "such as department size and number of arrests" that would "provide the context necessary to evaluate whether an alleged department-wide pattern is so obvious as to impart constructive notice."

11

*Verastique*, 106 F.4th at 434. The Fifth Circuit explained that "it is *impossible* to identify the existence of a pattern—much less one that imparts constructive notice," without such context. *Id.* That is because "[g]iven a constant number of incidents, the percentage of conduct supporting a pattern of illegality shrinks as the size of the police department or the number of arrests increases." *Id.* Thus, the plaintiffs failed to show "whether nineteen incidents over twenty-three years is sufficiently frequent to be obvious in the context of [the Dallas Police Department]," which "employs 3,200 to 3,300 officers and serves one of the largest cities in the nation." *Id.* at 10.

Critically, the allegations in *Verastique* involved 19 incidents *by a single police officer*—not across the entire police department. Applying the same standard, Mr. Juluke does not come close to alleging a pattern that has "occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice." *Davidson v. City of Stafford*, 848 F.3d 384, 396 (5th Cir. 2017).

More recently, in *Damond v. City of Rayville*, 127 F.4th 935, 939 (5th Cir. 2025), the Fifth Circuit held that the plaintiff failed to adequately allege a "custom of allowing inmate-on-inmate violence by failing to separate violent and non-violent inmates" at the Richland Parish Detention Center. The Fifth Circuit noted that the plaintiff had identified "six instances in which inmates attacked others but were later returned to their dormitory." *Id.* The Fifth Circuit explained, however, that the plaintiff had "fail[ed] to identify the jail personnel who were present for or involved in the violent incidents." *Id.* The Fifth Circuit further explained that these incidents were "dissimilar to" the attack on the plaintiff, and that they "occurred over the course of several months, were motivated by differing factors, and took place in different locations." *Id.* The Fifth Circuit concluded that "[t]hese alleged incidents are insufficient to allege a custom or policy of tolerating

12

widespread, unprovoked violence in the detention center or to put the officials on notice of the repeated constitutional violations." *Id.*

Again, Mr. Juluke alleges that *Brady* violations occurred in 23 Orleans Parish cases over a period of 24 years (1974–1997). Even assuming that all of these cases involved *Brady* violations (which is demonstrably false, as explained above); and assuming that Mr. Connick was aware, by the time of Mr. Juluke's trial, of *Brady* violations in all of these cases (which is factually false and not supported by the pleadings); and assuming that the alleged *Brady* violations in all of these cases were very similar to the alleged violations in Mr. Juluke's case,[5] the claims against OPDA would still fail. Failure to disclose evidence in 23 cases over a 24-year period—a rate of less than one per year, out of thousands of cases prosecuted each year by dozens of prosecutors—hardly demonstrates an unconstitutional official policy.[6] As explained in *Connick v. Thompson*, "*Brady* mistakes are inevitable. So are all species of error routinely confronted by prosecutors: losing a *Batson* claim; crossing the line in closing argument; or eliciting hearsay that violates the

---

[5] Mr. Juluke contends that the other cases are similar because they involve alleged nondisclosure of similar categories of exculpatory evidence. Yet he has not even attempted to show the *cause* or the *circumstances* of any alleged nondisclosure—*i.e.*, whether it was intentional or accidental; whether it was caused by a misunderstanding or lack of understanding of the law; whether prosecutors were acting on incorrect instructions received from training materials or from supervisors; etc. There is no "similarity" at all between, for example, a malicious prosecutor intentionally suppressing evidence he knows to be exculpatory and an inadvertent failure to disclose evidence due to an innocent administrative error—even if both incidents involve the same type of exculpatory evidence.

[6] *See also Peterson v. City of Fort Worth*, 588 F.3d 838, 852 (5th Cir. 2009) ("Although the record omits any evidence of the department's size or the number of its arrests, the department's own website indicates that it presently employs more than 1,500 officers, and that there were more than 67,000 incidents of crime in the last year alone. Given the department's size, and absent any evidence of its total number of arrests during the same time period, 27 incidents of excessive force over a period of four years do not reflect a pattern that can be said to represent official policy of condoning excessive force so as to hold the City liable for the acts of its employees' unconstitutional conduct. To hold otherwise would be effectively to hold the City liable on the theory of respondeat superior, which is expressly prohibited by *Monell*.").

Confrontation Clause." *Connick v. Thompson*, 563 U.S. 51, 73 (2011) (Scalia, J., concurring). Finding deliberate indifference based on *Brady* violations in a miniscule percentage of cases "would repeal the law of *Monell* in favor of the Law of Large Numbers." *Id.*

Mr. Juluke includes various other allegations about the frequency of *Brady* violations in Orleans Parish, but all fail for lack of factual support. He alleges that "[b]etween May 1991 and October 1996, there were 13 reversals of convictions in Orleans Parish because of *Brady* violations." Doc. No. 160 at ¶ 128. But he only identifies *five* alleged reversals between May 1991 and October 1996,[7] and, as explained above, one of those cases (Tyronne Smith) did not involve a reversal on *Brady* grounds, and another (Erin Hunter) did not involve a reversal at all. Mr. Juluke also alleges that "between October 1992 and August 1997, there were at least 18 *Brady* violations involving Connick's office in cases that went to trial." Doc. No. 160 at ¶ 128. But he identifies only *eight* alleged *Brady* violations between October 1992 and August 1997,[8] and, as explained above, two of those cases (Jermaine Davis and Shareef Cousin) did not involve any finding of a *Brady* violation.

Mr. Juluke also alleges that Innocence Project New Orleans "conducted an analysis of OPDA's *Brady*'s [sic] practices" and concluded that exculpatory evidence was withheld in various cases. Doc. No. 160 at ¶¶ 130–131. But Mr. Juluke does not even identify these cases, much less provide any factual allegations showing that exculpatory evidence was in fact withheld. Finally, Mr. Juluke alleges that "it is a certainty that evidence was withheld in a multitude of additional cases" that have never been identified. *Id.* at ¶ 132. Yet such speculation falls far short of alleging

---

[7] *See* Doc. No. 160 at ¶ 127h, k, m, o, p (cases involving Isaac Knapper, Curtis Kyles, Tyronne Smith, Erin Hunter, and Alfred Oliver).

[8] *See* Doc. No. 160 at ¶ 127p, q, r, s, t, u, v, w (cases involving Alfred Oliver, Jermaine Davis, Kuantay Reeder, Shareef Cousin, Juan Smith, Dan Bright, Robert Jones, and David Mahler).

"specific facts from which the Court can plausibly infer that the alleged *Brady* violations in the cited cases are similar enough to the alleged *Brady* violations in this case." Doc. No. 153 at 10.

### III.    Mr. Juluke has not adequately alleged that OPDA's policies were the "moving force" causing a violation of his constitutional rights.

Even if Mr. Juluke could establish that OPDA had constitutionally defective policies concerning *Brady* disclosures that were adopted or maintained with deliberate indifference, his allegations do not establish that such policies were the "moving force" of the alleged *Brady* violations in his case—*i.e.*, that the prosecutor or prosecutors responsible for the disclosures in his criminal case (who are not even identified) were acting pursuant to such a policy when they allegedly failed to disclose exculpatory evidence to him.

The Complaint lists seven former NOPD officers by name and describes the specific misconduct allegedly committed by each of them. *See, e.g.*, Doc. No. 160 at ¶ 142. By contrast, the Complaint does not name any of the Assistant District Attorneys who worked on Mr. Juluke's prosecution or include any allegations concerning their actions. The Complaint alleges that certain evidence "was never produced to Bernell Juluke or his counsel," *see id.* at ¶¶ 33, 117, but it provides no explanation as to *why* it was not produced. The Complaint provides absolutely no plausible basis to conclude or infer that the alleged withholding of evidence in his case is attributable to OPDA's official policies, as opposed to other plausible possibilities.

This Court previously held that Mr. Juluke had failed to adequately plead the "moving force" element and granted him leave to amend. *See* Doc. No. 153 at 13. Despite this opportunity, Mr. Juluke has not even attempted to provide facts supporting his conclusory claim that unidentified prosecutors acting pursuant to a vague and ill-defined policy were responsible for the violation of his constitutional rights. This confirms that the claim must be dismissed for failure to establish the essential element of causation. *See, e.g.*, *Hutchinson v. Terrebonne Parish Consol.*

15

*Gov't*, No. 23-cv-5681, 2025 WL 592776, at *2 (E.D. La. Feb. 24, 2025) (Long, J.) (dismissing § 1983 claim against parish for failure to adequately allege that injury was "directly caused" by a municipal policy); *Chatman v. Plaquemines Parish*, No. 23-cv-1688, 2025 WL 270627, at *1 (E.D. La. Jan. 22, 2025) (Long, J.) (granting summary judgment where plaintiff could not show that alleged constitutional violation was caused by the policies of the Sheriff's office).

**IV.    Mr. Juluke has not adequately alleged a claim for civil conspiracy against OPDA.**

In addition to his *Monell* claim against OPDA based on alleged suppression of exculpatory evidence (Count 8), Mr. Juluke also includes, in Count 9, a § 1983 claim for "civil rights conspiracy" against "all defendants." *See* Doc. No. 160 at ¶¶ 211–215. He alleges that "Defendants specifically conspired to fabricate evidence to convict [him] and to withhold and suppress evidence demonstrating his innocence." *Id.* at ¶ 213. But as discussed above, the Complaint does not include any allegations regarding the specific acts of any of the OPDA prosecutors who worked on Mr. Juluke's case—much less any facts plausibly demonstrating that they deliberately conspired to convict and violate the rights of a man whom they believed to be innocent. Nor are there *any* allegations (even bare-bones, conclusory allegations) that OPDA maintained an unconstitutional official policy that was the moving force causing such alleged misconduct. Mr. Juluke has not stated a cognizable claim for civil conspiracy against OPDA. *See, e.g.*, *Floyd v. Dillmann*, 614 F. Supp. 3d 454, 461 (E.D. La. 2022) (Milazzo, J.) (dismissing conspiracy claim against former NOPD lieutenant where allegations did not clearly specify his involvement).

This Court previously held that Mr. Juluke had failed to adequately plead a conspiracy claim against OPDA and granted him leave to amend. Doc. No. 153 at 13. But in his amended Complaint, Mr. Juluke includes no new facts supporting this claim. Mr. Juluke added a new allegation that "[p]olice officer defendants, the City of New Orleans/NOPD, and OPDA jointly withheld evidence of [his] innocence and knew, after speaking with their sole eyewitness Samuel

16

Raiford, that Plaintiff was innocent. Nonetheless, they conspired to convict [him] using a fabricated identification." Doc. No. 160 at ¶ 213. As further support, he refers to Paragraph 142. *See id.* Yet Paragraph 142 includes allegations about seven former NOPD officers, but no allegations about any prosecutors or other OPDA personnel. Mr. Juluke certainly has not alleged facts showing that any person associated with OPDA knew or believed that he was innocent yet conspired to convict him anyway through illegal means. And it is reckless and irresponsible for Mr. Juluke and his lawyers to continue advancing these deadly serious allegations against officers of the court without a shred of support, even after this Court has explained that they are unsupported. This approach makes a mockery of the courts and the rules that litigants are supposed to observe and be held to.

### CONCLUSION

For the reasons set forth above, Mr. Juluke's claims against OPDA (Counts 8 and 9) should be dismissed with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.

Respectfully submitted,

 /s/ Matthew J. Paul
W. Raley Alford, III, 27354
Matthew J. Paul, 37004
STANLEY REUTER ALFORD
  OWEN MUNSON & PAUL, LLC
909 Poydras Street, Suite 2500
New Orleans, Louisiana 70112
Telephone: (504) 523-1580
Facsimile:  (504) 524-0069
wra@stanleyreuter.com
mjp@stanleyreuter.com

*Counsel for Jason R. Williams (in his official capacity as Orleans Parish District Attorney)*

17