**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA**

BERNELL JULUKE,

          Plaintiff,

    v.

LEN DAVIS, et al.,

          Defendants.

Civ. A. No. 23-03111
c/w 23-6203

Relates to: 23-cv-03111

Section O
Judge Brandon S. Long

Division 2
Magistrate Judge Donna Phillips Currault

---

**PLAINTIFF BERNELL JULUKE'S RESPONSE IN OPPOSITION
TO OPDA'S MOTION TO DISMISS SECOND AMENDED COMPLAINT**

---

Plaintiff, Bernell Juluke, by and through his undersigned counsel, responds in opposition to the motion to dismiss Plaintiff's Second Amended Complaint (Doc. 163 & 163-1) filed Defendant Jason R. Williams, in his official capacity as Orleans Parish District Attorney ("OPDA") as follows:

**OVERVIEW**

On February 25, 2025, this Court dismissed without prejudice Plaintiff's claims against the OPDA for *Brady* violations under *Monell*. (Doc. 153.) In pertinent part, the Court found that Plaintiff's *Brady* pattern-and-practice claim failed because his allegations lacked the factual specificity and the number of violations required to plead such a claim, pursuant to *Armstrong v. Ashley*, 60 F.4th 262 (5th Cir. 2023). (*Id.* at 9-12.)

Specifically, the Court explained that while Plaintiff cited 13 published decisions involving *Brady* violations over a 36-year span, such allegations included two problems: (1) Plaintiff failed to describe the decisions and therefore did not allege facts sufficient to "infer that the alleged *Brady* violations are similar enough" to those at issue in this case; and (2) in any event, 13 such examples

"over a 36-year span and 'thousands of prosecutions are hardly sufficient to show a municipal custom' at the time Juluke was convicted in 1996." (*Id.* at 10 (quoting *Armstrong*, 60 F.4th at 278, in turn citing *Connick*, 563 U.S. at 62).) However, in granting Plaintiff leave to replead, the Court noted that Plaintiff's "opposition brief include[d] considerable factual detail that is missing from the complaint and that could materially alter the Court's analysis were it properly included in the complaint." (*Id.* at 12.)

With Plaintiff's Second Amended Complaint, he has added an abundance of factual detail and numerous additional examples of relevant *Brady* violations by the OPDA relevant to Plaintiff's March 1996 conviction. Specifically, Plaintiff has included detailed descriptions of 23 published decisions involving *Brady* violations similar to those at issue here. (Doc. 160, ¶¶ 126-27.) They largely consist of prosecutors, like here, withholding exculpatory evidence relating to eyewitness identification or testimony. In conjunction, Plaintiff has cited additional cases in Louisiana commenting generally on the well-known history of *Brady* violations by the OPDA. (*Id.* at ¶ 126.) With Plaintiff's detailed description of dozens of reported decisions during the relevant time period leading to Mr. Juluke's conviction, he has satisfied the Fifth Circuit's pleading standard under *Armstrong.* Two recent district court opinions support such a conclusion. *Moses v. City of New Orleans*, No. 24-cv-1768, 2025 WL 816296, at *7 (E.D. La. Mar. 14, 2025); *Flanks v. City of New Orleans*, No. 23-cv-6897, 2025 WL 660037, at *10 (E.D. La. Feb. 28, 2025).

Plaintiff has also cited summary statistics from reviews of OPDA's *Brady* violations during the relevant time period, including a study of capital and non-capital cases by the New Orleans Innocence Project, which concluded that Brady material was withheld in 25% of capital cases (9 of 36) and in 76% of non-capital cases in which allegations of suppression were made. (*Id.* at ¶¶ 130-31.) There is little doubt that additional *Brady* violations occurred during the time period

2

leading to Mr. Juluke's conviction, but which are not captured in a published judicial decision. The very fact that evidence is withheld from a defendant means that it is much more likely to go undiscovered. (Doc. 160, ¶ 132.) Indeed, such a claim is not akin to police brutality in the street — where evidence of the officer's force leaves a mark or where a living witness can testify to the excessive force he or she endured. The withholding of evidence means that a defendant is unlikely to ever see the evidence. That is, after all, often the purpose of withholding it — to ensure that the defendant does not have it thereby providing the prosecution an advantage. Nonetheless, Plaintiff has alleged numerous examples of published *Brady* violations, including the U.S. Supreme Court's criticism of the OPDA in *Kyles v. Whitley* for its *Brady* violations *before* Mr. Juluke's conviction.

Plaintiff's Second Amended Complaint also alleges that the OPDA had a facially unconstitutional written policy governing *Brady*, which instructed prosecutors that they are only to consider disclosure of *Brady* material in response to a defense request for the same. (*Id.* at ¶ 122.) Importantly, this policy informs the dozens of reported *Brady* violations discussed above in support of Plaintiff's pattern-and-practice claim — it is evidence that the OPDA deliberately withheld evidence as a matter of course.

The OPDA has moved to dismiss Plaintiff's Second Amended Complaint on similar grounds as it did Plaintiff's last complaint. The OPDA argues that Plaintiff fails to plausibly allege a *Monell* claim under Fifth Circuit precedent in *Verastique v. City of Dallas*, 106 F.4th 427 (5th Cir. 2024), because Plaintiff has not pled a sufficient number of *Brady* violations sufficiently similar to those Plaintiff identifies in his own underlying criminal case. In doing so, the OPDA impermissibly raises the bar on the pleadings. As discussed more fully below, the Court should deny the OPDA's motion.

3

**FACTUAL BACKGROUND**

Plaintiff set forth an overview of his case relevant to this motion in his opposition to OPDA's first motion to dismiss. (Doc. 85, at 2-6.) Plaintiff incorporates it here by reference rather than repeat it. Plaintiff revisits the factual background only to highlight the prosecutorial *Brady* violations that infected Plaintiff's trial here. Such violations inform the similarity of the violations set forth in the other examples Plaintiff has pled in detail in support of *Monell*.

First, two documents withheld from Plaintiff — the Davis/Williams incident report and the police logs — would have shown that Len Davis identified Plaintiff as the shooter without having spoken to, or having obtained any information from, the sole eyewitness, Samuel Raiford. Within two minutes of the shooting, by approximately 9:24 p.m., NOPD officers Len Davis and Samuel "Sammie" Williams arrived. (Doc. 160, ¶ 28.) They were the first officers to arrive—arriving even before the officers who were dispatched to the scene by 911. (*Id.*) Mr. Raiford was not on scene when Officers Davis and Williams arrived. (*Id.*)

Despite not yet having spoken with Mr. Raiford, the lone living eyewitness, and despite Mr. Raiford having been unable to identify the perpetrator in his 9-1-1 call, Officer Len Davis immediately called-in Bernell Juluke as the perpetrator (documented as "Pernell Maze"). (*Id.* ¶ 29.) Officer Davis and his partner Officer Williams intended to frame Bernell Juluke. (*Id.* ¶¶ 29-31.) They did not possess any evidence that he was the perpetrator, let alone the perpetrator identified by the lone living eyewitness, Samuel Raiford. (*Id.* ¶¶ 29-32.)

A review of Officers Davis and Williams original incident report for the Santinac murder confirms that they did not acquire such information from Raiford. (*Id.* ¶ 32.) The report does not mention any discussion with Raiford regarding the identity of a perpetrator or even that the officers suspected a perpetrator. (*Id.*) The report merely notes that Officers Davis and Williams held Mr.

Raiford until homicide detectives arrived to interview him. (*Id.*) Perhaps most importantly, the report affirmatively states that the identity of any suspect was "unknown" to Officers Davis and Williams — just as it was in Samuel Raiford's 9-1-1 call. (*Id.*) Neither this incident report, nor police logs showing that it was Officer Davis and Williams who initially identified Bernell Juluke — not Samuel Raiford — was ever produced to Bernell Juluke. (*Id.* ¶ 33.)

After Officer Davis and Williams implicated Mr. Juluke, other officers soon stopped a vehicle in which Mr. Juluke, Gable, and Nelson were riding, arrested them, and brought Samuel Raiford to the Homicide Division of NOPD to identify them in a rigged lineup. (*Id.* ¶¶ 34-44.) In reviewing Mr. Juluke's case in 2022, the OPDA summarized the stop of Mr. Juluke and his co-defendants Gable and Nelson aptly: They "became suspects despite being stopped unarmed, miles away from the murder in a car that did not match the description given by the [lone] witness because then-NOPD officers Len Davis and Sammie Williams inserted themselves immediately into the homicide investigation and called in a purported suspect's name into dispatch[.]" (*Id.* ¶ 38.)

Mr. Raiford became the State's key witness in the case against Mr. Juluke and his co-defendants at trial — virtually the only evidence of guilt given the absence of any other witness and the complete lack of forensic evidence against the three teenagers. (Doc. 160, ¶¶ 82-84, 37.) Given his centrality to the case, Mr. Raiford's accuracy and credibility was paramount. Nonetheless, three key pieces of exculpatory information refuting or at least casting doubt on Mr. Raiford's identification of Mr. Juluke and his co-defendants, were never produced, including: (1) transcribed Grand Jury testimony of Samuel Raiford, given on October 20, 1994; (2) handwritten notes of an ADA's interview with Samuel Raiford that occurred before October 18, 1994; and (3)

5

a transcribed interview of Samuel Raiford at the NOPD Homicide Division given in the early hours of August 23, 1994 (hours after the murder). (*Id.* ¶¶ 94-95.)

Such exculpatory evidence demonstrated Raiford's inconsistent statements with respect to: (1) the color of the alleged perpetrator's vehicle; (2) whether he had seen Juluke, Gable, and Nelson earlier the day of the murder at a basketball court in the Iberville projects arguing with Jacob Carter or whether he had in fact seen them a day earlier in a different location in the Iberville (a store on the corner of Bienville)—inconsistencies which would further demonstrate that Raiford did not witness them shoot Santinac and which would further corroborate the alibi defense of Juluke and his co-defendants; and (3) Raiford having provably lied under oath, just a month before Juluke's trial, in another matter in which he pled guilty to burglary—which would have further demonstrated Raiford's lack of credibility and the prosecution's insistence that Raiford was "truthful and forthright." (*Id.* ¶ 96.) The OPDA's review of Mr. Juluke's case confirmed that this information was wrongfully withheld, concluding that "significant information bearing on [Mr. Juluke's, Mr. Nelson's, and Mr. Gable's] guilt or innocence was kept from the jury at their trial" and that they "suffered a miscarriage of justice and their convictions and continued imprisonment violate the Sixth, Eighth and Fourteenth Amendments to the United States Constitution, corresponding Supreme Court precedent, and the Louisiana Constitution." (*Id.* ¶¶ 95, 97.)

In short, in pertinent part here, the OPDA withheld several key pieces of exculpatory and exonerating evidence from Mr. Juluke, including the Davis/Williams Incident Report, Police Logs, and three prior statements of chief witness Samuel Raiford. OPDA therefore played an important part in Plaintiff's (and his co-defendants') wrongful conviction.

Important context for the OPDA's *Brady* violations here is the fact that Mr. Juluke and his two co-defendants were arrested within minutes of the crime miles away. (*Id.* ¶ 35.) Beyond that,

6

very little was done to investigate. (*Id.* ¶ 49 (describing a single search warrant for weapons which turned up nothing as the only real investigative task taken beyond frame Juluke and his co-defendants).) This is important because it means that the prosecutors in his case had sparse documentation and few witnesses to consider when determining what materials to disclose to Mr. Juluke and his co-defendants. Their nondisclosure was not oversight, but rather part of a common deliberate practice in the office.

## LEGAL STANDARD

In deciding a Rule 12(b)(6) motion to dismiss for failure to state a claim, the court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007). A plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp v. Twombly,* 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## ARGUMENT

I.  **Plaintiff has plausibly alleged a facially unconstitutional policy promulgated by the OPDA.**

Plaintiff alleges that the OPDA maintained a facially unconstitutional *Brady* policy. "An official, written policy is 'itself' unconstitutional only if it affirmatively allows or compels unconstitutional conduct." *Edwards v. City of Balch Springs*, 70 F.4th 302, 309 (5th Cir. 2023). Here, the OPDA's *Brady* policy was itself unconstitutional because it contained affirmative misstatements of law. (Doc. 160, ¶ 122.) Most significantly, Plaintiff has alleged that written policy instructed that prosecutors were not required to disclose *Brady* material unless a judicial order on a defense request required it. (*Id.*) That is not the law—a prosecutor's *Brady* obligation exists

irrespective of a defense request for the information or a judicial order on such a request. *See, e.g.*, *United States v. Beasley*, 576 F.2d 626, 630 (5th Cir. 1978) ("*Brady* is not a discovery rule, but a rule of fairness and minimum prosecutorial obligation."); *United States v. Garrett*, 238 F.3d 293, 302 (5th Cir. 2000) ("The *Brady* line of cases announces no rule of discovery but the self-executing constitutional rule that due process requires disclosure by the prosecution of evidence favorable to the accused that is material to guilt or punishment."). If followed, the OPDA's written policy ensured that prosecutors would violate the Supreme Court's *Brady* decision and thereby makes this policy facially unconstitutional. *See Groden v. City of Dallas*, 826 F.3d 280, 286 (5th Cir. 2016) ("If the city had a policy of arresting people without probable cause in retaliation for annoying-but-protected speech, such a policy would be unconstitutional . . . Since Groden has alleged that the city had exactly this policy, he successfully alleged that the city had an unconstitutional policy, and the district court erred by dismissing his complaint on that ground.").

The Court should deny OPDA's motion because, in light of the alleged facially unconstitutional *Brady* policy, the Court need not reach the deliberate indifference or causation elements. *Doe v. United States*, 831 F.3d 309, 318 (5th Cir. 2016) ("Where the claim is that the policy '*itself* violates federal law, or directs an employee to do so,' it is unnecessary to prove a heightened level of culpability on the part of the policymakers."); *Edwards v. City of Balch Springs*, 70 F.4th 302, 308 (5th Cir. 2023) (a "facially unconstitutional policy's mere existence satisfies the moving-force requirement that is *Monell*'s third element").

II.   **Plaintiff has plausibly pled a pattern and practice of violations connected to Mr. Juluke's harms here.**

A.   **Plaintiff has added numerous *Brady* violations and relevant, factual specificity to his operative complaint to satisfy the pleadings standard.**

In his Second Amended Complaint, Plaintiff has added allegations demonstrating OPDA's (Connick) widespread pattern of *Brady* violations, specifically as they relate to exculpatory police reports, witness statements and information, and impeachment information, often relating specifically to the validity of eyewitness identification. (Doc. 160, ¶¶ 126-127.) This is precisely what was withheld from Mr. Juluke here.

Specifically, Plaintiff discusses in detail 23 judicial decisions addressing *Brady* violations by the OPDA that occurred between 1974 and 1997 (though the date of the decisions themselves range from 1976 to 2019). These decisions addresses material withheld that extraordinarily similar to that withheld from Plaintiff and which resulted in his March 1, 1996, conviction here. (*Id.* ¶ 127(a)-(w).) In fact, the vast majority — 17 of the 23 cases discussed in Plaintiff's complaint — involved withheld evidence relating to the validity of an eyewitness identification, which is precisely what is at issue here. The details of those cases demonstrate their relevance to Mr. Juluke. *See State v. Carney*, 334 So.2d 415, 419 (La. 1976) (withheld agreement between eyewitness and State to drop eyewitness' unrelated battery charges in exchange for testimony); *State v. Falkins,* 356 So.2d 415, 418 (La. 1978) (withheld evidence of initial misidentification by two state's witnesses); *State v. Henderson*, 362 So.2d 1358, 1364 (La. 1978) (withheld police press release suggesting victim-eye witness had misidentified the attackers was required to be considered on remand under *Brady*); *State v. Curtis*, 384 So.2d 396, 398 (La. 1980) (withheld evidence that sole eyewitness failed to identify the defendant as the murderer in a photograph lineup); *State v. Perkins*, 423 So.2d 1103, 1108 (La. 1982) (withheld exculpatory statements from eyewitness to

the shooting, who "substantially corroborated" the defendant's version of events, such that her statement "could have supported reasonable doubt"); *State v. Knapper*, 579 So.2d 956, 959-60 (La. 1991) (withheld police report containing eyewitness description of the offender that did not match testimony offered at trial); *Kyles v. Whitley*, 514 U.S. 419 (1995) (withheld conflicting eyewitness statements, among other evidence); *State v. Washington*, 546 So.2d 1360, 1363 (La. Ct. App. 1989) (withheld prior inconsistent statement of alleged eyewitness to murder); *State v. Smith*, 591 So.2d 1219, 1225 (La. Ct. App. 1991) (withheld evidence that State's only eyewitness to the shooting entered into an agreement with the OPDA in exchange for his testimony); *State v. Hunter*, 648 So.2d 1025, 1034 (La. Ct. App. 1994) (withheld grand jury testimony from eyewitness wherein she said she did not see the defendant with a gun); *State v. Oliver*, 682 So.2d 301, 311 (La. Ct. App. 1996) (withheld police report documenting victim's statement that contradicted the State's theory and the witness's trial testimony); *State v. Davis*, 727 So.2d 453, 457, 459 (La. 1998) (withheld police report which outlined eyewitness statements that conflicted with the testimony of one of the victims regarding key details relating to shooter and shooting (overturned on rehearing, however); *Reeder v. Williams*, No. 22-4614, 2023 WL 8449261, at *1 (E.D. La. Dec. 6, 2023) (withheld evidence State's only eyewitness had previously identified an alternate suspect as the shooter); *State v. Cousin*, 710 So.2d 1065, 1073 n.8 (La. 1998) (withheld statement made by the only eyewitness three days following the murder that would have precluded her from being able to identify offender); *Smith v. Cain*, 132 S.Ct. 627, 630-31 (2012) (withheld statements from sole eyewitness who identified the defendant as the gunman at trial, that, five days after the crime, he told police that he "could not ID anyone because [he] couldn't see faces," and "would not know them if [he] saw them"); *State v. Bright*, 875 So.2d 37, 43 (La. 2004) (withheld evidence that State's "star witness," the only witness identifying the defendant as the shooter, "had a prior

10

conviction for simple burglary and was on parole at the time of the offense and at the time of his subsequent identification of defendant in the photographic lineup," which the State later admitted "was wrong"); *Jones v. Cannizzaro*, No. 18-503, 2019 WL 2289470, at *2 (E.D. La. May 28, 2019) (withheld exculpatory evidence pertaining to eyewitnesses' identification of the perpetrator).

Such an abundance of violations pled is consistent with other decisions in this district post-*Armstrong*. *See Moses v. City of New Orleans*, No. 24-cv-1768, 2025 WL 816296, at *7 (E.D. La. Mar. 14, 2025) (denying OPDA's motion to dismiss *Monell* claim where complaint alleged 30 cases with *Brady* violations over a 28-year period); *Flanks v. City of New Orleans*, No. 23-cv-6897, 2025 WL 660037, at *10 (E.D. La. Feb. 28, 2025) (denying OPDA's motion to dismiss *Monell* claim where complaint alleged 26 *Brady* violations over an 18-year period). The Court should therefore deny the OPDA's motion on this ground.

### B. The Fifth Circuit's recent *Verastique* decision is distinguishable.

#### 1. Plaintiff has alleged far more factual specificity in nearly identical incidents than plaintiffs in *Verastique*.

To argue the contrary, the OPDA relies heavily on the recent Fifth Circuit decision in *Verastique v. City of Dallas*, 106 F.4th 427 (5th Cir. 2024), arguing that Plaintiff's additional allegations do not contain sufficient factual specificity, or a sufficient number of incidents, to demonstrate a municipal custom on the pleadings. (Doc. 163-1, at 10-12.) However, *Verastique* is distinguishable in several respects. *Verastique* arose from alleged excessive force against protesters marching in the "George Floyd demonstrations" in Dallas in 2020. 106 F.4th at 430-31. The Fifth Circuit described such demonstrations in harrowing terms, which included "individuals, bent on rioting and looting, roving through the downtown area," causing widespread property

damage, inciting violence against police, jumping on police vehicles and throwing rocks and bricks at officers, and forcing motorists off the road to avoid striking pedestrians. *Id.* at 430.

Against this backdrop, the plaintiffs alleged excessive force against a police officer and brought a *Monell* failure-to-discipline claim backed by 19 alleged incidents of excessive force or related misconduct against that same officer. *Id.* at 432. However, the Fifth Circuit found that the allegations were "conclusory and devoid of critical factual enhancement." *Id.* at 432. Worse, the court found that "[w]hat scant factual details plaintiffs provide *affirmatively proves* that all nineteen incidents are wholly inapposite to the case at hand." *Id.* Eight of the 19 incidents included no factual support, period. *Id.* Of the remaining 11 incidents spanning decades of time, the court described them as a "hodge-podge of unrelated allegations" with "stark factual dissimilarities to what the plaintiffs allegedly experienced" — four of which did not even include any physical conduct by the officer in that excessive force case. *Id.* Importantly, the court emphasized that none of the plaintiffs' allegations of prior misconduct "occurred in the context of a large-scale, multi-day, city-wide riot that became so violent and deadly as to trigger a statewide disaster declaration." *Id.* at 433.

Here, Plaintiff's allegations differ materially from those in *Verastique*. First, Plaintiff has alleged a pattern-and-practice claim based on the deliberate failure to produce exculpatory evidence. It involves workaday evidence — police reports, witness statements, transcripts — reviewed in the regular course by prosecutors after receiving a police file. The process of such review necessarily involves time for deliberation. It does not involve the split-second multifactorial decisions of police officers in the heat of a street encounter.

Second, as described above, the specificity and relevance of Plaintiff's allegations far surpass those in *Verastique*. Plaintiff here was subject to a prosecutor's decision to withhold

exculpatory evidence in conjunction with his criminal trial. Plaintiff has supported his pattern and practice allegations with numerous, specific details in other cases which are nearly identical to the *Brady* violations he suffered. This differs drastically from the plaintiffs in *Verastique*, who presented a disparate series of events, many without factual descriptions and untethered from the excessive force they alleged to have suffered in the midst of a multi-day, statewide emergency as emphasized by the Fifth Circuit.

The OPDA's reliance on other Fifth Circuit decisions to argue that Plaintiff has not pled sufficient specificity and similarity in his Monell allegations do not fare better. (Doc 163-1, at 7-8.) None of those cases include the detail and similarity of Plaintiff's allegations of other incidents here. *See Jason v. Tanner*, 938 F.3d 191, 198 (5th Cir. 2019) (finding that four prison incidents of inmate "broom or mop" violence over seven years was insufficient to allege a pattern and practice of deliberate indifference by the prison relating to plaintiff's claim where he was struck on the head with a yard tool); *Robinson v. Midland Cnty.*, 80 F.4th 704, 710 (5th Cir. 2023) (explaining that plaintiffs' allegations suggested that the county did not even know of the failures to provide medical care at issue); *Johnson v. Harris Cnty.*, 83 F.4th 941, 947 & n.6 (5th Cir. 2023) (plaintiff did not allege specific facts about the challenged practice — arresting citizens without probable cause as the "proffered examples only state[d] that (1) an individual was arrested and (2) charged with a crime that was (3) later dismissed for lack of probable cause").

### 2. Plaintiff's detailed discussion of 23 judicial decisions demonstrating widespread misconduct in the OPDA far outstrips the disparate and often factually devoid accusations against a single officer in *Verastique*.

The OPDA also relies on *Verastique*'s holding that the 19 prior incidents of misconduct by the lone officer at issue does "[n]othing [to] suggest that it was 'obvious' that the 'highly predictable consequence' of not supervising its officers was that they would use excessive force."

13

*Verastique*, 106 F.4th at 433 (quoting *Peterson v. City of Forth Worth*, 588 F.3d 838, 850 (5th Cir. 2009) (in turn quoting *Brown v. Bryan Cnty.*, 219 F.3d 450, 461 (5th Cir. 2000)). In particular, the *Verastique* plaintiffs had only alleged 19 "accusations of misconduct" against one officer over the course of 23 years which, in a department like the Dallas Police Department with its "3,200 to 3,300 officers serving one of the largest cities in the nation[,]" was simply not enough to establish a pattern. *Verastique*, 106 F.4th at 433-34.

Here, Plaintiff's complaint differs in important respects from *Verastique*. Plaintiff has alleged a claim that the de facto, unwritten policy of the OPDA was to deliberately withhold evidence and has demonstrated support for that allegation through its descriptions of dozens of cases throughout the office. (Doc. 160, ¶¶ 126-28.) Mr. Juluke's allegations are not limited to "accusations of misconduct" against a single officer, like the *Verastique* plaintiffs. Accordingly, where the plaintiffs' allegations of misconduct against a single officer in *Verastique* may not have established a municipal custom or put the Dallas Police Department on notice of a need to discipline or train, Plaintiff's allegations here far outstrip those. Moreover, Plaintiff's case involves one where the U.S. Supreme Court (*Kyles v. Whitley*) castigated the OPDA for its *Brady* failures the year before Plaintiff was convicted and still did nothing. (*Id.* ¶¶ 128-32.) Such allegations plausibly plead a municipal custom on the pleadings. *Moses*, 2025 WL 816296, at *7.

The OPDA's reliance on other cases for the same proposition are unhelpful. For example, *Damond v. City of Rayville*, 127 F.4th 935 (5th Cir. 2025), involved a pro se prisoner's appeal from the dismissal of his *Monell* claim as frivolous on initial screening under 28 U.S.C. § 1915(e)(2)(B). (Doc. 163-1, at 12.) The Fifth Circuit rejected the prisoner's attempt to show a custom of allowing inmate-on-inmate violence where he had pled only six alleged instances of

14

violence under disparate circumstances. *Damond*, 127 F.4th at 939. The case therefore involved none of the extensive, documented, and similar violations as Plaintiff has alleged here.

*Peterson v. City of Fort Worth*, 588 F.3d 838 (5th Cir. 2009), upon which Defendant also relies in a footnote, fares no better. (Doc. 163-1, at 13 n.6.) That case was decided on summary judgment. Moreover, the record involved 27 allegations of excessive force but none of them supported by judicial decisions finding the violations, unlike Mr. Juluke here. In fact, of the cited 27 complaints, only four had been sustained by the police department's review. *Id.* at 852.

In sum, Plaintiff's complaint has alleged far more than at issue *Verastique* and other cases upon which OPDA relies. The Court should therefore reject the OPDA's pleadings motion and permit discovery on these issues.

### C. OPDA's remaining attempts to nitpick Plaintiff's *Monell* allegations do not defeat Plaintiff's plausible allegations.

In an attempt to diminish Plaintiff's *Monell* allegations, the OPDA argues that at least "six of the [23] cases cited by Mr. Juluke do not involve any finding of unconstitutional non-disclosure of evidence[.]" (Doc. 163-1, at 8.) However, a review of those cases show that they are indeed consistent with the OPDA's pattern of nondisclosure. *See State v. Cousin*, 710 So.2d 1065, 1073 & 1073 n.8 (La. 1978) (noting that the prosecution indeed violated *Brady* in failing to disclose exculpatory statement made by state's eyewitness, but not reaching the issue because the "evidence is now in defendant's possession and will be available at the new trial); *State v. Hunter*, 648 So.2d 1025, 1034 (La. App. 1994) ("[H]er testimony at the grand jury that she did not see defendant with a weapon yet testified at trial she saw him with a gun in his hand. This prior inconsistent statement to the grand jury … is *Brady* material….Accordingly, the state was under an obligation to disclose … and their failure to do so violates *Brady v. Maryland*."); *State v. Smith*, 591 So.2d 1219, 1225-26 (La. App. 1991) (noting that "post-trial events demonstrate that an [undisclosed] agreement

15

probably existed between Thornton and the State in exchange for his testimony"); *State v. Parker*, 361 So.2d 226, 227 (La. 1978) (discussing plaintiff's claim that the OPDA failed to produce evidence of victim's arrest history; there is no indication that the OPDA rejected that assertion); *State v. Henderson*, 362 So.2d 1358 (La. 1978) (remanded to address defendant's assertion of *Brady* violations).

While the OPDA is correct that, in *State v. Davis*, the Louisiana appellate court ultimately rejected the defendant's *Brady* claims, this came only after rehearing and after the appellate court had previously found the very same nondisclosure of material relating to the sole eyewitness's identification as "[c]learly" *Brady* material." 727 So.2d 453, 457 (La. App. 1998). Whatever the case, there is no question that the State in *Davis* failed to disclose the identity of several witnesses whose statements to police cast serious doubt on the eyewitness's ability to identify the defendant. *Id.* at 458. The opinion on rehearing primarily addressed whether the disclosure of such evidence would have changed the outcome of the trial. *Id.* Therefore, the court's decision to change course largely had to do with the presence of other evidence that the Court found supported the conviction irrespective of the evidence withheld by the prosecution. *Id.* at 458.

Separately, the OPDA attacks Plaintiff's citation and discussion of other decisions by noting that "the decisions in ten of these cases did not occur until after Mr. Juluke's conviction in March 1996" and therefore "could not possibly have provided any notice of deficiencies in the office's policies at the relevant time." (Doc. 163-1, at 10 (citing Doc. 160, ¶ 127 n, p, q, r, s, t, u, v, w).) Importantly, however, all but one of the *violations* identified by Plaintiff in Paragraph 127 of his operative complaint occurred *before* Mr. Juluke's March 1, 1996, trial.[1] Accordingly, Plaintiff has set forth repeated examples of relevant Brady violations in the years of Connick's

---

[1] The exception is *Mahler v. Kaylo*, which involved violations in an August 1997 conviction — about 17 months after Plaintiff's. (Doc. 160, at 127(w).)

tenure leading to Plaintiff's 1996 conviction. Whether the decisions themselves came down after Mr. Juluke's conviction should not defeat Plaintiff's claim, particularly  where the U.S. Supreme Court had issued its opinion in *Kyles v. Whitley*, 514 U.S. 419 (1995), prior to Mr. Juluke's trial. *See Moses*, 2025 WL 816296, at *7 ("[A]s discussed in *Flanks*, the *Brady* violations identified by Moses as occurring during Connick's tenure need not have come to light before Moses's trial to demonstrate constructive notice to the policymaker and those violations need not be identical to those in Moses's case.") (citing *Flanks*, 2025 WL 660037, at *10-11).

Finally, the OPDA's complaint that Plaintiff, on the pleadings, "has not even attempted to show the cause or circumstances of any alleged nondisclosure, *i.e.*, whether it was intentional or accidental; whether it was caused by a misunderstanding" and so on, does not carry the day. (Doc. 163-1, at 13 n.5.) Plaintiff has provided numerous, detailed examples of experienced prosecutors (mostly in murder cases) withholding evidence that flat-out contradicts or greatly diminishes eyewitness testimony used to obtain convictions. (Doc. 160, ¶127.) Plaintiff has alleged this happened deliberately as a result of the OPDA's de facto policy to withhold such evidence. (Doc. 160, Count 7.) Plaintiff need do no more on the pleadings.

### III.     Plaintiff has plausibly alleged causation.

In attacking Plaintiff's *Monell* claim on the grounds of causation, the OPDA faults Plaintiff for not identifying the name of the prosecutor(s) who withheld exculpatory evidence from him. (Doc. 163-1, at 15.) However, to establish a *Monell* claim, a plaintiff need only "identify those officials or governmental bodies who speak with final policymaking authority for the local government actor concerning the action alleged to have caused the particular constitutional or statutory violation." *St. Maron Props., L.L.C. v. City of Houston*, 78 F.4th 754, 761 (5th Cir. 2023) (quoting *McMillian v. Monroe Cnty.*, 520 U.S. 781, 784–85 (1997)). OPDA cites no authority for

17

the proposition that Plaintiff must identify the specific line prosecutor(s) who withheld exculpatory evidence, particularly when, as here, the OPDA does not dispute that Plaintiff plausibly alleged underlying constitutional violations. (Doc. 163-1 at 5 ("Assuming for the sake of argument that Mar. Juluke has adequately alleged a constitutional violation in connection with his criminal proceedings, he has not adequately alleged the elements necessary to hold OPDA liable.").) Accordingly, the Court should reject this argument.

In addition, the OPDA faults Plaintiff for not explaining "*why*" exculpatory evidence was not produced to him and, in turn, argues that the complaint "provides absolutely no plausible basis to conclude or infer that the alleged withholding of evidence in his case is attributable to OPDA's official policies, as opposed to other plausible possibilities." (Doc. 163-1, at 15.) Plaintiff has alleged that the nondisclosures in this case were attributable to the same written and de facto policies encouraging the *deliberate* withholding of *Brady* evidence in numerous other cases. (Doc. 160, ¶ 207.) Indeed, proof of the deliberate nature of the violation in this case includes the facts that: (a) prosecutors had a rather small investigative file and withheld obviously exculpatory evidence in the form of the initial incident report by the very officers who radioed Bernell Juluke's identity and caused his arrest, along with police logs supporting the same conclusion; and (b) prosecutors relied nearly exclusively on Samuel Raiford to prove their case and did not disclose known evidence contradicting his credibility.

In short, Plaintiff's allegations plausibly plead that the OPDA's policies were the moving force behind his wrongful conviction. *Flanks*, No. 23-cv-6897, 2025 WL 660037, at *12 ("As the Court held previously, Connick's alleged affirmative conduct in expressing disdain for *Brady* and rebuffing suggestions to ensure compliance with *Brady* is more than heightened negligence, demonstrating potential culpability and a causal link between the alleged widespread practice of

18

*Brady* violations and the *Brady* violation claimed by Plaintiff in this case."). The Court should reject the OPDA's arguments accordingly.

## IV.     Plaintiff concedes dismissal of civil conspiracy against OPDA.

At the pleadings stage, Plaintiff is unable to do more to plead the details of an agreement between OPDA and Defendants to withhold exculpatory evidence from Plaintiff based on the limited investigative file and the reasonable inference that both the officers and prosecutors had knowledge of same. Given the Court's prior order, Plaintiff concedes dismissal of the claim and will not belabor the basis for that claim here.

## CONCLUSION

For the above reasons, Plaintiff respectfully requests that the Court deny the OPDA's motion to dismiss Plaintiff's Second Amended Complaint. Should the Court grant the OPDA's motion, Plaintiff requests leave to replead a final time consistent with the request of the *Gable* and *Hill* Plaintiffs in this consolidated matter.

.

Respectfully submitted,

*/s/ John Marrese*
John Marrese (Admitted *Pro Hac Vice*)
Steven Hart (Admitted *Pro Hac Vice*)
Brian Eldridge (Admitted *Pro Hac Vice*)
**Hart McLaughlin & Eldridge, LLC**
One South Dearborn, #1400
Chicago, Illinois 60603
Telephone: (312) 955-0545
jmarrese@hmelegal.com
shart@hmelegal.com
beldridge@hmelegal.com

Lance C. Unglesby (La. Bar #29690)
Adrian M. Simm, Jr. (La. Bar #36673)
Jamie F. Gontarek (La. Bar #37136)
**Unglesby & Crompton, LLC**

19

607 St. Charles Ave., Ste. 300
New Orleans, Louisiana 70130
Telephone: (504) 345-1390
Fax: (504) 324-0835
Lance@ucjustice.com
Adrian@ucjustice.com
Jamie@ucjustice.com

***Attorneys for Plaintiff Bernell Juluke***

## CERTIFICATE OF SERIVCE

I hereby certify that a true and correct copy of the foregoing pleading has been electronically filed with the Clerk of Court using the CM/ECF system. Notice and a copy of this filing will be sent to counsel of record via e-mail and by operation of the Court's electronic filing system.

Dated this 27th day of May 2025, in Chicago, Illinois.


*/s/ John Marrese*
John Marrese

20