**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **BERNELL JULUKE** | **CIVIL ACTION** |
| **VERSUS** | **NO. 23-3111**[1]<br>**c/w NO. 23-6203** |
| **LEN DAVIS, ET AL.** | **SECTION "O"** |

**ORDER AND REASONS**

Before the Court in this wrongful-conviction civil-rights case is Defendant Orleans Parish District Attorney ("OPDA") Jason R. Williams' Rule 12(b)(6) motion[2] to dismiss the municipal-liability and civil-rights-conspiracy claims that Plaintiff Bernell Juluke asserts under 42 U.S.C. § 1983 in a second amended complaint in which Mr. Juluke alleges that the OPDA conspired with others and secured his wrongful murder conviction in violation of his constitutional rights by withholding evidence in violation of the OPDA's *Brady v. Maryland* obligations. Plaintiff concedes that his civil-rights conspiracy claim must be dismissed, but Plaintiff opposes[3] the motion to dismiss his claim predicated on the OPDA's alleged *Brady* violations. In further support of their respective positions, Defendant has replied,[4] and Plaintiff has notified[5] the Court of supplemental authority. For the following reasons, the motion to dismiss is **GRANTED IN PART** (as to the civil-rights conspiracy claim) **AND DENIED IN PART** (as to the municipal-liability *Brady* claim).

---

[1] This Order and Reasons pertains to Civil Action No. 23-3111.
[2] ECF No. 163.
[3] ECF No. 177.
[4] ECF No. 180.
[5] ECF No. 185.

## I. BACKGROUND

This consolidated civil-rights case arises from allegedly wrongful second-degree murder convictions resulting in three then-teenagers' incarceration for nearly three decades until their convictions were vacated.

At approximately 9:20 p.m. on August 22, 1994, Rondell Santinac was shot in the head and killed while a passenger in a vehicle driven by Samuel Raiford near the Desire Housing Projects in New Orleans. Raiford, who escaped unharmed, ran to a neighbor's house and described to the 911 operator a single perpetrator—an unknown black male, wearing unknown color clothing driving a blue four-door Chevy Beretta which fled toward the interstate.[6]

Two minutes later, New Orleans Police Department Officers Len Davis and Samuel Williams arrived at the scene before the officers dispatched by 911. Raiford was not on the scene. Despite not having spoken to the lone eyewitness (who in any event stated to 911 that he could not identify the perpetrator), Officer Davis called in a perpetrator of unique detail: "perps Pernell Maze bunch of golds in his mouth." It is alleged that Officer Davis intended to frame Bernell Juluke, with whom Officer Davis was familiar because Bernell's older brother, Warren Mays, was a known drug dealer in New Orleans. Bernell sometimes went by Bernell Mays. Nevertheless, in drafting the initial incident report, Officers Davis and Williams state that the identity of any suspect was "unknown" to them. This incident report was among several favorable documents withheld from Bernell Juluke and his co-defendants.[7]

[6] ECF No. 160 ¶¶ 25-27.
[7] *Id.* ¶¶ 28-33.

Within minutes of hearing a radio broadcast describing the suspect vehicle as a blue four-door Chevy Beretta, over five miles from the scene of Santinac's murder, NOPD Officer Tommie Felix pulled over a two-door grey Chevy Beretta with 18-year-old Bernell Juluke driving, 17-year-old Kunta Gable in the front passenger seat, and 17-year-old Leroy Nelson (also known as Sidney Hill) in the back seat. When pulled over, none of the teenagers ran. The vehicle and all three were searched, yielding no evidence of any crime. Still, they were arrested for Santinac's murder.[8]

NOPD officers told Raiford that they had arrested those responsible for the murder, Gable, Hill, and Juluke, each of whom Raiford later admitted that he "generally knew" from the neighborhood. Following Raiford's coercion and a suggestive police lineup, Raiford identified Gable and Hill as the shooters and Juluke as the driver. NOPD obtained a single search warrant to search for weapons at the home of an uninvolved person; they found nothing. NOPD turned their investigation (such as it was) over to OPDA, which obtained an indictment. Gable, Hill, and Juluke were tried together and convicted on March 1, 1996. Each was sentenced to life in prison. Each has maintained his innocence.[9]

In January 2021, OPDA established its Civil Rights Division. As part of its mission to review potentially wrongful convictions, the Civil Rights Division evaluated the case of Juluke, Gable, and Hill and determined that their convictions were the result of police-officer misconduct and corruption, perjury and inconsistent statements by the sole eyewitness to the murder, and the withholding of key

[8] *Id.* ¶¶ 34-37.

[9] *Id.* ¶¶ 41-43; 49-50; 82-86.

exculpatory evidence, including Raiford's transcribed grand jury testimony from October 1994, handwritten notes of an ADA's interview with Raiford before October 18, 1994, and the transcribed interview of Raiford at the NOPD Homicide Division given hours after the murder. The Civil Rights Division concluded that the State failed "to meticulously observe constitutional safeguards in criminal proceedings and give full and forthright disclosure of all relevant information" and explained that "significant information bearing on [Mr. Juluke's, Mr. Hill's, and Mr. Gable's] guilt or innocence was kept from the jury at their trial," constituting "a miscarriage of justice." Ultimately in 2022—after spending 28 years in prison—Juluke, Gable, and Hill's convictions were vacated and they were released.[10]

This lawsuit, filed by Bernell Juluke, followed. Kunta Gable and Sidney Hill filed a separate lawsuit, Civil Action No. 23-6203, which has been consolidated with Juluke's. No master complaint has been filed.

Like Gable and Hill, Bernell Juluke alleges that he was wrongfully arrested, tried, and convicted of second-degree murder for which he was imprisoned for over 28 years because NOPD officers framed him, and because prosecutors at the OPDA violated their obligations under *Brady v. Maryland*, 373 U.S. 83 (1963) by suppressing material evidence favorable to him.[11] Williams previously moved to dismiss Juluke's claims.[12] The Court denied the motion without prejudice and

[10] *Id.* ¶¶ 88-97; 2, 137.
[11] *See generally* ECF No. 160 (the operative second amended complaint).
[12] ECF No. 66.

permitted Mr. Juluke an opportunity to amend to cure the deficiencies identified.[13] Mr. Juluke filed his second amended complaint.[14]

Williams now moves to dismiss the amended official-capacity claims for failure to state a claim.[15] Only the two official-capacity Section 1983 claims against Williams are relevant to the instant motion. Mr. Juluke's first official-capacity claim against Williams is a municipal liability claim under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978). Mr. Juluke alleges that OPDA had a policy, pattern, practice, and/or custom of withholding and/or suppressing material exculpatory evidence; that the pattern was well known to the OPDA due to numerous instances of such misconduct by OPDA before Juluke's prosecution; and that OPDA prosecutors withheld material exculpatory evidence against Juluke as the result of OPDA's policy, pattern, practice, and/or custom. Mr. Juluke's second official-capacity claim against Williams is a civil-rights-conspiracy claim in which he alleges that all defendants combined to arrest, prosecute, and convict him despite knowing that he was innocent.[16] Mr. Juluke opposes the motion insofar as it seeks to dismiss his *Monell* claim based on the OPDA's alleged *Brady* violations.[17]

---

[13] ECF No. 153.
[14] ECF No. 160.
[15] ECF No. 163.
[16] *See generally id.*
[17] ECF No. 177.

## II. LEGAL STANDARDS

### A. *Procedure*: Pleading Standard

Rule 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). A complaint that does not meet Rule 8(a)(2)'s pleading standard should be dismissed for failing to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell. Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitations of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

Ultimately, "[t]o survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Although courts "accept all well-pled facts as true, construing all reasonable inferences in the complaint in the light most favorable to the plaintiff, conclusory allegations, unwarranted factual inferences, or legal

conclusions are not accepted as true." *Allen v. Hays*, 65 F.4th 736, 743 (5th Cir. 2023) (cleaned up).

**B. *Substance*: 42 U.S.C. § 1983**

**1. Federal Civil Rights**

Enacted pursuant to Congress's authority to enforce the Fourteenth Amendment, 42 U.S.C. § 1983 "provides a cause of action against state actors who violate an individual's rights under federal law." *Filarski v. Delia*, 566 U.S. 377, 380 (2012). It provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any ... person … to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured.

42 U.S.C. § 1983. The statute's "purpose [] is to deter state actors from using their badge of authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992) (citation omitted). Because § 1983 merely provides a remedy for designated rights, rather than creating substantive rights, "an underlying constitutional or statutory violation is a predicate to liability." *Harrington v. Harris*, 118 F.3d 359, 365 (5th Cir. 1997) (citation omitted). To establish § 1983 liability, the plaintiff must satisfy three elements: "(1) a deprivation of a right secured by federal law (2) that occurred under color of state law, and (3) was caused by a state actor." *Victoria W. v. Larpenter*, 369 F.3d 475, 482 (5th Cir. 2004) (citation omitted).

**2. Official-Capacity Liability**

A § 1983 plaintiff may pursue remedies against state actors in their official or individual capacities. Mr. Juluke sues Williams in his official capacity as Orleans Parish District Attorney.

"The performance of official duties creates two potential liabilities, individual-capacity liability for the person and official-capacity liability for the municipality." *Turner v. Houma Mun. Fire & Police Civil Serv. Bd.*, 229 F.3d 478, 484 (5th Cir. 2000). The substantive law distinguishes between federal civil rights claims pursued against a an official in his *official* capacity and those against an official his *individual* (or personal) capacity. *See Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (explaining the doctrinal and practical differences between the two capacities).

Official capacity suits "'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Id.* (quoting *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 690 n.55 (1978)). Because the entity is the real party in interest, "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Id.* at 166. "Because the real party in interest in an official-capacity suit is the governmental entity and not the named official," liability is premised upon "the entity's 'policy or custom' [which] must have played a part in the violation federal law." *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (citation omitted).

Thus, a person may sue a municipality that violates his or her constitutional rights "under color of any statute, ordinance, regulation, custom, or usage." *See*

*Monell*, 436 U.S. at 690. A plaintiff pursuing a *Monell* liability claim must show "the deprivation of a federally protected right caused by action taken pursuant to an official municipal policy." *Hutcheson v. Dallas Cnty., Texas*, 994 F.3d 477, 482 (5th Cir. 2021) (citation omitted). Specifically, "[a] plaintiff must identify '(1) an official policy (or custom), of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose moving force is that policy (or custom).'" *Id.* (quoting *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002) (cleaned up)). Critically, "[m]unicipalities are not liable 'on the theory of *respondeat superior*' and are 'almost never liable for an isolated unconstitutional act on the part of an employee.'" *Id.* (quoting *Peterson v. City of Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009)).[18]

## III. LAW AND ANALYSIS

Applying these pleading standards and legal principles to Mr. Juluke's amended allegations, the Court summarizes the parties' contentions to frame the issue: whether Juluke's amended allegations suffice to state plausible official-capacity claims against Williams.

[18] In contrast, "[p]ersonal-capacity suits seek to impose individual liability upon a government officer for actions taken under color of state law." *Hafer*, 502 U.S. at 25 (citation omitted). Thus, "[o]n the merits, to establish personal liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." *Id.* (plaintiff pursuing individual capacity claim need not establish a connection to governmental "policy or custom"). Another distinction of consequence: "officials sued in their personal capacities, unlike those sued in their official capacities, may assert personal immunity defenses such as objectively reasonable reliance on existing law." *Id.* (citation omitted); *see also Burge v. Parish of St. Tammany*, 187 F.3d 452, 466 (5th Cir. 1999) (citation omitted).

**A. The Parties' Contentions**

As before, Williams assumes for the purposes of his motion that Juluke has alleged a *Brady* violation and moves to dismiss Mr. Juluke's claims for failure to adequately allege an unconstitutional official policy or deliberate indifference or the moving-force element. Williams contends that, despite adding 15 paragraphs in an attempt to allege an unconstitutional official policy or pattern and practice, Juluke still fails to state a *Monell* theory of liability. Williams contests Juluke's amended allegations, contending for example that several purported pattern-and-practice cases do not involve a finding of unconstitutional non-disclosure, another 10 did not occur until after Juluke's 1996 conviction, and Juluke's allegations that *Brady* violations occurred over several decades at a rate of less than one per year fail for lack of proper contextualizing facts and "hardly demonstrates an unconstitutional official policy." Williams further contends that Juluke fails to identify any Assistant District Attorneys who worked on his case and alleges no plausible basis to conclude that the alleged withholding of evidence in his case is attributable to OPDA's official policies.[19]

Opposing dismissal, Juluke advances several arguments that he contends support denying Williams' motion to dismiss. First, Juluke contends that he remedied the deficiencies previously identified. Instead of alleging without sufficient description 13 published decisions involving *Brady* violations over a 36-year span, he contends that he added the "considerable factual detail" included in his prior

[19] *See generally* ECF No. 163.

opposition to his second amended complaint, including "an abundance of factual detail" and "detailed descriptions of 23 published decisions involving" similar *Brady* violations.

Second, Juluke contends that inclusion of summary statistics from reviews of OPDA's *Brady* violations during the relevant time period provides additional relevant factual detail the Court previously found wanting. One such study concluded that *Brady* material was withheld in 25% of capital cases and 76% of non-capital cases in which allegations of suppression were made. Third, Juluke adds allegations in his second amended complaint that the OPDA had a facially unconstitutional written policy governing *Brady*, which instructed prosecutors to only consider *Brady* disclosure in response to a defense request or court order. Finally, Juluke urges the Court to disregard Williams' "attempts to nitpick" his *Monell* allegations because Williams should not be permitted to raise the bar on pleading. Rather, Juluke contends that his amended allegations comport with those which other sections of this Court have determined withstand OPDA's motions to dismiss. Juluke urges the Court to deny Williams' motion because he now plausibly alleges a pattern and practice of violations (by alleging numerous *Brady* violations with factual specificity) as well as deliberate indifference and the requisite causation.[20]

In reply, Williams advances three arguments. First, he contends that Juluke "has not shown that OPDA had a facially unconstitutional policy." Williams contends that Mr. Juluke's allegations "misrepresent[ ] what the policy manual actually said"

---

[20] *See generally* ECF No. 177.

and submits as an exhibit the OPDA policy manual's paragraph pertaining to *Brady* material, which Williams insists "does not compel or affirmatively authorize prosecutors to suppress *Brady* evidence" and thus the policy "is not facially unconstitutional." Second, Williams continues to press his argument that Mr. Juluke has not adequately alleged that OPDA's policymaker had actual or constructive notice of a pattern of similar constitutional violations demonstrating an unconstitutional unwritten, de facto policy. Though Williams concedes that Mr. Juluke alleges that OPDA had "at least 18 *Brady* violations" between October 1992 and August 1997 and "13 reversals of convictions . . . because of *Brady* violations" between May 1991 and October 1996, Williams submits that "[t]he actual numbers of alleged *Brady* violations and reversals listed in the Complaint are significantly lower[ a]nd some are irrelevant[.]" Williams submits that for the same reasons provided by this Court in its prior Order and Reasons, the *Brady* decisions identified by Mr. Juluke are insufficient as a matter of law to demonstrate that the OPDA had actual or constructive knowledge of a persistent unwritten policy in his office that was causing repeated constitutional violations through suppression of exculpatory evidence. Finally, Williams contends that Juluke still fails to allege that the OPDA's policies were the "moving force" causing a constitutional violation in his criminal case.[21]

**B. Municipal Liability**

Section 1983 permits Juluke to sue "[e]very person" who violates his federal rights "under color of any statute, ordinance, regulation, custom, or usage." 42 U.S.C.

---

[21] ECF No. 180.

§ 1983; *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). "Municipalities, which include counties and certain other local governmental bodies, are 'persons' under Section 1983." *Daves v. Dallas Cnty.*, 22 F.4th 522, 532 (5th Cir. 2022) (en banc); *Monell*, 436 U.S. at 690 & n.54.

To establish municipal liability—a *Monell* claim—the plaintiff "must show the deprivation of a federally protected right caused by action taken pursuant to an official municipal policy" or custom. *Valle v. City of Houston*, 613 F.3d 536, 541 (5th Cir. 2010); *Monell*, 436 U.S. at 690-91. Under *Monell*, the governmental entity is liable under § 1983 only when the entity itself caused the constitutional violation. 436 U.S. at 694; *see also City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (observing that "[i]t is only when the execution of the government's policy or custom inflicts the injury that the municipality may be held liable under §1983"). Municipalities are not liable under a *respondeat superior* theory and are "almost never liable for an isolated unconstitutional act on the part of an employee." *Peterson v. City of Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009).

A plaintiff may sue under Section 1983 "those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have cause the particular constitutional . . . violation at issue." *Jett v. Dall. Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989). Juluke's Section 1983 *Brady* claim against the district attorney in his official capacity is thus analyzed under the *Monell* doctrine. *Truvia v. Connick*, 577 F. App'x 317, 322 (5th Cir. 2014); *see also Burge v. Par. of St. Tammany*, 187 F.3d 452, 470 (5th Cir. 1999) ("[T]he

district attorney's office resembles other local government entities[.]") To establish OPDA's liability under Section 1983, Juluke must allege "that action pursuant to official municipal policy caused [his] injury." *Id.* (citing *Connick v. Thompson*, 536 U.S. 51, 60 (2011)). "Official municipal policy includes . . . acts of [ ] policymaking officials, [or] practices so persistent and widespread as to practically have the force of law." *Connick*, 536 U.S. at 61. "Under *Brady*, a local government entity, including a district attorney's office . . . deprives a criminal defendant of his right to due process when it suppresses or withholds evidence that is both favorable to the defendant and material to this defense." *Truvia*, 577 F. App'x at 321-22 (citing Smith v. Cain, 565 U.S. 73, 75 (2012)).

For purposes of Williams' Rule 12(b)(6) motion to dismiss, the local governmental actor is the OPDA, and the action alleged to have caused the particular constitutional violation is the OPDA's alleged policy, pattern, practice, and/or custom of withholding and/or suppressing material exculpatory evidence from citizens like Juluke.

To hold the OPDA liable under *Monell*, Plaintiff must establish three elements: "(1) a policymaker; (2) an official policy; and (3) a violation of a constitutional right whose 'moving forc'e is the policy or custom.*"* *Alvarez v. City of Brownsville*, 904 F.3d 382, 389 (5th Cir. 2018) (en banc) (citations omitted). More specifically, "[a] plaintiff must identify '(1) an official policy (or custom), of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose moving force is that policy (or custom).'" *Hutcheson v. Dallas Cnty., Texas*, 994

F.3d 477, 482 (5th Cir. 2021) (quoting *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002) (cleaned up)).

**C. Plaintiff Has Stated a Plausible *Monell* Claim (Count 8).**

To withstand dismissal of his *Monell* claim against OPDA, Juluke must identify a policymaker and an official policy that was the moving force behind the alleged constitutional violation. "An official policy 'usually exists in the form of written policy statements, ordinances, or regulations, but may also arise in the form of a widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy." *Alvarez*, 904 F.3d at 389-90 (citations omitted). If proceeding on the latter theory of widespread practice or custom, then

> [a]ctual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority. Actions of officers or employees of a municipality do not render the municipality liable under § 1983 unless they execute official policy as above defined.

*Armstrong v. Ashley*, 60 F.4th 262, 276 (5th Cir. 2023) (citation omitted). Where a plaintiff must "rely on a custom or practice so common and well settled as to constitute a custom that fairly represents municipal policy[,]" *id.*, in order to plausibly plead such a custom, pattern, or practice, the plaintiff "must do more than describe the incident that gave rise to his injury." *Johnson v. Harris Cnty.*, 83 F.4th 941, 946 (5th Cir. 2023) (quotation and citation omitted). The plaintiff's "description of the challenged" *Brady* practices "cannot be conclusory; it must contain specific facts." *Id.* (quotation and citation omitted). "And those specific facts must be similar to the case at hand[.]" *Id.* at 496-97.

**1. Juluke Plausibly Has Alleged that Connick Was the Final OPDA Policymaker.**

As the Court previously observed, the "specific identity" of the OPDA "policymaker is a legal question that need not be pled[.]" *Groden v. City of Dall.*, 826 F.3d 280, 284 (5th Cir. 2016). Juluke must "allege facts that show an official policy, promulgated or ratified by the policymaker, under which the [OPDA] is said to be liable." *Id.*

In his second amended complaint, Juluke alleges that Harry F. Connick, Sr. served as District Attorney at OPDA from early 1974 until 2003 and that "[h]e was a responsible policymaker for all policies at OPDA, including evidentiary disclosure and *Brady* policies"; that Connick "was responsible for training, supervision, and discipline of line attorneys at OPDA"; and that Jason Williams is sued as Connick's successor in his official capacity in relation to the policies, patterns, practices, and/or customs of the OPDA causing Plaintiff's injury.[22]

Though Juluke failed in his prior complaint to include well-pleaded facts from which the Court could plausibly infer that an OPDA policymaker promulgated the challenged *Brady* policies or practices, *see* ECF No. 153 at 6-7, in his second amended complaint, Juluke adequately alleges that Connick was the Orleans Parish District Attorney when Juluke was convicted, and that Connick approved and/or is responsible for the *Brady* policies and practices Juluke challenges, which suffices to plead facts plausibly establishing the "policymaker" element of *Monell* liability.

[22] *See* ECF No. 160 ¶¶ 24, 121.

*Accord Walter v. City of New Orleans*, No. 23-4352, 2026 WL 71306, at *6-7 (E.D. La. Jan. 9, 2026) (Morgan, J.) (finding that the plaintiff in his amended complaint sufficiently alleged the municipal policymaker element); *Davis v. City of New Orleans*, No. 24-1870, 2025 WL 1837468, at *8 (E.D. La. July 3, 2025) (Milazzo, J.) (same); *Moses v. City of New Orleans*, No. 24-1768, 2025 WL 816296, at *7 (E.D. La. March 14, 2025) (Ashe, J.) (same); *Flanks v. City of New Orleans*, No. 23-6897, 2025 WL 660037, at *7-8 (E.D. La. Feb. 28, 2025) (Brown, J.) (same). Having identified the policymaker who could be held responsible through actual or constructive knowledge for enforcing a policy that caused his constitutional injuries, the Court turns to consider whether Juluke sufficiently has alleged the other elements of *Monell* liability.

**2. Juluke Plausibly Has Alleged that the Policymaker Had Actual or Constructive Knowledge of an Official Policy, Practice, or Custom of Similar Constitutional Violations.**

On at least four recent occasions in other sections of Court, plaintiff-exonerees have amended their previously deficient complaints in order to plausibly plead a custom, pattern, or practice of *Brady* violations sufficiently common and well settled as to fairly represent OPDA policy. *See generally Walter v. City of New Orleans*, No. 23-4352, 2026 WL 71306, at *6-7 (E.D. La. Jan. 9, 2026) (Morgan, J.); *Davis v. City of New Orleans*, No. 24-1870, 2025 WL 1837468, at *8 (E.D. La. July 3, 2025) (Milazzo, J.); *Moses v. City of New Orleans*, No. 24-1768, 2025 WL 816296, at *7 (E.D. La. March 14, 2025) (Ashe, J.); *Flanks v. City of New Orleans*, No. 23-6897, 2025 WL 660037, at *7-8 (E.D. La. Feb. 28, 2025) (Brown, J). Juluke's amended allegations comport with

the revised allegations in these other amended complaints and comply with this Court's prior admonition that greater factual detail concerning OPDA's pattern and practice of withholding *Brady* evidence in order to obtain convictions be provided in any amendment. Accordingly, just as in *Walter*, *Davis*, *Moses*, and *Flanks*, Juluke's second amended complaint withstands Williams' motion to dismiss. Juluke has alleged sufficient facts to plausibly indicate that Connick had actual or constructive knowledge of an official policy, practice, or custom of similar constitutional violations. He has adequately pled the "policy" or "custom" plus "deliberate indifference" element of his *Monell* claim.

As indicated, "[o]fficial municipal policies can take various forms." *Gomez v. Galman*, 18 F.4th 769, 777 (5th Cir. 2021) (per curiam). "They often appear as written policies, but an official policy may also be an unwritten but 'widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy." *Id.* (citation omitted). To plausibly plead a custom, pattern, or practice that fairly represents OPDA policy, Juluke must describe the incident giving rise to his injury as well as describe the challenged *Brady* practices in detailed—rather than conclusory—terms. *Johnson v. Harris Cnty.*, 83 F.4th 491, 496 (5th Cir. 2023) (quotation and citation omitted). The specific facts alleged must be similar to the constitutional injury of which he complains. *Id.*

As a threshold matter, the parties clash over whether Juluke has identified an official written policy instructing OPDA prosecutors to withhold exculpatory evidence sufficient to dispense his obligation to allege deliberate indifference.

"An official, written policy is 'itself' unconstitutional only if it affirmatively allows or compels unconstitutional conduct." *Edwards v. City of Balch Springs*, 70 F.4th 302, 309 (5th Cir. 2023). Notably, a "facially unconstitutional policy's mere existence satisfies the moving-force requirement that is *Monell*'s third element." *See id.* at 308; *see also Groden v. City of Dallas*, 826 F.3d 280, 286 (5th Cir. 2016) ("If the city had a policy of arresting people without probable cause in retaliation for annoying-but-protected speech, such a policy would be unconstitutional . . . since Groden has alleged that the city had exactly this policy, he successfully alleged that the city had an unconstitutional policy, and the district court erred by dismissing his complaint on that ground."); *see also Doe v. United States*, 831 F.3d 309, 318 (5th Cir. 2016) ("Where the claim is that the policy 'itself violates federal law, or directs an employee to do so,' it is unnecessary to prove a heightened level of culpability on the part of the policymakers."). A "facially innocuous policy[,]" on the other hand, "will support liability only if it was promulgated with deliberate indifference to the known or obvious consequences that constitutional violations would result." *Edwards*, 70 F.4th at 308 (internal quotations and citations omitted).

Juluke first contends that the Court should deny OPDA's motion because, in light of the alleged facially unconstitutional *Brady* policy identified in the second amended complaint, the Court need not reach the deliberate indifference or causation elements. In his second amended complaint, Juluke alleges that the OPDA had a formal written *Brady* policy that was inaccurate and facilitated constitutional violations insofar as it incorrectly indicated that the *Brady* disclosure obligation was

implicated only by court-order or when demanded by the defense and insofar as the written policy failed to require that a prosecutor turn over impeachment evidence. Juluke also alleges that Connick failed to supervise, train, or discipline prosecutors with respect to their *Brady* obligations.[23]

For the first time in his reply, Williams provides and submits what he contends is the actual written policy and argues that review of the written policy essentially disproves Juluke's allegations. The Court declines to indulge Williams' invitation to assess the submitted written *Brady* policy at the pleading stage in order to determine whether Juluke's allegations misrepresent the OPDA policy's terms. Regardless, considering Juluke's allegations respecting the written policy, Juluke stops short of alleging that the written policy was facially unconstitutional (*i.e.,* that it directed OPDA prosecutors to withhold evidence or otherwise violate accuseds' constitutional rights under *Brady*).[24] Accordingly, it is not appropriate to dispense with the deliberate indifference requirement in assessing whether Juluke has stated a plausible claim. Instead, the Court considers whether these allegations of an inadequate or misleading written policy and failure to train, supervise, or discipline coupled with Juluke's other pattern-and-practice allegations suffice to state a claim that OPDA had a custom, pattern, or practice of *Brady* violations and that such pattern of similar violations conferred knowledge sufficient to implicate the

[23] ECF No. 160 ¶¶ 122-24.

[24] The Court need not resolve whether, as Juluke argues, the OPDA's written policy affirmatively allowed or compelled unconstitutional conduct given the policy's alleged "affirmative misstatements of law." *Compare* ECF No. 177 *with* ECF No. 180 (arguing that Juluke "has not shown that OPDA had a facially unconstitutional policy").

deliberate indifference component of such claims. Such "[a] pattern requires similarity, specificity, and sufficiently numerous prior incidents." *Armstong*, 60 F.4th at 276 (quoting *Davidson v. City of Stafford, Tex.*, 848 F.3d 384, 396 (5th Cir. 2017)).

To this end, Juluke has added 15 paragraphs to the second amended complaint to support his pattern-and-practice theory of *Monell* liability based on OPDA's *Brady* violations. Juluke alleges that the OPDA maintained a deficient written policy, failed to train, supervise, or discipline prosecutors, and had a policy of not tracking *Brady* violations but instead only tracking prosecutor "wins." Juluke cites other courts' observations of OPDA's "storied, shameful history of" *Brady* noncompliance and statistics of *Brady* violations, including IPNO's review of non-capital cases during Connick's tenure in which 76% of courts found evidence favorable to the defendant had been withheld. Additionally, Juluke alleges "at least 18 *Brady* violations" between October 1992 and August 1997 and "13 reversals of convictions . . . because of *Brady* violations" between May 1991 and October 1996. All told, Juluke summarizes 23 cases concerning OPDA prosecutions occurring during a 24-year period in which he alleges *Brady* violations occurred. Indeed, Juluke alleges that the majority of these (17 of the 23) involved withheld evidence relating to the validity of eyewitness identifications, which is the sort of evidence Juluke alleges OPDA failed to turn over to him, despite the otherwise thin and flimsy case file.[25]

As other sections of Court have determined, descriptions of constitutional violations in prior cases are factual allegations which, at this stage, the Court takes

---

[25] ECF No. 160 ¶¶ 118-136.

as true. *See, e.g., Flanks*, 2025 WL 660037, at *11 n. 169. Taken together and viewing these alleged facts in the light most favorable to him, Juluke has alleged sufficient facts that plausibly indicate that the OPDA had a municipal custom, or engaged in a pattern and practice, of withholding evidence in violation of its *Brady* obligations. Juluke's allegations of OPDA *Brady* violations are sufficiently similar and numerous that they sufficed to place Connick on notice of such violations and the need to train, supervise, or discipline prosecutors, thus plausibly reflecting alleged municipal deliberate indifference to the constitutional violation alleged in the instant case. These alleged *Brady* violations identified by Juluke occurring during Connick's tenure as OPDA were numerous and detailed enough to plausibly indicate a pattern-and-practice or custom. Following other sections of Court, adopting Judge Brown's analysis in *Flanks*, the Court finds that "[a]t this motion-to-dismiss stage, [Juluke's detailed] listing constitutes a plausible allegation that the OPDA had a custom of nondisclosure of favorable evidence, as would violate *Brady*, with Connick on constructive or actual notice of such violations—including the need to train, supervise, and discipline prosecutors—as to reflect his deliberate indifference." *See, e.g., Davis*, 2025 WL 1837468, at *9 and n.64 (citing *Flanks*, 2025 WL 660037, at *8-10).

Williams' nits challenging the number and similarity of the alleged pattern of *Brady* violations notwithstanding, qualitatively and quantitatively, Juluke's amended allegations withstand dismissal. The specificity and relevance of Plaintiff's amended allegations satisfy the plausibility standard—Juluke has alleged that the

OPDA's pattern of similar violations of withholding *Brady* evidence from criminal defendants was so widespread as to confer knowledge on Connick such that the allegations compel the inference at this stage that the *Brady* policy or pattern was implemented with deliberate indifference to the known or obvious consequences that wrongful convictions would result. *Accord Walter*, 2026 WL 71306, at *6-7 (denying motion to dismiss, finding that the plaintiff sufficiently pleaded that Connick was aware of OPDA's custom or practice of failing to train its employees on their *Brady* obligations and observing that "[i]n response to the Court's instruction, Plaintiff provided significantly greater factual detail as to the 10 cases with conviction dates as well as findings of *Brady* violations prior to the date of Plaintiff's own conviction, which span the years 1968 to 1986 [and] Plaintiff provides detailed allegations of 26 other cases in which the state suppressed and/or withheld exculpatory evidence"); *Davis*, 2025 WL 1837468, at *8 (denying motion to dismiss, observing that "[i]n his Complaint, Plaintiff cites more than 30 convictions obtained by OPDA prosecutors in which a *Brady* violation was subsequently found[,] with at least 18 of these convictions occurring in the 16 years preceding Plaintiff's conviction in 1983"); *Moses*, 2025 WL 816296, at *7 (denying motion to dismiss, holding that the plaintiff "lists 30 OPDA prosecutions [over a 28-year period] in which he says *Brady* violations occurred, including instances from 1967, up to and including 1995, when he was tried[,]" which at the pleading stage "constitutes a plausible allegation that the OPDA had a custom of nondisclosure of favorable evidence, as would violate *Brady*, with Connick on constructive or actual notice of such violations . . . as to reflect his

deliberate indifference"); *Flanks*, 2025 WL 660037, at *7-8 (observing that, by listing 26 *Brady* violations in an 18-year period, the plaintiff "points to a much greater number of cases in similar timespans to both *Thompson* and *Armstrong*" and that the "large number of cases cited" suffices to allege "a custom of *Brady* violations in the OPDA with Connick on constructive or actual notice of these violations, thus alleging Connick was deliberately indifferent to the need to train, supervise, and discipline prosecutors").

Williams insists that dismissal is appropriate because Juluke inadequately alleges that OPDA could have had sufficient knowledge to act with deliberate indifference in relation to its *Brady* policies. Not so, as addressed above. "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick*, 563 U.S. at 61 (quotation and citation omitted). Ordinarily, "a plaintiff must show a pattern of similar violations to establish deliberate indifference." *Sligh v. City of Conroe*, 87 F.4th 290, 302 (5th Cir. 2023) (quotation and citation omitted). For the same reasons that the Court finds that Juluke plausibly pleads a custom, pattern, or practice of sufficiently similar *Brady* violations by OPDA for purposes of *Monell*'s "policy" requirement, Juluke plausibly pleads a "pattern of similar [*Brady*] violations" by OPDA for purposes of the deliberate-indifference requirement. *See id.* (quotation and citation omitted). Moreover, though Williams insists that any *Brady* violations that had not yet been revealed by the time Juluke was tried could not confer constructive notice to the policymaker, other sections of this Court have disagreed and concluded

that such violations need not be identical to those in Juluke's case and not all need to have been publicly discovered before Juluke's trial to demonstrate constructive notice to the policymaker. *See, e.g., Moses*, 2025 WL 816296, at *7 (citing *Flanks*, 2025 WL 660037, at *10-11).

**3. Juluke Plausibly Has Alleged that OPDA's Policy or Practice Was the Moving force Behind the Alleged Constitutional Violation.**

To meet the "moving force" element, Juluke must plead facts plausibly establishing "a direct causal link" between OPDA's *Brady* policies and his "constitutional injury." *Valle v. City of Hous.*, 613 F.3d 536, 546 (5th Cir. 2010) (quotation and citation omitted). In his second amended complaint, Juluke plausibly pleads a "policymaker" and "policy" on the part of the OPDA, and he likewise pleads facts sufficient to indicate that any such allegedly unconstitutional "policy" was the "moving force" behind his constitutional injury.

Considering the number and similarity of alleged *Brady* violations alleged during Connick's tenure, Juluke has alleged sufficient nature and quantity of facts at this stage to allege that OPDA's policy, pattern, or custom—deliberately withholding favorable material from the defense—was the moving force behind Juluke's wrongful conviction and incarceration, the alleged constitutional violation. Juluke's allegations satisfy the pleading-stage causal link between the policy and the constitutional violation. *See, e.g.*, *Moses*, 2025 WL 816296, at *7; *Davis*, 2025 WL 1837468, at *10; *Flanks*, 2025 WL 660037, at *12.

### D. Civil-Rights-Conspiracy Claim (Count 9)

Finally, Williams contends that Juluke, again, fails to state a Section 1983 civil-rights-conspiracy claim. To state a Section 1983 civil-rights-conspiracy claim, Juluke must plead facts plausibly establishing "(1) the existence of a conspiracy involving state action and (2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy." *Armstrong*, 60 F.4th at 280 (quotation and citation omitted). "Conclusory allegations that do not reference specific factual allegations tending to show an agreement do not suffice to state a civil rights conspiracy claim under § 1983." *Montgomery v. Wilson*, 759 F. App'x 312, 314 (5th Cir. 2019) (per curiam) (citation omitted).

Juluke concedes that, absent discovery, he "is unable to do more to plead the details of an agreement between OPDA and Defendants to withhold exculpatory evidence." He thus "concedes dismissal" of this claim. Accordingly, Williams' motion to dismiss the civil-rights-conspiracy claim will be granted.

## IV. CONCLUSION

**IT IS ORDERED** that the motion[26] to dismiss is **GRANTED IN PART** (insofar as Juluke's civil-rights conspiracy claim is hereby dismissed as to Williams) **AND DENIED IN PART** (insofar as Juluke's *Monell* claim based on the failure to disclose *Brady* material survives dismissal).

[26] ECF No. 163.

New Orleans, Louisiana, this 24th day of September, 2026.

BRANDON S. LONG
UNITED STATES DISTRICT JUDGE